IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

PRISON LEGAL NEWS,                              )
a project of the HUMAN RIGHTS DEFENSE           )
CENTER, a not-for-profit, Washington            )
charitable corporation,                          )
                                                 )
                    Plaintiff,                    )
                                                 )
v.                                               )
                                                 )          Case No: 4:12-cv-239-MW/CAS
THE GEO GROUP, INC., a Florida Corporation,)
CORRECTIONS CORPORATION OF                      )
AMERICA, a Tennessee Corporation, registered )
in and doing business in the state of Florida, and )
KENNETH S. TUCKER, in his official capacity )
as Secretary of the Florida Department of        )
Corrections,                                     )
                                                 )
                    Defendants.                   )
_____)

_____

Amicus Curiae Brief of The Florida Press Association,
The First Amendment Foundation, The Reporters' Committee
for Freedom of the Press, the Society of Professional Journalists
and Allied Daily Newspapers of Washington re Summary Judgment

_____

Thomas R. Julin & Jamie Z. Isani
Florida Bar Nos. 325376 & 728861

Hunton & Williams LLP
Attorneys for the Amici Curiae
1111 Brickell Avenue – Suite 2500
Miami, FL 33131
305.810.2516 Fax 1601
tjulin or jisani@hunton.com

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................1

INTEREST OF THE AMICI CURIAE ............................................................1

ARGUMENT .............................................................................................6

    I.    The Rule Does Not Meet the Substantive
    Requirements of *Turner v. Safley* ......................................................6

    II.   The Rule Lacks Procedural Safeguards &
    Criteria To Prevent its Use for Improper Censorship ...........................14

        A.     The Rule Lacks Required Procedural Safeguards .....................14

        B.     The Rule Lacks Sufficiently Specific Guidelines to
            Prevent its Use to Censor the Contents of *Prison Legal News* .................16

CONCLUSION..........................................................................................20

CERTIFICATE OF SERVICE ......................................................................v

TABLE OF AUTHORITIES

Page(s)

Cases

*Atlanta Journal & Constitution v. City of Atlanta Department of Aviation,*
    322 F.3d 1298 (11th Cir. 2003) (en banc) ..................................................18

*Barrett v. Orman,*
    373 Fed. Appx. 823 (10th Cir. 2010).........................................................14

*Beard v. Banks,*
    548 U.S. 521 (2006)......................................................................................9

*Bigelow v. Virginia,*
    421 U.S. 809 (1975)......................................................................11, 12, 13

*City of Lakewood v. Plain Dealer Publishing Co.,*
    486 U.S. 750 (1988).............................................................................17, 18

*Florida Prison News v. Crosby,*
    No 3:04-cv-14-J-16TEM (M.D. Fla. July 28, 2005).....................................4

*Freedman v. Maryland,*
    380 U.S. 51 (1965)......................................................................................17

*Gold Coast Publications, Inc. v. Corrigan,*
    42 F.3d 1336 ...............................................................................................18

*Grayned v. City of Rockford,*
    408 US 104 (1972).......................................................................................17

*Harrell v. The Florida Bar,*
    608 F.3d 1241 (11th Cir. 2010) ............................................................18, 19

*High Ol' Times v. Busbee,*
    456 F. Supp. 1035 (N.D. Ga. 1978)............................................................12

*International Society for Krishna Consciousness v. Eaves,*
    601 F.2d 809 (5th Cir. 1979) ......................................................................19

*Jones v. North Carolina Prisoners' Labor Union, Inc.,*
    433 U.S. 119 (1977).............................................................................15, 16

*Jucklovich v. Simmons,*
    392 F.3d 420 (10th Cir. 2004) ...................................................................15

ii

*Lawson v. Singletary,*
    85 F. 3d 502 (11th Cir. 1996) ................................................................7, 8

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)................................................................................15

*Miami Herald Publ'g Co. v. City of Hallandale,*
    734 F.2d 666 (11th Cir. 1984) ...............................................................18

*Miniken v. Walter,*
    978 F. Supp. 1356 (E.D. Wash. 1997) .....................................................9

*Pell v. Procunier,*
    417 U.S. 817 (1974)..................................................................................7

*Perry v. Secretary, Florida Department of Corrections,*
    664 F.3d 1359 (11th Cir. 2011) ...................................................... passim

*Prison Legal News v. Columbia County,*
    No. Case No.: 3:12-cv-00071-SI, 2012 WL 1936108 (D. Ore. May 29, 2012) ...........9

*Prison Legal News v. Cook,*
    238 F.3d 1145 (9th Cir. 2001) .................................................................8

*Prison Legal News v. Lehman,*
    397 F.3d 692 (9th Cir. 2005) ...................................................................8

*Prison Legal News v. McDonough,*
    200 Fed. Appx. 873 (11th Cir. 2006)............................................4, 5, 9, 15

*Procunier v. Martinez,*
    416 U.S. 396 (1974)......................................................................7, 14, 15, 16

*Rios v. Lane,*
    812 F.2d 1032 (7th Cir. 1987) ...............................................................17

*Sentinel Commications Co. v. Watts,*
    936 F.2d 1189 (11th Cir.1991) ...............................................................18

*Shaw v. Murphy,*
    532 U.S. 223 (2001)..................................................................................7

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011)........................................................................2, 11

HUNTON & WILLIAMS LLP

*Thornburgh v. Abbott,*
 490 U.S. 401 (1989) .................................................................................7, 8, 15

*Turner v. Safley,*
 482 U.S. 78 (1987) ................................................................................ *passim*


Constitutional Provisions & Rules

U.S. Const. amend. I ................................................................................ *passim*

Florida Administrative Code §33-501.401(3) ............................................................1, 20


Other Authorities

http://en.wikipedia.org/wiki/List_of_dry_communities_ by_U.S._state ..........................12

http://www.myfloridalicense.com/dbpr/pmw/track.html ...................................12

http://www.writeaprisoner.com/why-write-a-prisoner/default.aspx .................................13

HUNTON & WILLIAMS LLP

## INTRODUCTION

This brief is filed for the Florida Press Association, the First Amendment Foundation, the Reporters' Committee for Freedom of the Press, the Society of Professional Journalists, and Allied Newspapers of Washington as *amicus curiae.*

The rule at issue, Florida Administrative Code §33-501.401(3), is targeted squarely at the content of advertising, the rule previously has been found not to achieve any legitimate penological objectives, and the rule imposes such flexible restrictions on the manner of presentation of that advertising that it may be used to censor the content of not only the advertising, but all other aspects of publications, including noncommercial editorial content. The state cannot show the rule satisfies the standards that the First Amendment imposes to limit the discretion of the state to impose restrictions on communications with prisoners in this way.

## INTEREST OF THE AMICI CURIAE

The Florida Press Association was founded in 1879 as a nonprofit corporation to protect the freedoms and advance the professional standards of the press of Florida. The First Amendment Foundation advocates for government openness and transparency which is critical to citizen trust and involvement in a democratic society. For more than 40 years, the Reporters' Committee for Freedom of the Press has provided free legal advice, resources, support and advocacy to protect the First Amendment and Freedom of Information rights of journalists working in areas where U.S. law applies, regardless of the medium in which their work appears. The Society of Professional Journalists has been an industry leader for more than 100 years. The Society both nationally and through

250 local chapters, fights battles for First Amendment rights that might not otherwise be fought.

Allied Daily Newspapers of Washington is a trade association for newspapers including *The Seattle Times*. Its interest in this case arises from the fact that Paul Wright, editor and co-founder of *Prison Legal News* was imprisoned for 17 years in Washington State until his release in 2003. Mr. Wright founded *Prison Legal News* in 1990 while imprisoned. Since then he has successfully litigated a wide variety of censorship issues against prison systems, benefitting the public and the press generally. He is a 2007 recipient of the James Madison Award from the Washington Coalition for Open Government.

Although this case involves prison regulations and the regulations at issue have a particularly harsh impact on those publications such as *Prison Legal News* that specialize in serving the prison community, the case also is of great important to the amici for a variety of reasons as well.

First, advertising often is as important to readers as editorial content. In some instances, the advertising is of even greater importance because it informs readers not just about the availability of products and services they may wish to buy, but it advises them of products and services that allow readers to improve themselves and their communities. The advertising also often helps advertisers to reach a mass market for their products and services, keeping costs low and achieving vital efficiencies that help the economy. As stated recently in *Sorrell v. IMS Health Inc.,* 131 S. Ct. 2653, 2664 (2011), "a 'consumer's concern for the free flow of commercial speech often may be far keener than

his concern for urgent political dialogue'" and in some instances commercial speech "can save lives."

Second, members of the amici are themselves directly threatened by the regulation at issue because they also may distribute publications such as *The Tallahassee Democrat,* the *Gainesville Sun, The Miami Herald* and many others within the Florida prison system and their publications also are subject to the restrictions imposed on the plaintiff's publication. Their publications also carry advertising for many goods and services, including telephone and other communications services that prisoners might wish to use now or in the future but are currently prohibited from using. If the prisons fail to follow existing rules that require notice of impoundment to be given to a publisher whenever a prison intercepts a publication, publishers will be denied an opportunity to challenge the decision. State compliance with notice requirements is vital to the protection of the speech rights of the plaintiff and the amici's members.

Third, government regulation of advertising often poses a direct threat to the ability of the press to report the news and information that is of public importance when the regulations are so flexible that they can be used to punish criticism of the government or the reporting of news that leads to criticism of the government. Unless government discretion to regulate advertising is appropriately circumscribed, the discretion may be used for purposes of censorship forbidden by the First Amendment.

Fourth, the history of this case shows that serious dangers to First Amendment principles are created when the federal courts decline to adjudicate the constitutionality of regulations because the state temporarily has halted enforcement of those regulations.

Prison Legal News filed a similar action in 2004 seeking a declaration that the Florida Department of Corrections (FDOC) violated the First Amendment by (1) refusing to allow delivery of its magazine to prisoners because it contained ads for three-way calling services and pen-pal services and allowed subscriptions to be purchased with postage stamps, and (2) prohibiting prisoners from accepting compensation for articles they wrote for newspapers and magazines.   *See Florida Prison News v. Crosby,* No 3:04-cv-14-J-16TEM (M.D. Fla. July 28, 2005) (DE-87 at 2-3).   In reaction to the suit, FDOC amended its rules effective March 16, 2005, to provide that a publication such as *Prison Legal News* would not be rejected based on its inclusion of the restricted advertisements for prohibited products or services, as long as those advertisements were 'merely incidental to, rather than being the focus of, the publication.'"   *Id.* at 8-9 ¶¶18-19.   After the amendment, the FDOC then allowed distribution of *Prison Legal News* to continue.

Prison Legal News insisted that the amended rule posed a continuing threat to it notwithstanding that its distribution was being permitted.   U.S. District Judge John H. Moore, II, conducted a three-day bench trial and found that the FDOC's prior prohibition of distribution served no governmental purpose whatsoever because FDOC could stop the inmates from using the advertised services whether they saw advertising for them or not. *Id.* at 14-15.   But, Judge Moore also entered judgment as a matter of law for FDOC because it was no longer prohibiting distribution of *Prison Legal News*.  *Id.* at 16.   The Eleventh Circuit agreed that FDOC mooted the challenge by adopting an amended regulation and then not invoking it to prohibit further distribution.  *Prison Legal News v. McDonough,* 200 Fed. Appx. 873, 877-78 (11th Cir. 2006).   The Eleventh Circuit agreed

4

with the district court that the FDOC had shown "'no intent to ban PLN based solely on the advertising content at issue in this case' in the future." *Id.* at 878.  But the Eleventh Circuit added: "We have no expectation that FDOC will resume the practice of impounding publications based on incidental advertisements.  As to the current rule, we offer no opinion on its constitutionality." *Id.*  This ruling allowed FDOC to escape an adjudication that its amended rule violates the First Amendment.  In light of this history and FDOC's renewed invocation of the rule, as it was amended further in 2009,[1] the Court should not shy away from ruling on the constitutionality of the rule, whether

---

[1]   The amended rule now provides:

(3)   Inmates shall be permitted to receive and possess publications per terms and conditions established in this rule unless the publication is found to be detrimental to the security, order or disciplinary or rehabilitative interests of any institution of the department, or any privately operated institution housing inmates committed to the custody of the department, or when it is determined that the publication might facilitate criminal activity. Publications shall be rejected when one of the following criteria is met:

*          *          *

(l)   It contains an advertisement promoting any of the following where the advertisement is the focus of, rather than being incidental to, the publication or the advertising is prominent or prevalent throughout the publication.

1.   Three-way calling services;

2.   Pen pal services;

3.   The purchase of products or services with postage stamps; or

4.   Conducting a business or profession while incarcerated.

(m) It otherwise presents a threat to the security, order or rehabilitative objectives of the correctional system or to the safety of any person.

5

FDOC continues its enforcement throughout this litigation or not.  The 2009 amendment exacerbates the problems with the 2005 rule by banning possession not only of publications containing non-incidental restricted advertising, but also banning those that containing restricted ads that are either "prominent" or "prevalent" throughout the publication.  Now that the FDOC has resumed impounding and rejecting *Florida Legal News* on the basis of its advertising content, the issue with respect to the constitutionality of the rule is squarely at issue.

<u>ARGUMENT</u>

I.

<u>The Rule Does Not Meet the Substantive Requirements of *Turner v. Safley*</u>

The Eleventh Circuit frequently and recently has examined the constitutionality of regulations that impose restrictions on First Amendment rights of both prisoners and the public and the press when they seek to communicate with prisoners.  An appropriate starting point for analysis, therefore, is those prior decisions.

The most recent Eleventh Circuit decision is *Perry v. Secretary, Florida Department of Corrections,* 664 F.3d 1359 (11th Cir. 2011).  The plaintiffs in that case operated three pen pal services.  The FDOC interpreted its rules as prohibiting inmate possession of advertisements by the plaintiffs promoting their services, but it also allowed a third pen pal service called Christian Pen Pals to solicit one-to-one matching of noninmates and inmates as pen pals.  The plaintiffs claimed this violated the Equal Protection Clause and that their solicitations were protected by the First Amendment. The Eleventh Circuit noted that that the Supreme Court historically had articulated two

6

different standards for evaluating First Amendment challenges to prison regulations restricting speech rights– one set forth in *Procunier v. Martinez,* 416 U.S. 396 (1974) (examining censorship of prisoner mail and prisoner marriages), and a lower standard articulated in *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (examining restrictions on journalists' rights to interview inmates face-to-face).   In decisions after *Martinez* and *Pell*, the Supreme Court regularly applied only the lower decision from *Pell* and in *Turner v. Safley,* 482 U.S. 78 (1987), the Court set out a four-part test providing guidelines for applying the lower standard.   The standard requires the Court to consider:

1.   Whether a valid, rational connection exists between the regulation and a legitimate and neutral governmental interest to justify it.

2.   Whether alternative means of exercising the right are available.

3.   How accommodation of the asserted constitutional right impacts guards and other inmates and the allocation of prison resources generally.

4.   Whether ready alternatives are available to the prison for achieving the governmental objectives.

*Shaw v. Murphy,* 532 U.S. 223, 228-30 (2001) (citing *Turner*).   The first of these factors is fatal to any regulation if the connection between the regulation and the asserted goal is arbitrary or irrational, "irrespective of whether the other factors tilt" in favor of upholding the regulation.   *Id.* at 229-30.   In *Thornburgh v. Abbott*, 490 U.S. 401 (1989), the Supreme Court made clear the *Turner* standard is required even "when the regulation at issue affects the sending of a publication to a prisoner."   *Perry,* 664 F.3d at 1365 (citing *Thornburgh*, 490 U.S. at 413); *see also Lawson v. Singletary,* 85 F. 3d 502 (11th Cir. 1996).   There is no doubt then that the *Turner* standard applies in this case.

Before proceeding to examine whether the challenged FDOC rule and conduct meets this standard, amici pause to emphasize that even the *Safley* standard imposes significant limits on the discretion of the state to adopt and apply regulations that restrict the dissemination of news and information to prisoners.  Justice Stevens, dissenting in *Thornburgh,* accused the majority of adopting "a manipulable 'reasonableness' standard . . . that too easily may be interpreted to authorize arbitrary rejections of literature addressed to inmates."  *Id.* at 428.  But the majority rejected this characterization of its action, asserting to the contrary that the standard "'is not toothless'" and insisted that it would impose an effective check on any exercise of discretion serving no legitimate penological purpose.  *Id.* at 414 (quoting petitioners' petition for certiorari).

In application, the standard has proven not to be toothless.  In *Turner* itself, the Supreme Court applied the standard to invalidate a prison regulation that allowed an inmate to marry only with the permission of the superintendent of the prison, and provided that such approval should be given only "'when there are compelling reasons to do so.'"  *Turner,* 482 U.S. at 82.  In *Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005), a federal appellate court applied the standard to reject the Washington Department of Corrections' arguments that allowing *Prison Legal News* in its prisons increased the risk of contraband in the mail, increased the volume of prison mail, increased the risk of fire, and reduced the efficiency of inmate cell searches.   In *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001), an appellate court applied the standard to reject the Oregon Department of Correction's arguments that allowing *Prison Legal News* in its prisons made it hard to find contraband in the mail, created an undue fire hazard, allowed

8

inmates to hide contraband in their cells, and reduced correctional officer efficiency.  In *Prison Legal News v. Columbia County*, No. Case No.: 3:12-cv-00071-SI, 2012 WL 1936108  (D. Ore. May 29, 2012), a district court applied the standard to preliminarily enjoin a prison rule forbidding correspondence other than postcards.[2]  And, in *Miniken v. Walter*, 978 F. Supp. 1356 (E.D. Wash. 1997), a district court applied the *Turner* standard to conclude that although a prohibition against delivery of bulk mail to inmates may be constitutional, an inmates' right to receive his personal subscription to *Prison Legal News* was violated by application of a policy.  The standard therefore clearly has teeth and should not be treated as inevitably requiring deference to the judgment of state authorities to restrict First Amendment rights.[3]

Turning, then, to the specific rule and conduct at issue, it is apparent that they do not satisfy any, let alone all four of the *Turner* standards.

Judge John H. Moore's decision in the initial *Prison Legal News* lawsuit against

---

[2]   U.S. District Judge Michael H. Simons conducted a five-day bench trial on Feb. 4-8, 2013.  No decision had been rendered by the date of this filing.

[3]   In the most recent Supreme Court case applying *Turner, Beard v. Banks,* 548 U.S. 521 (2006)*,* a majority could not agree on whether a rule that denied newspapers, magazines and photographs to specially dangerous and recalcitrant inmates violated the First Amendment.  Two justices concluded that it did.  *Id.* at 552 (Stevens, J., dissenting, joined by Ginsburg, J).  Two others said it would pass the first prong of *Turner* but fail the second because "by design" the rule did not provide an alternative means for inmates to exercise the rights they have been given.  *Id.* at 537 (Scalia, J., concurring in the judgment, joined by Thomas, J.).  Those two then declined to apply the third and fourth *Turner* factors due to their dissatisfaction with them.  *Id.* at 541.  Four justices wrote prison officials had provided an adequate basis for upholding the rule under *Turner*.  *Id.* at 524-42 (Breyer, J., announcing the judgment of the Court, joined by Roberts, C.J. & Kennedy & Souter, JJ.).  Because Justice Alito did not participate in the case, no majority addressed whether the rule satisfied the *Turner* standards.

HUNTON & WILLIAMS LLP

the FDOC all but requires a finding that no valid, rational connection exists between the regulation and a legitimate and neutral government interest. Judge Moore ruled after a bench trial that the state is fully capable of preventing prisoners from using the services that are the subject of the challenged rule whether the prisoners see the advertisements or not. As far as the amici are aware, circumstances remain the same and no contradictory evidence will or can be offered by the state. Judge Moore's ruling shows that the rule serves no legitimate penological purpose whatsoever, it simply restricts prisoners from viewing advertising that offers a service they cannot use and that restriction operates to prevent prisoners from receiving *Prison Legal News* and all of the other content that prisoners may find useful.

The second *Turner* factor also weighs in favor of invalidation of the rule because enforcement of the rule leaves Prison Legal News no alternative means of distributing the banned advertising and, worse, no economically viable means of continuing its distribution to Florida prisoners at all. As amici believe the summary judgment record will show, Prison Legal New has a small base of approximately 7,000 subscribers across the country and its operation is supported by a small number of advertisers and employees. Revenues barely meet expenses. Continued not-for-profit publication is the product of the plaintiff's devotion to serving the informational needs of prisoners rather than any desire for financial gain. The amici also believe the record will show that publication of a separate edition of *Prison Legal News* that excludes restricted advertisements would be cost prohibitive, so the company would have no alternative other than to halt all distribution in the Florida prison system if the rule were upheld. The

10

fact that prisoners cannot presently use the advertised services also does not diminish the magnitude of the violation of First Amendment rights to provide the ads to Florida prisoners because the rule acts as an effective prohibition of distribution of *Prison Legal News* entirely.

Even if the burden of creating a separate edition were not cost-prohibitive, the First Amendment would not allow the imposition of such a burden on speech without justification.  The Supreme Court has held that "the 'distinction between laws burdening and laws banning speech is but a matter of degree' and that the 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'  . . . Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."  *Sorrell,* 131 S. Ct. at 2664 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 812 (2000)).

The Supreme Court also has made clear that states may not ban the advertising of goods or services that are unlawful if the goods or services lawfully may be sold elsewhere.  *Bigelow v. Virginia,* 421 U.S. 809 (1975), provides an example of such a ruling.  In that opinion the Court invalidated the conviction of a Virginia newspaper editor who had published in Virginia an advertisement for abortion clinics in New York. The Virginia law at issue made it illegal to advertise in Virginia abortion clinics, irrespective of where they might be located.  Justice Blackmun, writing for seven members of the Court, held that the advertisement was speech protected by the First Amendment and that Virginia's interest in protecting its citizens against services that were unlawful in that state could not justify a prohibition of advertising for a service

11

lawfully available in another state.  He observed that a state "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information that is legal in that State."  *Id.* at 824-25.  Applying *Bigelow*, the district court in *High Ol' Times v. Busbee*, 456 F. Supp. 1035 (N.D. Ga. 1978), held a state statute outlawing the sale or offer of "drug-related objects" could not be validly applied to prohibit advertisements of such objects in other states where they were lawful.

This principle is of vital importance to the amici.  Daily newspapers distributed in Florida prisons now include advertisements for alcoholic beverages, firearms and ammunition, and numerous other products or services that the state prohibits prisoners from possessing.  If, however, the state can prohibit distribution of *Prison Legal News* in Florida prisons simply because it carries advertising for products of services prisoners cannot acquire or use, the state also could prohibit distribution of most publications.  Even worse, if the Court were to interpret the First Amendment as allowing the challenged rule to survive, local governments that prohibit the sale of certain products and services also could ban newspapers and magazines that carry advertisements for those products and services.  For instance, four counties in Florida, Lafayette County, Liberty County, Madison County, and Washington County, prohibit the sale of alcoholic beverages.  Suwanee County only lifted it prohibition on alcoholic beverage sales on August 16, 2011.  *See* *http://en.wikipedia.org/wiki/List_of_dry_communities_by_U.S._state*.  Certain types of gambling are allowed in Florida solely on Indian reservations and in south Florida counties.  *See* *http://www.myfloridalicense.com/dbpr/pmw/track.html*.  Still, the amici's members publish advertising for alcoholic beverages

HUNTON & WILLIAMS LLP

and gambling in all Florida counties.  They do not and cannot, in accordance with the Supreme Court's ruling in *Bigelow,* be required to publish separate editions for geographic areas that prohibit the sale of advertised products and services.

A further alternative to halting distribution in Florida or creating a separate edition for Florida would be to remove the ads from *Prison Legal News* both in Florida and outside of Florida.  This would avoid the cost of creating separate editions, but it also would result in the most grievous violation of First Amendment rights.  Other institutions where *Prison Legal News* is distributed, as evidenced by the advertising itself, do not prohibit three-way calling services, pen pal services, purchase of products or services with postage stamps, conducting a business or profession, or advertising those services to prisoners.  Instead, they allow prisoners to engage in these activities because they find the activities beneficial to the prisoners and to society and consistent with penological objectives.  *See generally* WriteAPrisoner.com http://www.writeaprisoner.com/why-write-a-prisoner/default.aspx (compiling reasons prison pen pals are widely allowed).

The third *Turner* factor also weighs against the constitutionality of the challenged rule because the lack of the rule and the distribution of *Prison Legal News* imposes no additional burdens on prison guards or resources.  The FDOC already has rules that require monitoring of all correspondence, and therefore that will continue and these rules will be unaffected.  The primary impact of invalidation of the rule will be to lighten the FDOC's load by making it unnecessary to determine whether advertising of restricted services is non-incidental, prominent, or prevalent throughout every publication.

Judge Moore's prior ruling also establishes that the fourth factor of *Turner* weighs

HUNTON & WILLIAMS LLP

against the rule because the state has readily available means of preventing prisoners from using the restricted services without preventing them from viewing advertising.

II.

The Rule Lacks Procedural Safeguards &
Criteria To Prevent its Use for Improper Censorship

The challenged rule also violates the First Amendment in two additional ways. First, it does not provide Prison Legal News with notice and an opportunity to challenge a decision by a prison official to impound and reject an issue of the *Prison Legal News* that the official contends prisoners are prohibited from possessing.  Second, the rule does not provide sufficiently clear standards to prevent its use for censorial purposes that the courts will be able to detect and stop.

A.   The Rule Lacks Required Procedural Safeguards

In *Perry,* the Eleventh Circuit observed that the Supreme Court's decision in *Martinez* also created a three-part test to decide whether there are proper procedural safeguards for correspondence of a personal nature."  The *Martinez* safeguards require an inmate to be notified of the rejection of material written by or addressed to him, that the author of the material be given a reasonable opportunity to protest the decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence.   *Martinez,* 416 U.S. at 418-19.   The *Martinez* procedural safeguards, unlike the *Martinez* standards of scrutiny, have not been lowered or changed by subsequent decisions, so they remain binding on this Court today.  *Perry,* 664 F.3d at 1368 ("*Martinez* may still control for due process claims where a prison limits personal correspondence"); *see also Barrett v. Orman,* 373 Fed. Appx. 823, 826

14

(10th Cir. 2010) ("*Martinez's* procedural requirements survived *Thornburgh*); *Jucklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004) (same).

The rule challenged by *Prison Legal News* affords no procedural safeguards, let alone the strict procedural safeguards required by *Maritnez*.

The Eleventh Circuit did not apply that *Martinez* test in *Perry* because the communications at issue were "bulk mailings" – bundled materials delivered in bulk for distribution to multiple prisoners. The Eleventh Circuit held that the lower due process standards set in *Mathews v. Eldridge,* 424 U.S. 319 (1976), for the denial of Social Security disability benefits, would apply.[4] The Eleventh Circuit did not explain its rationale for distinguishing between bulk mailings and personal correspondence, but it may have been influenced by the Supreme Court's decision in *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119 (1977), which also examined a restriction on "bulk mailings." In that case, the plaintiff was a "self-denominated Prisoners' Labor Union" and the mailings at issue were bulk mail solicitations to join a union. The defendant prohibited bulk mailings other than the Jaycee Newsletter and the plaintiff challenged the rule on equal protection grounds. The Court found no violation in light of the distinct threat that solicitations to join a union posed to prison security, not on any distinctions that exist between bulk mailings and personal mail. *Jones* also did not

---

[4] Applying the *Matthews* standards in *Perry v. Secretary, Florida Department of Corrections,* 664 F.3d 1359, 1368 (11th Cir. 2011), the Eleventh Circuit held that the plaintiffs' First Amendment rights were sufficiently protected by their ability to "separate and distinguish mail to inmates" concerning pen pal services from other solicitations and to correspond with FDOC officials to challenge the denial of their advertisements.

consider what procedural safeguards apply to a decision denying access to mailings of any type. The ruling in *Jones* cannot therefore explain the distinction adopted by the Eleventh Circuit in *Perry* for bulk mailings.

In any event, the instant case involves neither bulk mailings nor solicitations of the type at issue in *Jones* or *Perry*.  The instant case involves distribution directly to individual prisoners of a magazine containing a wide variety of news and information of interest to prisoners, as well as some advertising for services that the prison system does not allow prisoners to use.  The inclusion of that advertising for services that cannot be used does not provide any justification for elimination of the *Martinez* safeguards that protect all of the other content because, as discussed, that advertising does not undermine any legitimate penological interests or otherwise impose burdens on the state that would warrant the banning of the advertising.

B.    The Rule Lacks Sufficiently Specific Guidelines to
       <u>Prevent its Use to Censor the Contents of *Prison Legal News*</u>

In *Martinez*, the plaintiff argued in the Supreme Court that the regulations allowing censorship of prisoner mail suffered from undue vagueness that would allow "censorship of constitutionally protected expression without adequate justification." *Martinez,* 416 U.S. at 401-02.   The Supreme Court did not, however, address the argument because the rules had not been challenged below on vagueness grounds.  *Id.* Here, the plaintiff has attacked the rule at issue not only on First Amendment grounds but

also separately on due process grounds.[5]  DE-14 at 13.

The due process claim also is a distinct basis for invalidation of the rule because courts have held that even when prisoner speech rights may be restricted consistent with the First Amendment, this "does not detract from the continuing requirement[s]" of due process, which includes a right to be free from "poorly delineated prison regulation." *Rios v. Lane,* 812 F.2d 1032, 1039 (7th Cir. 1987).

The amici have a particular interest in ensuring that the Court does not allow the vague rule at issue here to stand because, as discussed above, the amici's members also are subject to the rule if they send their newspapers and magazines to Florida prisoners. The amici also must comply with other forms of distribution licensing such as newsrack regulations.  Such regulations are constitutionally justifiable by the legitimate interest that a city may have in safety and aesthetics, *see generally City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988), just as prison regulations are justifiable by legitimate penological interests.  But the courts also have recognized that such regulations sometimes may be used for improper censorship if the discretion of those

---

[5]   The amici are aware that the plaintiff moved to file a Second Amended Complaint that would separate its vagueness challenge from other aspects of its claims and that the Court denied that request.  This does not, however, obviate the need for the Court to decide whether the rule suffers from undue vagueness because the requirement for clear and specific criteria is a fundamental component of both due process, *Grayned v. City of Rockford*, 408 US 104 (1972) ("a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"), and First Amendment protection of speech, *Freedman v. Maryland*, 380 U.S. 51 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office").

administering the regulations is not carefully restricted by clear and specific guidelines. *Id.* at 772.  In *Lakewood*, the Court explained that facial attacks are allowed when "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.   . . .  And these evils engender identifiable risks to free expression that can be effectively alleviated only through a facial challenge." *Id.* at 757.  Those risks, the Court held, include the risk that the licensor's discretion will intimidate parties into censoring their own speech and that such self-censorship will not be able to present an effective "as applied" challenge. *Id.* at 757-58.  The Eleventh Circuit has invoked these principles frequently to invalidate speech restrictions.[6]  Most recently, the Eleventh Circuit applied these principles in *Harrell v. The Florida Bar*, 608 F.3d 1241 (11th Cir. 2010), to enjoin rules regulating attorney advertising.  The court recognized that the Florida Supreme Court, like a prison administrator, has important interests that can justify serious restrictions on advertising, but the court was firm in its insistence that when such restrictions are imposed, clear and

---

[6]  *See Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation,* 322 F.3d 1298, 1311 (11th Cir. 2003) (en banc) (invalidating a licensing scheme that failed to use "clear standards by which to accept or reject a publisher's request"); *Gold Coast Publ'ns, Inc. v. Corrigan,* 42 F.3d 1336, 1349) (11th Cir. 1994) (upholding a licensing scheme that limited discretion through "neutral criteria and procedural safeguards"); *Sentinel Comm'ns Co. v. Watts*, 936 F.2d 1189, 1196 (11th Cir.1991) (invalidating licensing scheme that "appears to be subject to the completely standardless and unfettered discretion of one bureaucrat working for the DBS in Tallahassee"); *Miami Herald Publ'g Co. v. City of Hallandale*, 734 F.2d 666, 675 (11th Cir. 1984) ("Accompanying . . . discretion is the opportunity to discriminate on the basis of what the licensee intends to say, which in the context of licensing newspaper distribution raises the spectre of prior restraint").

specific criteria are required to prevent improper use of the restrictions.  The court quoted

this language from *International Society for Krishna Consciousness v. Eaves,* 601 F.2d

809, 822-23 (5th Cir. 1979), to make its point emphatically:

> "All vague statutes are unacceptable partly because they encourage ...
> arbitrary and discriminatory application; similarly, vague measures
> regulating first amendment freedoms enable low-level administrative
> officials to act as censors, deciding for themselves which expressive
> activities to permit. The very existence of this censorial power, regardless
> of how or whether it is exercised, is unacceptable."

*Harrell,* 608 F.3d at 1258.   The court also held that when a speech restriction is

challenged on vagueness grounds "'it [is] immaterial . . . whether the party challenging

the measure even applied for' permission to engage in the challenged conduct," because

"'the very existence of [censorial] power is unacceptable, there is little reason [for a

court] to forbear entertaining an anticipatory challenge in order to allow that power to be

exercised.'"  *Id*. (quoting *Eaves,* 601 F.2d at 823).

The rule at issue in this case has multiple vagueness problems that could be

exploited for improper censorial purposes.  Initially, the rule directs prison officials to

determine whether a publication carries an advertisement promoting "three-way calling

services," "pen-pal services," purchases by postage stamps, or "conducting a business or

profession."  To begin, none of these terms is defined by the rule and their meanings are

far from clear.  Next, the rule does not entirely ban the advertising that it describes.  It

only bans advertising that is not focal, non-incidental, prominent, or prevalent.  These

highly-subjective words allow prison officials wide discretion to favor certain

publications over others notwithstanding that they all carry the same type of advertising.

Because the terms are so vague, they do not provide judges with meaningful standards by

HUNTON & WILLIAMS LLP

which they can assess whether prison authorities have impounded or rejected a publication because it carried content which constitutionally could be banned or content that is protected by the First Amendment such as political endorsements or criticism of prison regulation or administration.  The danger that such censorship will be imposed is quite apparent from the fact that *Prison Legal News* has been a critic of prison policies and practices across the country since its creation by a former prisoner himself.  A vague and standardless licensing scheme like this that allows administrators to achieve indirectly what they cannot achieve directly simply cannot stand.

<u>CONCLUSION</u>

The Court should declare Florida Administrative Code §33-501.401(3) unconstitutional facially and as applied.

Respectfully submitted,

Hunton & Williams LLP
Attorneys for the Amici Curiae, the Florida Press Association, The First Amendment Foundation, The Reporters' Committee for Freedom of the Press, the Society of Professional Journalists and Allied Daily Newspapers of Washington

By     s/ Thomas R. Julin
            Thomas R. Julin & Jamie Z. Isani
            Florida Bar Nos. 325376 & 728861
            1111 Brickell Avenue – Suite 2500
            Miami, FL 33131
            305.810.2516 Fax 1601
            tjulin@hunton.com / jisani@hunton.com

HUNTON & WILLIAMS LLP

Case No: 4:12-cv-239-MW/CAS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, I also certify that the foregoing document is being served this day on all counsel or *pro se* parties identified on the following Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.



           *s/ Thomas R. Julin*
Thomas R Julin

<u>SERVICE LIST</u>
Case No. 4:12CV239-MW/CAS
United States District Court, Northern District, Tallahassee Division
Served via CM/ECF:

Randall C. Berg, Jr., Esq.
Florida Bar No. 318371
Dante P. Trevisani, Esq.
Florida Bar No. 72912
Florida Justice Institute, Inc.
3750 Miami Tower
100 S.E. Second Street
Miami, Florida 33131-2309
305-358-2081 Fax 0910
RBerg@FloridaJusticeInstitute.org
dtrevisani@floridajusticeinstitute.org

Randall C. Marshall, Esq.
Florida Bar No. 181765
American Civil Liberties Union Found. of Fla.
4500 Biscayne Blvd. Suite 340
Miami, Florida 33137
786-363-2700 Fax 1108
RMarshall@aclufl.org

v

Lance Weber, Esq.
Alissa Ruth Hull, Esq.
Fla. Bar No. 99801
Human Rights Defense Center
P.O. Box 2420, Brattleboro, VT 05303
802-579-1309 Fax 228-1681
lweber@humanrightsdefensecenter.org
ahull@humanrightsdefensecenter.org

*Attorneys for the Plaintiff*

Susan A. Maher, Esq.
Cedell Ian Garland, Esq.
Lance Neff, Esq.
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
 (850) 414-3300 fax 488-4872
susan.maher@myfloridalegal.com
Cedell.Garland@myfloridalegal.com
lance.neff@myfloridalegal.com

*Counsel for Michael Crews, in his official capacity as Secretary of the Florida Department of Corrections*

HUNTON & WILLIAMS LLP