**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

**Case No: 4:12-cv-239-MW/CAS**

| | |
|---|---|
| PRISON LEGAL NEWS, | ) |
| a project of the HUMAN RIGHTS DEFENSE CENTER, | ) |
| a not-for-profit, Washington charitable corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE GEO GROUP, INC., et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Prison Legal News ("PLN"), by and through undersigned counsel and pursuant to Rule 56, Fed.R.Civ.P., hereby moves for summary judgment, and in support states:

**Preliminary Statement**

As recently as 2006, the Florida Department of Corrections ("FDOC" or "Defendant") insisted that Plaintiff's publication posed no security threat and was admissible into its facilities. In fact, the FDOC continued to allow the publication into its facilities through the middle of 2009. Despite no material change in the advertising content, the FDOC has reversed course, suddenly declaring *Prison Legal News* to be an inadmissible threat to the safety and order of its institutions. Although the FDOC cannot identify a single adverse incident that occurred because of the publication, it stubbornly maintains that the magazine is too dangerous to be given to inmates. This irrational censorship of PLN's speech violates Plaintiff's First Amendment rights. Moreover, the FDOC's failure to provide notice to PLN when its correspondence is rejected

violates Plaintiff's Due Process rights.  Thus, Plaintiff is entitled to summary judgment on both counts against the FDOC.

## Statement of Facts[1]

Plaintiff Prison Legal News

Plaintiff Prison Legal News ("PLN") is a project of the Human Rights Defense Center, a not-for-profit corporation dedicated to the protection and advancement of human rights.  Wright Decl., Ex. 1, ¶ 2.  *See also Prison Legal News v. McDonough,* 200 F. App'x 873, 875 (11th Cir. 2006).  PLN is the publisher of *Prison Legal News*, a monthly journal of prison news and analysis, and a distributor of books and other materials.  Wright Decl. ¶ 6.  Having published *Prison Legal News* for over 20 years, PLN's core mission has been public education, advocacy, and outreach on behalf of, and for the purpose of assisting, prisoners who seek to enforce their constitutional and basic human rights.  *Id.* at ¶ 3.  To further that mission, *Prison Legal News* is comprised of writings from legal scholars, attorneys, inmates, and news wire services, presenting news and analysis primarily of legal developments affecting incarcerated people and their families, as well as political commentary largely critical of the prison system.  *Id.* at ¶¶ 6, 11.  *See also* Sample Issues of *Prison Legal News*, Ex. 2.  *Prison Legal News* has a monthly circulation of approximately 7,000 printed copies, and has subscribers in the United States and abroad, including incarcerated subscribers in all 50 state correctional systems, the Federal Bureau of Prisons, and numerous county jails throughout the country.  Wright Decl. ¶ 9.  Subscribers to *Prison Legal News* also include attorneys, judges, journalists, academics, and others.  *Id.*

---

[1] For ease of the Court, a list of all exhibits cited herein is attached as Exhibit 31.

<u>The Previous Case</u>

In early 2003, the FDOC began censoring *Prison Legal News* on the basis of its advertising content, and refused to allow inmates to receive their subscriptions to the magazine. *See* Order, Findings of Fact and Conclusions of Law, Case No. 3:04-CV-14-J-16JHM/TEM (M.D. Fla. July 28, 2005) (DE 87) at pp. 5-6, attached as Ex. 3 (hereinafter "Order"). Specifically, the FDOC contended that *Prison Legal News* contained ads for services that inmates were not permitted to use, including non-approved telephone services, the exchange of postage stamps for cash, and pen-pal services, and therefore violated portions of F.A.C. 33-501.401 ("Admissible Reading Material"). *Id.* The FDOC also failed to notify PLN when its mail was being rejected, thereby depriving it of timely notice of the censorship and the ability to appeal the rejection, in violation of the Due Process Clause. *See* Complaint, Case No. 3:04-CV-14-J-16JHM/TEM (DE 1) at ¶¶ 20-22, attached as Ex. 4.

PLN attempted to avert a lawsuit by bringing the issue to the FDOC's attention. At first, in November 2003 the FDOC agreed to stop censoring *Prison Legal News* for its ad content. *Id.* at ¶ 23. However, the very next month, the Department revisited the issue and decided that the censorship would continue. *Id.* As a result, PLN was forced to bring suit in January of 2004, asserting a First Amendment claim and a Due Process claim.[2] *Id.*

Three months after the Complaint was filed, the FDOC filed a Motion for Summary Judgment, urging the District Court to dismiss the action on mootness grounds because the Department had changed its policy and was no longer going to censor *Prison Legal News* for its ad content. *See* Def. Mot. Summ. J., Case No. 3:04-CV-14-J-16JHM/TEM (DE 14), attached as Ex. 5 (hereinafter "Def. Mot. Summ. J."). The FDOC noted, through the affidavit of its Library

---

[2] The Complaint also contained a First Amendment claim based upon the FDOC's prohibition on paying inmates for writing articles, but that claim is not relevant to the instant case. *Id.*

Services Administrator Allen Overstreet, that in March of 2004—two months after the Complaint was filed—it had <u>again</u> changed its position and was amending its internal Procedure[3] 501.401 to clarify that: "A publication will not be rejected based upon inclusion of an advertisement for 3-way calling services or pen-pal services if the publication is otherwise admissible and the advertisement is merely incidental to, rather than being the focus of, the publication." *Id.* at 3-4 & 13.[4]

In fact, the FDOC attached—and quoted at length—the affidavits of several top management employees who swore under oath that *Prison Legal News* would no longer be censored because the magazine did not present a security threat. For instance, Assistant Secretary of Institutions Hieteenthia Hayes noted that an arrangement with the FDOC's telephone services provider "forecloses the use of 3-way calling services by eliminating the ability to add such numbers to the authorized phone list," and therefore "the department rescinded its prior policies that prompted the rejection of publications like *Prison Legal News*." *Id.* at 5 & 49-51. Ms. Hayes concluded: "Based upon these actions, as a matter of department policy, <u>no future issue of *Prison Legal News* should be or will be rejected on the grounds that it contains either pen-pal or 3-way calling services advertisements</u>." *Id.* (emphasis added). Michael Rathmann, the former Assistant Secretary for Institutions, confirmed that the telephone policy "has been revised to resolve a security issue caused by companies that offer a service that forwards inmate phone calls (and bypasses some of our security measures). It is no longer necessary to stop the Prison Legal News or any other publication solely because they had ads

---

[3] Procedures provide guidance to staff on how to interpret and implement the corresponding provisions of the Florida Administrative Code.

[4] Assistant Secretary of Institutions Hieteenthia Hayes further elaborated, illustrating how the new Procedure would admit publications like *Prison Legal News*: "In other words, if the publication is dedicated to advertising or promoting pen-pal services or three-way calling services, that publication will be rejected for security reasons. However, if the publication's focus is publishing articles, news, short stories, and similar material and the advertisements are merely incidental to the primary focus of the publication, the publication will not be rejected because it contains such ads." *Id.* at pp. 4 & 49-51.

from these phone companies." *Id.* at 6 & 72.  Finally, the FDOC proffered the affidavit of James

Upchurch, Bureau Chief for Security Operations, who explained the security concerns behind the

new telephone policy.  Mr. Upchurch concluded: "Because this process prevents use of the long-

distance three-way calling services advertised by local companies, it adequately addresses the

department's security concerns.  For this reason, it is now unnecessary to reject flyers and

publications carrying such advertisements." *Id.* at 6 & 74-76.

      Given the above developments, the FDOC argued that the case had become moot:

> Thus, the attached affidavits and exhibits amply demonstrate the mootness of
> Plaintiff's allegations with respect to the alleged rejection and impoundment of
> Plaintiff's publications within the prisoner population of the Department of
> Corrections.  They conclusively demonstrate that Plaintiff's publications will <u>not</u>
> be censored in the future for the reasons alleged in the Complaint (incidental
> containment of three-way calling or pen-pal ads).

*Id.* at 7 (emphasis in original).

      District Judge John H. Moore disagreed, and denied the FDOC's motion.  *See* Order on

Def. MSJ, Case 3:04-CV-14-J-16JHM/TEM (DE 30) (M.D. Fla. Nov. 16, 2004), Ex. 6.  Judge

Moore found that "the Defendants have 'flip-flopped' on their policy stance at least three times,

and they conceivably remain free to once again change their policy at the conclusion of this

lawsuit.  As such, the Court is not willing to hold that the Plaintiff's claims are moot." *Id.* at 4.

      In March 2005, the amendment to Procedure 501.401 became effective.[5]  *See* Def. Resp.

to Pl. Mot. Summ. J., Case No. 3:04-CV-14-J-16JHM/TEM (DE 43) (M.D. Fla. April 8, 2005) at

1-2, attached as Ex. 7.  In May 2005, the FDOC initiated rulemaking by submitting a proposed

---

[5] That Procedure was as follows: "A publication will not be rejected based upon inclusion of an advertisement promoting any of the following if the publication is otherwise admissible and the advertisement is merely incidental to, rather than being the focus of, the publication:
    1. three-(3) way calling services;
    2. pen-pal services; or
    3. the purchase of products or services with postage stamps; or
    4. conducting a business while incarcerated, to include profit making activities or any activities having the potential to generate revenue or profit." *Id.*

change to F.A.C. 33-501.401(4).  That change, which became effective in September 2005 or August 2006,[6] amended F.A.C. 33-501.401(4) so that it contained a provision nearly identical to the newly amended Procedure 501.401.  *See* Previous Rule 501.401(4), attached as Ex. 8.

At the bench trial in June 2005, the FDOC repeatedly made clear that *Prison Legal News* presented no legitimate threat to the security of its institutions, and would not be censored: "Therefore, because the previously impounded magazines have been returned to the inmates, and because the Department's new policy ensures that Plaintiff's magazine will not be rejected merely because it contains a three-way calling, pen-pal, or postage advertisement, Plaintiff's request for injunctive relief is moot and should be denied."  Def. Trial Brief, Case 3:04-CV-14-J-16JHM/TEM (M.D. Fla.) (DE 58) at 10-11, attached as Ex. 9 (hereinafter "Def. Trial Brief").

Judge Moore, relying on these representations, found that there was no reason to award PLN injunctive relief.  *See* Order, Ex. 3. The FDOC had reversed nearly all of the past impoundment decisions, and "presented sufficient evidence at trial to show that they have no intent to ban PLN based solely on the advertising content at issue in this case."  *Id.* at 15. Although the Court did not reach the merits of the censorship claim, it did find that "not only does the FDOC have plenty of ways at its disposal to prevent the inmates from taking advantage of any illicit services offered in advertisements, its procedures and policies already ensure that publications such as PLN, which are not focused on such content, can be distributed to inmates without any substantial security concerns."  *Id.* at 13-14 (emphasis added).

On appeal, the Eleventh Circuit agreed that the issue was moot, relying on the FDOC's promise that it would not resume the censorship of Plaintiff's publication:

> We agree with the district court's finding that, although the FDOC previously
> wavered on its decision to impound the magazine, it presented sufficient evidence

---

[6] The Rule history indicates that amendments became effective on 9/5/05 and 8/1/06.  It is unclear on which date this particular change became effective.

to show that it has "no intent to ban PLN based solely on the advertising content at issue in this case" in the future. . . . The FDOC officially revised its impoundment rule and has not refused to deliver issues of the magazine since this amendment. . . . <u>We have no expectation that FDOC will resume the practice of impounding publications based on incidental advertisements.</u>

*McDonough*, 200 F. App'x at 878 (emphasis added).

<u>The Current Censorship of *Prison Legal News*</u>

Despite its promises to the both the District Court and the Eleventh Circuit, in late 2008 the FDOC once again began censoring *Prison Legal News* based on incidental advertisements. Wright Decl. ¶ 16.  In a complete reversal, the FDOC amended the Admissible Reading Material Rule ("Rule") to eliminate the provision that prevented FDOC staff from rejecting publications based on incidental advertisements.  *See* Amended Rule 33-501.401, Ex. 10.   Instead, the new Rule—which became effective in June 2009 and is still in effect today—requires the rejection of publications containing prohibited advertisements:

> Publications shall be rejected when one of the following criteria is met:  . . .  It contains an advertisement promoting any of the following where the advertise-ment is the focus of, rather than being incidental to, the publication or the adver-tising is prominent or prevalent throughout the publication.
> 1. Three-way calling services;
> 2. Pen pal services;
> 3. The purchase of products or services with postage stamps; or
> 4. Conducting a business or profession while incarcerated.

 *See* F.A.C. 33-501.401(3)(l).

As a result, every monthly issue of *Prison Legal News* since September 2009, as well as books and various correspondence from Plaintiff PLN, has been impounded by the FDOC.  *See* Wright Decl. ¶16; LRC Decisions, Ex. 11.  All but two never reached their intended recipients.[7]

---

[7] While several issues were impounded in late 2008 and early 2009, they were later overturned by the LRC.  *See* LRC Decisions.  The September 2009 issue is the first for which the impoundment was consistently upheld.  *Id.* The impoundment of the October 2011 issue was overturned by a divided vote of the LRC, because two members of the committee felt that the ads were not prevalent or prominent. *See* LRC Meeting Minutes, Ex. 12.  However, the FDOC has since reversed course once again, and has advised that that decision was a mistake.  *See* Def. Resp. to Pl.

In 2009, PLN had roughly 240 inmate subscribers in FDOC facilities; currently that number is around 92, as inmates have cancelled their subscriptions because they are not receiving their issues.  Wright Decl. ¶ 15. The book *The Prisoner's Guerilla Handbook to Correspondence Programs*, which is published and distributed by PLN, was also impounded and rejected several times because one page out of 224 noted that stamps were accepted as payment.[8]  *Id.* at ¶ 20; LRC Decisions.  Moreover, except for five issues,[9] the FDOC failed every single time since September 2009 to provide PLN with notice of the rejection or impoundment of its correspondence.  Wright Decl. ¶ 16. The only way that PLN has learned of the censorship of its mail is through inmate-subscribers who occasionally write to complain that they did not receive their subscriptions.  *Id.*

The amendment to the Rule was not prompted by any incident, and none was considered in deciding to adopt the Rule.[10]  *See* FDOC's Resp. to Pl. First Interrogatories, #9, attached as Ex. 16; Upchurch Rule 30(b)(6) Dep. 74:24-76:25, Ex. 18. The only thing that motivated the amendment was the fact that FDOC personnel noticed an alleged increase in the size and frequency of the advertisements appearing in *Prison Legal News*.  *Id.* at #2.   However, an examination of all issues of the magazine reveals that no such dramatic increase has taken place.

First. Req. for Admissions, #18, Ex. 13. This further illustrates the subjective nature of the standard and the impossibility of applying it with any consistency.  The September 2011 issue was impounded, rejected by the LRC, and then later approved.  *See* LRC Decisions.

[8] As an example, PLN never received notice of the February 2012 impoundment or rejection of this book from the FDOC; it found out about it when the intended inmate-recipient wrote to ask where his book was.   Wright Decl. ¶20.  Later, on January 3, 2013, the FDOC ordered 26 copies of the book.  *See* Sales Receipt, Ex. 14.  After Plaintiff updated its initial disclosures to reveal this information to Defendant, PLN received a letter from the LRC, informing PLN that the determination had been reversed.  *See* Letter from LRC, Ex. 15.  Strangely, the letter criticized PLN for not correcting the LRC by appealing.  *Id.* Of course, PLN could not have appealed because it never received notice of the impoundment.

[9] Those issues are December 2011, January 2012, June 2012, January 2013, and February 2013.  Wright Decl. ¶ 16.

[10] Although James Upchurch states that he cannot recall any specific incidents that were considered, he notes that he "shared" one specific incident. *See* FDOC's Resp. to Pl. First Interrog., #9, Ex. 16. This incident came to light after it was decided to change the rule and involved an inmate paying someone to send emails for him, which had nothing to do with the four prohibited services at issue in the Rule.  *See* Bohrer Emails, Ex. 17.  Also, that practice is already prohibited by other rules.  *Id.*

*See* Febus Decl., Ex. 19. While the number of "offending" ads has increased, the actual percentage of the publication containing the offending ads has remained nearly constant, in part because the publication has increased in length over the years. *Id.* For instance, from January 2002 through August 2009 (the time period when the magazine was allowed in FDOC facilities), the offending ads averaged 5.90% of the magazine's total usable area, and those percentages ranged from a low of 3.65% to a high of 8.82%. *Id.* at ¶¶ 23-24. From September 2009 through January 2013 (the time period when the magazine was not allowed in FDOC facilities), the offending ads averaged 6.44% of the magazine's total usable area, and those percentages ranged from a low of 3.59% to a high of 8.85%. *Id.*

There is no evidence of a single adverse incident occurring because of an advertisement in *Prison Legal News*. In fact, the FDOC could not produce evidence of a single adverse incident that occurred because an inmate engaged in a three-way call, purchased something with stamps, or engaged in a business or profession. *See* FDOC's Resp. to Pl. First Interrog., #14. No incident has been connected to *Prison Legal News*. Except for accepting stamps as payment (which PLN has done since its founding), PLN does not offer any of the advertised services enumerated in the Rule. Wright Decl. ¶ 10.

The FDOC is the only correctional agency in the country that prohibits inmates from receiving *Prison Legal News* based on its advertising content. Wright Decl. ¶¶ 12-14. That is, the magazine is not censored for its advertising content by any other state correctional agency, the Federal Bureau of Prisons (including at its Supermax facilities), or any county jail across the country—including jails in Florida. *Id.* Many other "mainstream" magazines are admitted into FDOC facilities, even though they contain ads for products or services that inmates are not allowed to have. *See* Miller Decl., Ex. 20, ¶ 30.

<u>The Mail Inspection and Impoundment Process</u>

Every piece of mail is opened by mailroom staff, examined for contraband, and the content is skimmed for prohibited communications.  F.A.C. 33-210.101(5).  Publications are also examined to determine if they contain any prohibited content.  F.A.C. 33-501.401.  If a mailroom employee believes that a publication violates the Rule, he or she impounds the publication by issuing a Notice of Impoundment.  *See* F.A.C. 33-501.401(8) & Sample Notice of Impoundment, attached as Ex. 21.    After an Assistant Warden signs off, the rules require that copies be sent to the intended inmate-recipient, the Literature Review Committee ("LRC"), and the sender of the publication. F.A.C. 33-501.401(8).[11]    The Notice informs the sender that the impoundment decision may be appealed to the LRC by mailing a copy of the Notice, as well as a letter explaining the reasons for the appeal, to the Library Services Administrator, within 15 days.  *See* Sample Notice of Impoundment.  The first impounding facility posts the publication to an electronic bulletin board, and every other facility then automatically impounds the publication without notice to the publisher.  *See* F.A.C. 33-501.401(8)(c).

The LRC is comprised of three FDOC employees. F.A.C. 33-501.401(14).  It meets periodically to decide whether to affirm (and thereby reject the publication) or overturn (and thereby approve the publication) every impoundment decision.  *Id.*  Publishers and senders are not provided with notice of this final rejection.  *See* Hughes Rule 30(b)(6) Dep. 28:7-23, Ex. 22.  When making these decisions, the LRC only has copies of the pages with the allegedly offending ads on them; the members do not have the entire publication.  *Id.* at 14:6-15. The LRC also decides whether to approve or deny appeals that have been submitted by senders or publishers.

---

[11] However, as noted above, notice was not sent to PLN (with 5 exceptions), even though every issue of *Prison Legal News* since September 2009 was impounded.

F.A.C. 33-501.401(14).  The LRC maintains a list of rejected and approved publications.  F.A.C. 33-501.401(4).  If an incoming publication has been previously rejected, it is not reviewed again; it is automatically rejected, and notice is provided to the inmate, but not the publisher.   F.A.C. 33-501.401(7).

The LRC has no standards or guidelines for determining whether offending advertisements are "the focus of, rather than being incidental to, the publication or the advertising is prominent or prevalent throughout the publication," as those terms are used in the Rule.  *See* Hughes Rule 30(b)(6) Dep. at 11:2 – 12:1.  The ads are not measured or counted, and there is no maximum number of offending ads that a publication can have before being rejected. *Id.* 14:23 – 15:8.  The determination of prevalence or prominence is left to the subjective judgment of the committee members. *Id.* at 14:5; Moore Dep., Ex. 23 at 19:8-11.  In fact, several FDOC employees expressed confusion on how the Rule would be applied.  *See* Emails During Rulemaking, Ex. 24.

### Other Relevant Security Measures

The FDOC has numerous other methods of addressing the security issues it claims are behind the Rule.  For instance, the FDOC has contracted with Securus Technologies, Inc. ("Securus") to provide telephone services to all inmates within the FDOC.  *See* Securus Contract, attached as Ex. 25.  That contract, which has been in place since September 2007 and is still in effect today, requires the telephone system to block and record all attempts at three-way calling and call forwarding.[12] *Id.* at 14. Securus's marketing materials advertise that they can block three-way calls with "near perfect accuracy."  *See* Securus Website Printout, Ex. 26.  The system also records every single call and has the capability of blocking calls to specific numbers.

---

[12] Inmates are also prohibited from engaging in three way calling, call forwarding, or attempting to call a number that is not on their approved list.  F.A.C.33-602.205(2)(a).  Any attempt at a three-way call results in automatically blocking that number from the inmate's list.  F.A.C. 33-602.205(13)(b)(5).

Securus Contract, at 13. Inmates are assigned a unique identifier so that prison officials can know which inmate is making a call, and many times corrections officers monitor the calls in real time. *Id.* at 18; Upchurch Rule 30(b)(6) Dep. at 90:24. Each inmate is permitted to call only numbers that are on a preapproved list, on which the inmate can have a maximum of ten numbers and which can only be changed every six months. F.A.C. 33-602.205(2)(a)&(c). Calls to cell phones are permitted. *See* F.A.C. 33-602.205(2)(a)(1)-(5).

All calls from inmates are traditional collect calls or are prepaid by the person receiving the call. Securus Contract at 4. The recipient is charged a "to connect" charge and then a per-minute charge thereafter, and long distance calls cost more than local calls. *Id.* at 40. All calls are limited to 15 minutes. F.A.C. 33-602.205(2)(e). The revenue from these calls goes to Securus, which in turn pays a commission to the FDOC of 35% of its gross revenue from the contract. Securus Contract at 41.

The FDOC has been applying the portion of the Rule prohibiting ads for three-way calling services to censor issues that contain ads for any type of discount phone services, even though these companies do not, and cannot, offer three way calling services. Wright Decl. ¶ 17. What these companies do offer is a local phone number that rings at the recipient's phone, regardless of where that phone is physically located. *See* Dyar Decl., Ex. 27, ¶¶ 6-9. They are not call forwarding services or call diversion operations; all relevant data on the recipient is contained in the industry-standard databases, so that if the number were looked up, the recipient's name and physical address would be readily discoverable. *Id.* The exact same security precautions are in place as with any call made by an inmate. *Id.* In fact, these calls provide even more security than a "typical" call to a cell phone, where the recipient could be anywhere in the country.

Inmates are prohibited from soliciting pen pals, which means they cannot send mail to, or receive mail from, any company that offers to find them a pen pal. *See* F.A.C. 33-210.101(9) & (11). Attempts at such solicitation are intercepted by mailroom staff. Inmates are also prohibited from purchasing products with postage stamps, F.A.C. 33-210.101(22), and are restricted in the number of stamps they are allowed to possess at any one time. F.A.C. 33-602.201 & F.A.C. 33-210.101(2)(e). Several correctional agencies around the country have banned stamps altogether, and have instituted a system of electronic postage. Miller Decl. ¶¶ 22-24. Other correctional systems have instituted a secure version of email which reduces the use of stamps.[13] *Id.* Finally, inmates are prohibited from conducting a business or profession while incarcerated. F.A.C. 33-602.207. For example, they cannot be compensated for writing articles. *McDonough*, 200 F. App'x at 875.

### Memorandum of Law

This case is about censoring an entire publication—containing news, analysis, and political commentary on the prison system, some of which criticizes the FDOC—based on incidental advertisements for certain prohibited services. A few short years ago, the FDOC agreed that *Prison Legal News* posed no threat to the security and order of its institutions. Now, however, with no further evidence, the FDOC has inexplicably reversed course by effectively banning the magazine from its facilities. This irrational application of the Rule to PLN's correspondence violates the First Amendment, and the FDOC's failure to notify PLN of the censorship violates the Due Process Clause.

---

[13] For example, the Federal Bureau of Prisons provides "Corrlinks" for its inmates. The Washington State Department of Corrections uses "eMessaging." Miller Decl. ¶ 23. Inmates under no circumstances are allowed to surf the Internet. Emails are also searched electronically for key words, which reduces the staff time necessary to review letters.

## I.       The FDOC Has Violated, and Continues to Violate, PLN's First Amendment Rights

This case is governed by the standard set forth in *Turner v. Safley*, 482 U.S. 78, 84

(1987); namely, whether the challenged regulation is "reasonably related to legitimate

penological interests."  *Id.*  The *Turner* Court identified four factors that define this inquiry:

> (1) whether there is a "valid, rational connection" between the regulation and a
> legitimate governmental interest put forward to justify it; (2) whether there are
> alternative means of exercising the asserted constitutional right that remain open
> to the inmates; (3) whether and the extent to which accommodation of the
> asserted right will have an impact on prison staff, inmates, and the allocation of
> prison resources generally; and (4) whether [alternatives to the regulation exist or
> whether] the regulation represents an "exaggerated response" to prison concerns.

*Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996) (citing *Turner*, 482 U.S. at 89-91).

The Supreme Court has made clear that *Turner*'s "standard is not toothless," and that

courts must not blindly defer to the judgment of prison administrators simply because

institutional concerns are at issue.  *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989); *see also*

*Procunier v. Martinez*, 416 U.S. 396, 405-6 (1974) ("[A] policy of judicial restraint cannot

encompass any failure to take cognizance of valid constitutional claims."); *Bradbury v.*

*Wainwright*, 718 F.2d 1538, 1543 (11th Cir. 1983) ("Although deference to prison administrators

is 'wide-ranging,' courts are not required to abdicate their responsibility to redress constitutional

violations.").  Thus, when "a prison regulation or practice offends a fundamental constitutional

guarantee, federal courts [must] discharge their duty to protect constitutional rights."  *Procunier*,

416 U.S. at 405-6.  All four *Turner* factors weigh in Plaintiff's favor, and therefore the Rule's

application to PLN must be struck down.

### 1.       There Is No Rational Connection Between the Penological Justifications for the Rule and Its Application to PLN's Correspondence

The first *Turner* factor is two-pronged:   A court must first determine whether the

penological objective underlying the regulation is "legitimate and neutral," and then must decide

whether the regulation is rationally related to that objective. *Thornburgh*, 490 U.S. at 414; *Turner*, 482 U.S. at 89. This first factor constitutes a *sine qua non*, meaning that if Defendant fails to demonstrate that application of the Rule to *Prison Legal News* is rationally related to the Rule's objectives, this Court need not reach the other factors. *See Prison Legal News v. Lehman,* 397 F.3d 692, 699 (9th Cir. 2005); *Morrison v. Hall*, 261 F.3d 896, 901 (9th Cir. 2001); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001).

When putting forth their penological objectives, officials "cannot rely on general or conclusory allegations to support their policies." *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990). Rather, the FDOC "must demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *Id.* at 386 ("An evidentiary showing is required as to each point."). Indeed, courts "must first identify with particularity the specific rehabilitative goals advanced by the government to justify the restriction at issue, and then give the parties the opportunity to adduce evidence sufficient to enable a determination as to whether the connection between these goals and the restriction is rational under *Turner*." *Ramirez v. Pugh*, 379 F.3d 122, 128 (3d Cir. 2004).

Moreover, the proper inquiry in an "as-applied" challenge recognizes that "[a] regulation valid and neutral in other respects may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns." *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 986 (8th Cir. 2004); *see also Thornburgh*, 490 U.S. at 403 (rejecting a facial challenge to mail regulations, but remanding for determination of whether the application to specific publications was reasonable under *Turner*); *Hodgson v. Fabian*, 2009 WL 2972862, *8 (D. Minn. Sept. 10, 2009) ("A valid neutral regulation may be invalid if it is applied to particular mail items in a way that negates legitimate concerns."). Similarly, a challenged regulation fails *Turner*'s analysis if it

contains "loopholes that undermine its rationality and the credibility of defendants' concerns." *Cal. First Am. Coalition v. Woodford*, 299 F.3d 868, 881 (9th Cir. 2002). Here, using the Rule to censor *Prison Legal News* simply does not serve the Rule's objectives in any rational way.

Three-Way Calling Services

The FDOC's only asserted justification for banning publications with ads for three-way calling services is to prevent inmates from calling unapproved phone numbers and calling numbers that are not traceable, which limits the FDOC's ability to identify who is actually receiving the call and where they are physically located. *See* FDOC's Resp. Pl. First Interrog., #10. There is no valid connection between this justification and banning *Prison Legal News*. In the first place, the FDOC itself recently admitted that, because the telephone system can prevent three-way calling and call forwarding and prescreen numbers, there was no reason to censor the magazine on this basis. *See* Def. Mot. Summ. J.; FDOC's Resp. Pl. First Set Interrog., # 2. Judge Moore in the first PLN case found that the telephone security measures "make[] it virtually impossible for any significant security issue to arise out of inmates bypassing the phone systems." Order at 14. Those same security measures are still in place. The contract between the FDOC and Securus requires attempts at three-way calling and call forwarding to be blocked and recorded, and the FDOC has not attempted to terminate the contract because of any alleged failures in this regard. Securus Contract at 14. Securus claims that its three-way call prevention technology works with "near perfect accuracy." Securus Website Printout. Thus, nothing has changed since the FDOC's earlier pronouncement.

Furthermore, no three-way calling problems were identified or considered when the FDOC suddenly decided to change to Rule to ensure that *Prison Legal News* was banned from its institutions. Indeed, the FDOC could not identify any actual instances of three-way calling or

call forwarding taking place, and it certainly could not identify any adverse incident that occurred because of a three-way call.[14]   *See* Upchurch Rule 30(b)(6) Dep. at 32:7-18; 41:6-12. In fact, the <u>only</u> reason the Rule change was initiated was that the FDOC claimed to have noticed an alleged increase in the size and frequency of prohibited advertisements.   FDOC's Resp. Pl. First Set Interrog, # 2.   But a comprehensive examination of every issue of *Prison Legal News* conclusively demonstrates that the "offending" ad content has not changed.   *See* Febus Decl. ¶¶ 23-24.   That FDOC officials claimed to have noticed a few ads that were bigger is of no consequence for this analysis, and is refuted by the record.[15]

A further indicator of irrationality is that the FDOC has applied this prong of the Rule to ban publications with ads for <u>any</u> kind of phone service, whether it mentions three-way calling or not.   In fact, the vast majority of the phone ads are not offering three-way calling services, they are offering a legitimate means of avoiding the payment of long-distance charges by providing a local phone number.   *See* Wright Decl. ¶ 17; Dyar Decl. ¶ 9. These are not call forwarding services or call diversion operations; all relevant data on the recipient is contained in the industry-standard databases, so that if the number were looked up, the recipient's name and physical address would be readily discoverable.   Dyar Decl. ¶¶ 6-9.   The local number is simply assigned to the recipient.   These services do not "bypass" the Securus telephone system or any security measures; they use the exact same system to call a local number.[16]   *Id.* The exact same security precautions are in place as with any call made by an inmate.   *Id.*   Therefore, all of the

---

[14] Certain papers documenting alleged three-way calls were disclosed on the last day of discovery by Defendant, thus giving Plaintiff no opportunity to conduct follow-up discovery.  Should these documents be used by Defendant, Plaintiff intends to move to exclude them from the record.

[15] Moreover, any conclusion by the FDOC about the increase in ads was based merely on anecdotal evidence, and not a comprehensive examination.  Upchurch Rule 30(b)(6) Dep. at 72:1-18.

[16] Because Securus receives less revenue when inmates make a local call as opposed to a long distance call, Securus has been blocking calls to numbers provided by these discount phone service providers.  The legality of this practice is the subject of an ongoing proceeding at the Federal Communications Commission.  *See* Millicorp Comments in FCC Proceeding WC 09-144, Ex. 28.  Because Securus pays the FDOC a 35% commission, the discount phone services result in a loss of revenue for the FDOC as well.

FDOC's security concerns are alleviated.  Miller Decl. ¶¶ 20, 32.  In addition, the FDOC allows calls to be made to cell phones.  *See* F.A.C. 33-602.205. Because the recipient of a call to a cell phone may be physically anywhere in the country, this "loophole" further undermines the credibility of the FDOC's concerns.  *See Woodford*, 299 F.3d at 881.

Finally, the FDOC has numerous other security measures at its disposal to address its concern of inmates calling numbers that cannot be traced, including recording every call (and real-time monitoring of many calls), rules prohibiting three-way calls and call forwarding, and a limited approved call list of ten numbers that can only be changed every six months.  *See* Securus Contract & F.A.C. 33-602.205(2)(c). Thus, just as Judge Moore found and the FDOC admitted a few years ago, the Department's security concerns are amply covered, making it virtually impossible for an inmate to call someone whose information is unknown to the Department.  The <u>only</u> reason that the Rule was changed was to capture *Prison Legal News* within its reach, even though the FDOC has absolutely no evidence of any problems associated with three-way calling.  The FDOC has offered only general and conclusory allegations, and no evidence to support its claims. There is therefore no rational connection between the justification for this prong of the Rule, and applying it to *Prison Legal News.*

<u>Pen-pal Services</u>

The FDOC's only asserted justification for banning publications with ads for pen-pal services is to protect the public from fraud scams.  *See* FDOC's Resp. Pl. First Interrog., #11. There is no valid connection between this justification and banning *Prison Legal News*.  The question here is not whether the FDOC could ever ban pen-pal ads; the question is whether it can ban <u>an entire publication</u> because of incidental pen-pal ads.  Again, the FDOC admitted in the previous case that there was no need to censor the magazine on this basis.  Judge Moore in the

first PLN case found that "[i]nmates cannot participate in pen-pal services, and the Florida prisons mail system reviews all outgoing and incoming mail to make sure that inmates are not participating in any illicit or prohibited services." Order at 14. Indeed, the FDOC has numerous security measures at its disposal. *See, e.g.,* F.A.C. 33-210.101(5) (inspection of mail); F.A.C. 33-210.101(15) (inmate must reveal their status as inmates); F.A.C. 33-210.101(11) (inmates prohibited from engaging in correspondence that threatens institutional security); F.A.C. 33-210.101(10) (inmate prohibited from corresponding with someone who does not want mail from that inmate); Section 817.031, Florida Statutes (criminalizing fraud through correspondence).

Further, the FDOC is aware of only six reports of inmates perpetuating scams using a pen-pal service, and none was related to *Prison Legal News* and its ads, none occurred in Florida, and most are so remote in time as to be irrelevant.[17]  *See* FDOC's Resp. Pl. First Interrog., #14. It was aware of no other pen-pal incidents. Upchurch Rule 30(b)(6) Dep. at 58:8-16. Thus, the FDOC has no evidence that ads from *Prison Legal News* have ever caused a problem. Moreover, all of the incidents the FDOC now cites to nearly a decade later existed at the time of the first case, during which it insisted that PLN's ads did not pose a security threat. Finally, none of this was considered when the Rule was changed, and therefore has nothing to do with the amendment to the Rule. The connection between the FDOC's limited evidence and the Rule's application to PLN is simply too tenuous, and therefore fails *Turner*'s first factor as well.

<u>Purchasing Products or Services with Postage Stamps</u>

The FDOC's only asserted justification for banning publications with ads for purchasing products or services with postage stamps is to eliminate any type of currency within the prisons. *See* FDOC's Resp. Pl. First Interrog., #12.   There is no valid connection between this

---

[17] Plaintiff will be moving to exclude the use of Steve Arnold's testimony if used.  Mr. Arnold is deceased.

justification and banning *Prison Legal News*.  Again, the FDOC insisted in the previous case that it would not censor the magazine on this basis. Def. Trial Brief at 10-11.  Judge Moore found that "since the FDOC strictly regulates its mail system, there would be no way for inmates to purchase products such as subscriptions through the mail with postage stamps. This would be true even if the prisons allowed inmates to possess a sufficient number of stamps to allow them to purchase a PLN subscription, which they do not."   Order at 14.

Moreover, the FDOC offers nothing more than general and conclusory allegations, as it cannot identify a single adverse incident that occurred because of postage stamps, let alone because of an <u>advertisement</u> for using postage stamps.  Upchurch Rule 30(b)(6) Dep. at 58:17 – 59:1; 76:2-8.  While the FDOC speculates that stamps can be used for currency, which may then lead to violence over debts, it offers no actual evidence that this has happened.[18]  *See Woodford*, 299 F.3d at 882 ("Although prison officials may pass regulations in anticipation of security problems, they must at a minimum supply some evidence that such potential problems are real, not imagined.").  Indeed, one court has already held that it was unconstitutional to prevent a prisoner from receiving a copy of *Prison Legal News* because it accepted stamps as payment. *Waterman v. Commandant, United States Disciplinary Barracks,* 337 F.Supp.2d 1237, 1242 (D. Kan. 2004).  Finally, inmates are allowed to possess up to 40 stamps and receive up to 20 stamps in the mail, a loophole that further undermines the rationality of the Rule.  *See* F.A.C. 33-602.201 & 33-210.101(2)(e).   Hence, there is no valid, rational connection between the justifications behind this portion of the Rule and its application to PLN.

<u>Conducting a Business or Profession</u>

The FDOC's only asserted justifications for banning publications with ads for conducting

---

[18] Defendant disclosed, after the close of discovery, numerous documents purporting to document the exchange of stamps for cash.  Should these documents be used by Defendant, Plaintiff intends to move to exclude them from the record.

a business or profession is to prevent excessive entanglement with the inmate's business, to prevent the kinds of fraud or abuse that could be committed through running a business, an increase in administrative burdens because of mail and money handling, and difficulty in controlling inmates' interactions with the general public.  *See* FDOC's Resp. Pl. First Interrog., #13.  There is no valid connection between these justifications and banning *Prison Legal News*, because the FDOC has no evidence to show that any of this has ever happened.  Upchurch Rule 30(b)(6) Dep. at 59:2-19.  And, the threat of fraud and abuse is no greater with the tools that inmates already have than with the ability to operate a business.  *See Morrison*, 261 F.3d at 902 (striking down a ban on a certain type of mail because there was no evidence that more contraband arrived in that type as opposed to other types).  Further, the types of ads in *Prison Legal News* that are swept within this portion of the Rule typically offer an inmate money for doing something, such as drawing a picture or writing an article. *See* Sample Advertisement, Ex. 29.  They do not involve any kind of business operation that would implicate the FDOC's concerns, and there is no evidence of a rampant problem with inmates starting up businesses because of ads they saw in *Prison Legal News*.  Finally, as with the other prongs, none of these alleged issues were taken into account when deciding to amend the Rule.  This complete lack of evidence demonstrates that there is no valid, rational connection between the justifications behind this portion of the Rule and its application to PLN.

Generally Applicable Considerations

With the above arguments on the specific prongs of the Rule in mind, several principles that apply across the board are worth highlighting.  For instance, courts have emphasized the importance of examining the evidence to determine whether a regulation is rational.  The case of *California First Amendment Coalition v. Woodford* is instructive.  In *Woodford*, journalists

challenged a rule which barred public viewing of execution procedures prior to administration of lethal injection. 299 F.3d 868 (9th Cir. 2002). Prison officials argued that the rule was necessary to protect the anonymity of execution staff who, they alleged, faced possible retaliation. *Id*. at 880. The court struck down the regulation, finding that while ensuring staff safety was a legitimate penological goal, "defendants had presented no evidence that execution staff had ever been, or were ever likely to be, publicly identified or attacked," and that "defendants' fear that execution team members will be publicly identified and retaliated against is an overreaction, supported only by questionable speculation." *Id*. Here, the FDOC similarly offers nothing more than questionable speculation; the lack of relevant evidence renders application of the Rule unconstitutional.

Further, in determining whether a regulation is rationally related to its goal, all relevant evidence must be considered and the "fit" between the goal and censored correspondence must be assessed. For instance, in *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001), an inmate challenged a regulation that prohibited inmates from receiving bulk rate, third, and fourth class mail. *Id*. Prison officials argued that it furthered a legitimate interest by preventing the introduction of contraband into the prison system. *Id*. at 902. The court disagreed, however, striking the rule as unconstitutional and holding that there was no rational connection to the regulation, because "although the defendants presented evidence that contraband is sometimes included in bulk rate, third, and fourth class mail, the defendants have failed to present any evidence that the risk of contraband in first or second class mail is any lower than the risk of contraband in mail that is sent bulk rate, third, or fourth class." *Id*. at 902. Similarly, while there may be evidence that the prohibited services are occasionally used by inmates, these occasions cannot be tied to advertisements for those services, and they certainly cannot be tied to *Prison*

*Legal News*.

Finally, several factual considerations apply to all four prongs of the Rule.  First, there is absolutely no evidence of problems being caused by *Prison Legal News* during the nearly eight years (2002 to mid-2009) in which it was allowed into FDOC facilities.  Not coincidentally, no other state correctional agency, county jail, or the Bureau of Prisons bans this magazine because of its advertising content.  *See Martinez*, 416 U.S. at 414 n. 14 ("[T]he policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction."). And the only state known to have a rule similar to Florida – Arizona – does not ban *Prison Legal News*.  Wright Decl. ¶ 13.  Defendant has offered no evidence why Florida should be any different.  Furthermore, the <u>only</u> reason that the FDOC changed the Rule was that staff claims to have noticed an increase in the size and frequency of the ads.  *See* FDOC's Resp. Pl. First Interrog., #2. However, the offending ad content has not changed.  *See* Febus Decl. at ¶¶ 23-24.  It strains credulity for the FDOC to argue that when the magazine's space averaged 5.9% offending ads, it posed no threat, but when its space averaged 6.44%, it was too dangerous to be admitted.  *Id.*  There was absolutely nothing to indicate that the previous version of the Rule was not serving Defendant's security needs.  Thus, the only reason the Rule was amended was to ensure that *Prison Legal News* would fall within its scope.

Lastly, because of the FDOC's asserted penological justifications, the majority of the above discussion has been not about the Rule, but about the actual services themselves, and the nature of the security threat that they pose.  It is important to remember, though, that this case is not about whether the FDOC can stop those services—it is about whether the FDOC can censor an entire publication because it contains incidental advertisements for those services. And the nature of the interests at stake here—those of a magazine publisher attempting to communicate a

political message—must be taken into account. *See Dehne v. Avanino*, 219 F. Supp. 2d 1096, 1111 (D. Nev. 2001). For example, the outcome of this case might be different if the publication at issue were simply a commercial flyer explaining its services. In that case, the sender's interest in communicating its message would not be as strong as it is here, in a case involving political and social commentary about the prison system that enjoys the highest protection under the First Amendment. With such fundamental rights at stake and the evidence of potential harm so flimsy, this Court should conclude that the FDOC's actions have simply gone too far. Although failure under *Turner*'s first factor obviates the need to address the remaining factors, Plaintiff will address them out of an abundance of caution.

2.      **PLN Has No Alternative Means of Exercising Its First Amendment Rights**

Because PLN's entire publication, and most of its correspondence, has been impounded by the FDOC, PLN has no other means of communicating its message to its intended recipients. Advertising is the life-blood of the publishing industry; without it, no publication—including any mainstream newspaper or magazine—could exist. *Prison Legal News* is a national publication, and PLN cannot simply create a special edition that does not contain the offending ads without incurring an extraordinary expense. Wright Decl. ¶¶ 21-37. To create a special edition would cost an estimated $38,267 – $31,838 per year at current subscriber levels, and $43,284 - $58,677 per year if, as expected, subscriber levels return to pre-censorship levels. *Id* at ¶¶ 21-22. PLN fully expects to grow its subscriber base in Florida, which would increase the costs to an estimated $46,954 - $77,790 per year. *Id.* PLN is a non-profit company whose revenues barely exceed expenses, and any increase in costs could cause PLN to stop operating in Florida. *Id.* at ¶ 37. The FDOC cannot require PLN to engage in such a costly endeavor that would put them out of business in this state.

The case of *Lindell v. Frank*, 377 F.3d 655 (7th Cir. 2004), is instructive on this point.  In *Lindell,* the Wisconsin DOC implemented a "publishers only" rule and prohibited prisoners from receiving by mail clippings of published articles or photocopies of such clippings.  *Id*. at 658.  The defendants argued that the policy prevented contraband from entering prisons and preserved staff resources that would be expended in reviewing each clipping.  *Id*. at 659.  The Seventh Circuit found that, although the rule was facially valid, it was unconstitutional as applied in that case because it did not leave any alternative avenues available for the exercise of the inmates' constitutional rights.  *Id*.  Noting that the prison's rule did not prohibit inmates from subscribing to the actual magazines and/or newspapers from which the clippings originated, the court nonetheless held that this was not a realistic alternative means of exercising their First Amendment rights, given that "subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers."  *Id*. at 659 (quoting *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir. 1995)). *See also Cook*, 238 F.3d at 1149 ("[P]aying a higher rate is not an alternative because the prisoner cannot force a publisher who needs to use, and is entitled to use, the standard rate to take additional costly steps to mail his individual newsletter.").  Thus, while the alternative was feasible, it imposed too great a burden on the inmate, and therefore the restriction was unconstitutional.

The situation is analogous here. *See Miniken v. Walter,* 978 F.Supp. 1356, 1363 (E.D. Wash. 1997) (noting PLN was a "nonprofit operation . . . centered on mailing [*Prison Legal News*] third class as an economic and logistical matter").  PLN has no other feasible method of exercising its First Amendment rights, and therefore this factor weighs in PLN's favor.

### 3.    Accommodating PLN's Rights Will Have No Impact on Prison Staff

Allowing inmates to receive *Prison Legal News* and PLN's other correspondence will

have no impact on prison staff, as FDOC employees already routinely inspect and deliver thousands of publications to inmates across the state.  The FDOC was in fact delivering *Prison Legal News* without incident from at least January 2002 through August 2009.  In fact, not impounding the magazine will actually result in <u>less</u> work for the LRC, because the Committee will not have to review the publication, as only impounded publications are forwarded to the LRC for review.

The FDOC cannot satisfy this factor by arguing that accommodating PLN's rights may lead to more rule violations, which in turn will require more staff time to investigate and discipline those responsible.  That chain of logic is flawed because it is based on pure speculation.  Moreover, because <u>any</u> accommodation of rights has the potential to increase demands on staff (who must inspect more mail and conduct more investigations), this reasoning would be present in any First Amendment case, and should therefore be rejected.  *See Morrison*, 261 F.3d at 903 (holding that the efficient use of prison staff and resources could not justify an effective ban on subscription publications); *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1110 (N.D. Cal. 2002) ("[A]ny negative impact on prison resources created by a supposed increase in prison mail may be outweighed by the penological benefits of inmate correspondence with the outside world.").  Thus, this factor weighs in PLN's favor.

### 4.	Numerous Alternatives to the Rule Exist, and the Rule is an Exaggerated Response to Concerns

The FDOC has numerous alternatives, other than the Rule, to address its penological concerns, indicating that applying the Rule to PLN's correspondence is merely an exaggerated response to those concerns.  *Turner*, 482 U.S. at 90-91 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable

relationship standard."). These alternatives are more than adequate to address the FDOC's security concerns. One such alternative that would apply to all four prongs of the Rule would be to do what the New York Department of Correctional Services has done, and insert a disclaimer into every issue of *Prison Legal News* stating that the magazine may have ads for services that inmates are prohibited from using. Wright Decl. ¶ 14.

<u>Three-Way Calling</u>

As noted above, the FDOC has numerous methods of preventing inmates from contacting non-approved persons. The FDOC's telephone company is contractually required to, and does, detect and block all attempts at three-way calling or call forwarding. *See* Securus Contract. All inmate calls are recorded and can be monitored in real time. *Id.* at 13. FDOC rules prohibit inmates from engaging in three-way calling or call forwarding. F.A.C. 33-602.205(2)(a-c). Inmates are only permitted to have ten numbers (which are preapproved) on their approved call list, and are only permitted to change that list once every six months. *Id.* All numbers on the approved call list can be researched to determine who is on the other line and where they are.

Moreover, the vast majority of ads cited under this portion of the Rule are not for three-way calling; rather, they are for discount phone services that pose no more security threat than any other phone call. Dyar Decl. ¶ 9; Wright Decl. ¶ 17. *See also* Sample Phone Ad, Ex. 30. All of these methods work, as the FDOC can produce no evidence that any adverse incident has occurred because an inmate made a three-way call or contacted a non-approved person. Thus, just as Judge Moore found in the first PLN case, the FDOC has numerous alternatives that more than satisfy their security concerns, and the ban on advertisements for three-way calling is an exaggerated response to their concerns.

<u>Pen-pal Services</u>

The FDOC has a myriad of rules at its disposal that it can and does enforce to prevent fraud scams through pen-pal services. *See, e.g.,* F.A.C. 33-210.101(5) (inspection of mail); F.A.C. 33-210.101(15) (inmate must reveal their status as inmates on the envelope cover); F.A.C. 33-210.101(11) (inmates prohibited from engaging in correspondence that threatens institutional security); F.A.C. 33-210.101(10) (inmate prohibited from corresponding with someone who does not want mail from that inmate); Section 817.031, Florida Statutes (criminalizing fraud through correspondence).   The FDOC can produce no evidence of any recent pen-pal scams, and no evidence that a pen-pal scam was perpetrated because of an ad in *Prison Legal News*.   These alternatives amply cover the FDOC's security concerns.   Miller Decl. ¶¶ 25, 32.

<u>Purchasing Products or Services with Postage Stamps</u>

The FDOC has ready alternatives to combat the existence of currency in its prisons.   For instance, all types of currency are banned.   Upchurch Rule 30(b)(6) Dep. at 42:25- 43:10. Inmates are only allowed to possess 40 stamps at one time, and may only receive 20 stamps at a time through the mail.   F.A.C. 33-602.207 & 33-210.101(2)(e).   Of course, all of the problems that the FDOC speculates will occur if currency exists (such as violence, extortion, etc.) are already prohibited by FDOC rules, and inmates are punished for breaking them.   Moreover, the FDOC could simply ban stamps altogether from its prisons, and allow inmates to purchase postage electronically, like the inmates do with every other canteen purchase. Miller Decl. ¶ 24. For instance, the Washington Department of Corrections creates subaccounts for prisoners, so that if family members wish to send the prisoner money for postage, that money can then only be used for postage. *Id. See also Martinez*, 416 U.S. at 414 n. 14 ("[T]he policies followed at other

well-run institutions would be relevant to a determination of the need for a particular type of restriction.").  Or the FDOC could allow inmates to use e-mail, which would drastically reduce the use of stamps, or it could allow inmates to purchase envelopes with preprinted postage and without stamps.  Miller Decl. ¶ 23. These ready alternatives demonstrate that the ban on ads for purchasing products or services with postage stamps is an exaggerated response to the FDOC's concerns.

Conducting a Business or Profession

Inmates are already prohibited from conducting a business or profession while incarcerated, which sweeps so broadly as to prevent inmates from being paid to write articles for publication.  *See* F.A.C. 33-602.20; *McDonough*, 200 F. App'x at 875. As mentioned above, there are numerous prohibitions against fraud and abuse that the FDOC can and does enforce. There is no evidence that these Rules are inadequate; therefore, this is an exaggerated response.

To conclude, all four *Turner* factors weigh in Plaintiff's favor, and the FDOC's application of the Rule to PLN's correspondence is not reasonably related to the penological interests at stake. For all the foregoing reasons, the FDOC has violated, and continues to violate, PLN's First Amendment rights.

*The FDOC Is Barred By Judicial Estoppel from Arguing That It Must Censor* Prison Legal News

"Judicial estoppel is 'designed to prevent parties from making a mockery of justice by inconsistent pleadings.'" *City of Riviera Beach v. That Certain Unnamed Gray, Two Story Vessel Approximately Fifty-Seven Feet In Length*, 649 F.3d 1259, 1273 (11th Cir. 2011) (quoting *McKinnon v. Blue Cross & Blue Shield of Ala.*, 935 F.2d 1187, 1192 (11th Cir. 1991)).  Three factors typically inform the decision whether to invoke judicial estoppel: (1) whether the present position is clearly inconsistent with the earlier position; (2) whether the party succeeded in

persuading a court to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or second court was mislead; and (3) whether the party advancing the inconsistent position would derive an unfair advantage. *Jaffe v. Bank of America, N.A.*, 395 F. App'x 583, 587 (11th Cir. 2010).[19]

In the first PLN case, the FDOC insisted that the ads in *Prison Legal News* did not pose a security threat, that all of its penological concerns had been addressed by other measures, and therefore it had no intention of banning the magazine in the future. *See* Def. Mot. Summ. J.  It promised both the District Court and the Eleventh Circuit that no further censorship based on ad content would take place, and it worked. *See McDonough*, 200 F. App'x at 878 ("We have no expectation that FDOC will resume the practice of impounding publications based on incidental advertisements.").

Now, less than three years after the Eleventh Circuit affirmed the dismissal on mootness grounds, the FDOC has changed its mind, making this the <u>fifth</u> time the Department has changed its position on this issue.  The purported reason given for this change—that the size and frequency of the offending ads increased—is simply false when the entirety of the publication is taken into account.  *See* Febus Decl.  Again, it strains credulity for the FDOC to argue that when the magazine's space averaged 5.9% offending ads, it posed no threat, but when that number was 6.44%, it was too dangerous to be admitted.  *Id.*  This is particularly true given that no objective criteria exist to determine what is meant by "prominent or prevalent."  *See* Hughes Rule 30(b)(6) Dep. at 11:2 – 12:1.

All three judicial estoppel factors weigh in Plaintiff's favor.  The position is clearly inconsistent with the earlier position, the FDOC succeed in persuading both courts, as the case

---

[19] The Eleventh Circuit has noted that other factors may be relevant as well, including whether the party previously adopted an inconsistent position under oath in a judicial proceeding, and whether the party intended to make a mockery of the judicial system. *Jones v. U.S.*, 467 F. App'x 815, 817 (11th Cir. 2012).

was dismissed as moot and later affirmed, and the FDOC would derive an unfair advantage here if allowed to make that argument.  It would be antithetical to the interests of justice to allow the FDOC to argue that it must censor *Prison Legal News* because of grave security concerns, when less than three years ago it assured the court that those security concerns were not an issue and therefore no censorship was necessary or forthcoming.  Given these considerations, summary judgment should be granted in Plaintiff's favor on the First Amendment count.

## II.    The FDOC Has Violated, and Continues to Violate, PLN's Due Process Rights By Failing to Provide PLN with Notice of the Impoundment of Its Mail

A procedural due process violation requires the plaintiff to demonstrate the deprivation of a protected liberty or property interest, and that the procedures surrounding the deprivation were inadequate.  *See Arrington v. Helms*, 438 F.3d 1336, 1347-8 (11th Cir. 2006).  The Supreme Court has already determined that that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment."  *Martinez*, 416 U.S. at 417. *See also Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1367-68 (11th Cir. 2011).  The Supreme Court has also determined that, in the prison context, Due Process requires three minimal procedural safeguards each time a single piece of mail is intercepted:  1) The inmate must be notified, 2) the sender must be given a reasonable opportunity to protest the decision, and 3) the complaints must be referred to a prison official other than the person who originally disapproved the correspondence. *Martinez*, 416 U.S at 418-419.

Of course, for a publisher to exercise that right to protect the decision, the publisher must first be notified that its mail has been intercepted.  *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (citations omitted) ("For more than a century the central meaning of procedural due process has been clear:  'Parties whose rights are to be affected are entitled to be heard; and in

order that they may enjoy that right they must first be notified.'") (emphasis added).  Indeed, numerous courts have determined that *Martinez* requires the publisher or sender to be notified each time a piece of mail is intercepted, and that those protections apply to the type of correspondence at issue in the case, including the very same publication.  *See Jacklovich v. Simmons*, 392 F.3d 420, 433-34 (10th Cir. 2004); ("[P]ublishers [including PLN] are entitled to notice and an opportunity to be heard when their publications are disapproved for receipt by inmate-subscribers … providing adequate individualized notice to the publisher would appear to impose a minimal burden") (citations omitted); *Cook*, 238 F.3d at 1152-53 (holding that Prison Legal News was entitled to individualized notice each time its publication was censored by prison officials); *Lehman*, 397 F.3d at 701 (same); *Montcalm Publishing Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) (holding that rejection notices must be delivered to the publishers of disapproved publications); *Martin v. Kelley*, 803 F.2d 236, 243-44 (6th Cir. 1986) ("[W]e hold that the mail censorship regulation is insufficient because it fails to require that notice and an opportunity to protest the decision be given to the author of the rejected letter … [w]ithout notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech."); *Trudeau v. Wyrick*, 713 F.2d 1360, 1366-67 (8th Cir. 1983) (holding that it was the prison official's duty under *Martinez* to provide notice to both the author and the intended recipient of a letter that it was being withheld).

Here, even though since September 2009 the FDOC has impounded every monthly issue of *Prison Legal News*, at least 41 information packets, and a book, the FDOC only provided notice to PLN for five magazine issues and four information packets.  Wright Decl. ¶ 16. The FDOC failed in every other instance of censorship to notify PLN.  Thus, PLN was unable to

appeal the rejection because it was not timely notified of it.[20]  *Id.* Thus, the FDOC has violated,

and continues to violate, PLN's Due Process rights as secured by *Martinez*.

## Conclusion

This Court should not accept the FDOC's constantly shifting positions on the necessity of

censoring PLN's correspondence.  A few short years ago, Defendant insisted that any security

concerns posed by *Prison Legal News* were fully accommodated.  With no material change in

circumstances and no evidence of any harmful incidents caused by these ads, the FDOC has

reversed course.  Defendant has not simply censored direct advertisements for prohibited

services; Defendant has gone a step further, and censored an entire publication based on its

incidental ad content.  On such a thin record, the First Amendment does not permit this

censorship, as doing so serves no rational purpose.  Finally, the FDOC has violated PLN's Due

Process rights by failing to provide notice of the rejection of its mail.

For all the foregoing reasons, Plaintiff respectfully requests that the Court 1) grant

Plaintiff's Motion for Summary Judgment on both counts, 2) declare the Rule unconstitutional as

applied to PLN and permanently enjoin the FDOC from censoring PLN's correspondence based

on its advertising content, and 3) declare that the FDOC's failure to notify PLN of the censorship

of its mail violates Due Process, and enter a permanent injunction requiring FDOC to notify PLN

every time its correspondence is intercepted.

---

[20] The problem is compounded by the facts that 1) publishers are required to attach a copy of the Notice of
Impoundment to their appeal, and 2) no reasonable person can tell how much offending ad content is considered
prevalent or prominent, so PLN has no idea what violates the Rule and what doesn't.

Respectfully submitted,

**Randall C. Berg, Jr.**  
Fla. Bar No. 318371  
RBerg@FloridaJusticeInstitute.org  
**Dante P. Trevisani**  
Fla. Bar No. 72912  
DTrevisani@FloridaJusticeInstitute.org  
Florida Justice Institute, Inc.  
3750 Miami Tower  
100 S.E. Second Street  
Miami, FL 33131-2309  
T. 305.358.2081  
F. 305.358.0910  

**Lance Weber**  
Human Rights Defense Center  
P.O. Box 2420  
Brattleboro, VT 05303  
T. 802.579.1309  
F. 866.228.1681  
lweber@humanrightsdefensecenter.org  

**Randall C. Marshall, Esq.**  
Fla. Bar No. 181765  
ACLU Found. of Fla.  
4500 Biscayne Blvd., Ste. 340  
Miami, FL 33137  
T. 786.363.2700  
F. 786.363.1108  
RMarshall@aclufl.org  

_s/Dante P. Trevisani._  
Dante P. Trevisani, Esq.

Counsel for Prison Legal News

## Certificate of Service

I HEREBY CERTIFY that I electronically filed today, March 8, 2013, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered for this case on the following service list, including all opposing counsel.

_s/Dante P. Trevisani_  
Dante P. Trevisani

### SERVICE LIST

**Case No. 4:12CV239-MW/CAS**
**United States District Court, Northern District, Tallahassee Division**

**Served via CM/ECF:**

Susan A. Maher, Esq.
Cedell Ian Garland, Esq.
Lance Neff, Esq.
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone:  (850) 414-3300
Facsimile:  (850) 488-4872
E-mail:  susan.maher@myfloridalegal.com
Email: Cedell.Garland@myfloridalegal.com
Emai: lance.neff@myfloridalegal.com
Counsel for Kenneth S. Tucker, in his official capacity as Secretary of the Florida Department of Corrections