UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


PRISON LEGAL NEWS, a
project of the HUMAN
RIGHTS DEFENSE CENTER,
a not-for-profit,
Washington charitable
corporation,

       Plaintiff,

vs.                CASE NO:   4:12-cv-239-RH/CAS

THE FDOC GROUP, INC., a
Florida corporation,
CORRECTIONS CORPORATION OF
AMERICA, a Tennessee corporation,
registered and doing business
in the state of Florida; and
KENNETH S. TUCKER, in his
official capacity as Secretary
of the Florida Department
of Corrections

       Defendants.
_____/


THE DEPOSITION OF:    JAMES R. UPCHURCH

AT THE INSTANCE OF:    The Plaintiff

DATE:                Thursday, January 24, 2013

TIME:                Commenced at 9:32 a.m.
                     Terminated at 12:30 p.m.

PLACE:               Collins Building
                     107 West Gaines Street
                     Tallahassee, Florida

REPORTED BY:         SARAH B. GILROY, RPR, CRR
                     sbrinkhoff@comcast.net
                     Notary Public in and for
                     the State of Florida at
                     Large

```
1    APPEARANCES:

2
     REPRESENTING THE PLAINTIFF:
3
             RANDALL C. BERG, JR., ESQUIRE
4            DANTE P. TREVISANI, ESQUIRE
             Florida Justice Institutes
5            3750 Miami Tower
             100 SE Second Floor
6            Miami, Florida 33131

7
     REPRESENTING THE DEFENDANT CCA:
8
             JOHN A SCHIFANO, ESQUIRE
9            Burr Forman
             One Tampa City Center, Suite 3200
10           Tampa, Florida 33602

11
     REPRESENTING THE DEFENDANT DEPARTMENT OF CORRECTIONS:
12
             LANCE NEFF, ESQUIRE
13           C. IAN GARLAND, ESQUIRE
             Office of the Attorney General
14           PL-01, The Capitol
             Tallahassee, Florida 32399-1050
15

16   REPRESENTING THE DEFENDANT GEO GROUP:

17           SCOTT J. SEAGLE, ESQUIRE
             Coppins, Monroe, Adkins & Dincman
18           1319 Thomaswood Drive
             Tallahassee, Florida 32308
19

20   ALSO PRESENT:

21           SUSAN HUGHES, DOC
             WAYNE GREEN, DOC
22           SUSAN MAHER, ESQUIRE

23

24

25
```

ACCURATE STENOTYPE REPORTERS, INC.

```
1                          I N D E X

2    WITNESS                                   PAGE NO.

3    JAMES R. UPCHURCH
          Direct Examination by Mr. Berg          4
4

5
                      INDEX OF EXHIBITS
6                (Exhibits attached hereto.)

7    NUMBER DESCRIPTION
     1        Notice of 30(B)(6) depositon         4
8    2        Garland e-mail to Neff with re: List 11
     3        4-16-04 Upchurch affidavit           17
9    4        Contract amendment between DOC and
                Securus                            39
10   5        Amendment to 33-501.401             82
     6        6-11-08 draft with PKD comments     82
11   7        e-mail string containing language   82

12   CERTIFICATE OF OATH                         105
     CERTIFICATE OF REPORTER                     106
13   ERRATA SHEET                                107
     READ AND SIGN LETTER                        109
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Exhibit No. 1 was marked for identification).
 2   The following deposition of JAMES R. UPCHURCH was
 3   taken on oral examination, pursuant to notice, for
 4   purposes of discovery, and for use as evidence, and
 5   for other uses and purposes as may be permitted by the
 6   applicable and governing rules.  Reading and signing
 7   is not waived.
 8                    *    *    *
 9        THE COURT REPORTER:  Do you solemnly swear or
10        affirm the testimony you are about to give will
11        be the truth so help you God?
12        THE WITNESS:  I do.
13   Thereupon,
14                    JAMES R. UPCHURCH
15   the witness herein, having been first duly sworn, was
16   examined and testified as follows:
17                    DIRECT EXAMINATION
18   BY MR. BERG:
19      Q   Would you please state your name for the
20   record, Mr. Upchurch.
21      A   James R. Upchurch.
22      Q   Mr. Upchurch, I notice that your title has
23   changed, I guess, since we last met.  And you are now
24   Director of Operations and Support; is that correct?
25      A   Yes.
```

```
1      Q    And you used to be Bureau Chief of Security

2    Operations; correct?

3      A    Yes.

4      Q    Have your duties changed as a result of that

5    title change?

6      A    Well, in addition to -- there is a Bureau

7    Chief of Security Operations now --

8      Q    And who is that?

9      A    -- that reports to me.  That's Jeremy Vaughan.

10      Q    Okay.

11      A    And then I also have four other bureau chiefs

12    that report to me, classification bureau chief, Rusty

13    McLaughlin; let's see, institutional support is

14    Charlie Terrell; Lee Adams, who is over population

15    management and release -- not population management,

16    excuse me -- admissions and release.

17      Q    I'm sorry.  Who was that?

18      A    Lee Adams.

19      Q    Okay.

20      A    Steve Grizzard, who is over facilities

21    maintenance and management; and -- is that five?  It

22    should be five total.

23      Q    So McLaughlin, classification?

24      A    Right.

25      Q    Terrell?
```

```
 1     A    Institutional support.

 2     Q    And Adams?

 3     A    Admissions and release.

 4     Q    And Grizzard, maintenance?

 5     A    Facilities and maintenance.

 6     Q    Okay.  And the last one I missed.

 7     A    Did you get Jeremy Vaughan?

 8     Q    Right.

 9     A    And over bureau of security operations.

10     Q    So is Jeremy Vaughan Jerry Vaughan's son?

11     A    Yes.

12     Q    And I guess Jerry is retired now; is that

13  correct?

14     A    Several years now, yes.

15     Q    Okay.  So Jeremy Vaughan is taking your old

16  job --

17     A    Yes.

18     Q    -- is that correct?  You have been designated

19  by the department as a 30(b)(6) witness; is that

20  correct?

21     A    Right.

22     Q    And you've also been designated as a hybrid

23  expert; is that correct?

24     A    Yes.  That's my understanding.

25     Q    Okay.  You've had your deposition taken many
```

```
 1    times before so I don't need to go over that with you;

 2    correct?

 3        A    I don't think so, unless you've got something

 4    new to --

 5        Q    I don't.

 6        A    You may have to remind me of some of it.

 7        Q    Okay.

 8        A    I'm sure you will.

 9        Q    I previously thought you were going to be the

10    only 30(b)(6) witness, but I understand there are

11    others.  So if you wouldn't mind, take a look at

12    the -- were you given a copy of what I will have

13    marked as Plaintiff's Exhibit No. 1 to this

14    deposition?

15        A    That's it; right?

16        Q    Yes, sir.

17        A    Yes.  I have one.

18        Q    And would you go over those items and tell me,

19    starting with No. 1, which items you are going to

20    testify to and which ones -- and who else is going to

21    testify, if you know.

22        A    It's my understanding I will testify to No. 1.

23        Q    Okay.

24        A    Three.

25        Q    Okay.
```

```
1      A    Five.

2      Q    Okay.

3      A    Eight.

4      Q    Okay.

5      A    Eleven.

6      Q    Okay.

7      A    Twelve.

8      Q    Okay.

9      A    Thirteen through 17; 13, 14, 15, 16, and 17.

10  I think that's it.

11     Q    Okay.  Now on the ones that --

12     A    Did I miss one?

13     Q    No.  On the ones that you didn't --

14     A    Wait a minute.  Four.

15     Q    Okay.

16          MR. NEFF:  And maybe a partial of two as well.

17     A    And maybe a partial on two.

18  BY MR. BERG:

19     Q    Okay.  Do you know who else on two?

20     A    Do I know?  No, I don't.

21     Q    Okay.

22          MR. BERG:  Could you help me out?  Do you know

23     who is testifying on two, who you've designated?

24          MR. NEFF:  Depends on how much information you

25     want, maybe Susan or maybe Mr. Terrell, --
```

ACCURATE STENOTYPE REPORTERS, INC.

1          MR. BERG:  Susan.

2          MR. NEFF:  -- Ms. Hughes, and Mr. Green.

3          MR. BERG:  Okay.  And six and seven?

4          MR. NEFF:  For the remainder it's either going

5     to be Ms. Hughes or Mr. Green.

6          MR. BERG:  So six and seven will be Hughes or

7     Green?

8          MR. NEFF:  Uh-huh.

9          MR. BERG:  Nine and ten?

10          MR. NEFF:  For the remainder it's going to

11     be --

12          MR. BERG:  Oh, okay.

13          MR. NEFF:  -- Ms. Hughes or Mr. Green.

14          MR. BERG:  Okay.  Gotcha.

15     And 18?

16          MR. NEFF:  For the remainder, it's Mr. Hughes

17     or Mr. Green.

18          MR. BERG:  I'm slow.  I'm slow, Lance.

19          (Discussion off the record.)

20  BY MR. BERG:

21     Q   Have you had -- what have you done in

22  preparation for your deposition here today,

23  Mr. Upchurch?

24     A   I have reviewed a number of documents that I

25  believe were provided to you.  I have gone through a

1  lot of my e-mail folders and files to see if I've

2  overlooked anything or anything that I've missed.

3        I've reviewed some rules and the location of

4  some -- just to ensure the existence of rule as it

5  relates to some particular items.

6        I met with Lance for a few hours.  I -- that's

7  pretty much it, a few telephone conversations with

8  Susan Maher.

9     Q    Okay.

10     A    And I may have met with her too.  It all kind

11  of runs together.

12     Q    You said you reviewed documents that were

13  produced to me.  Could you be a little more specific

14  in particular which ones you reviewed?

15     A    I think it was stuff that had been produced

16  in -- I had a cover sheet.  There is a list of

17  documents that were -- had been produced at other

18  times and stuff that was provided to me by

19  Mr. Garland -- no, from Crystal Harwood.

20        MR. BERG:  Mind if I see it?

21        MR. NEFF:  (Examining document.)

22        MR. BERG:  (Examining document.)

23  BY MR. BERG:

24     Q    So you've handed me an e-mail listing the

25  documents you reviewed in preparation for the

1    deposition today; is that correct?

2        A    That's not all of them, but that's a large

3    portion --

4        Q    Okay.

5        A    -- of things I looked at.

6            MR. BERG:  Could we mark this as Plaintiff's

7        Exhibit No. 2.

8            (Exhibit No. 2 was identified for the record.)

9    BY MR. BERG:

10       Q    Did you also review the -- you were deposed

11   twice before in what I will call PLN-1.

12           Do you understand what PLN-1 is?

13       A    Is that from '04, '05?

14       Q    Yes, sir.  We tried it in '05 in Jacksonville.

15           Do you recall that lawsuit?

16       A    Yes.

17       Q    You testified in that lawsuit; correct?

18       A    I recall.  I did some affidavits, I believe.

19       Q    And you were deposed twice in that lawsuit;

20   correct?  Once as a fact witness and once as an

21   expert; correct?

22       A    Yes, sir.

23       Q    Did you look at your -- either of those

24   depositions?

25       A    No.

```
 1      Q    Okay.  Did you look at your trial testimony in
 2   that case?
 3      A    No.
 4      Q    In the trial of that case or leading up to
 5   that case, the department was -- starting in 2002,
 6   began rejecting Prison Legal News on the basis of
 7   advertising content; correct?
 8      A    The -- we did.  I'm not sure of the exact
 9   date.  But that sounds probably right, yeah.
10      Q    Okay.  And there came a time when, in 2005,
11   when you learned that MCI, your telephone operator,
12   was able to detect three-way calls that the department
13   changed its position on Prison Legal News coming into
14   and being received by inmates, largely on the basis of
15   the fact that you could detect three-way calling;
16   correct?
17      A    Could you repeat that, please?
18      Q    Sure.  In 2005, roughly, you became aware that
19   MCI, who was the telephone contractor with the
20   department, was able to detect three-way calls and
21   call forwarding.  And based on that, the department
22   changed its position on the impounding and rejection
23   of Prison Legal News coming into and being received by
24   inmates in the Florida Department of Corrections;
25   correct?
```

1    A    That's not exactly true.

2    Q    What's not exactly true about it?

3    A    Well, as is true today, there is only a

4 limited amount of call forwarding and three-way

5 calling that can be detected -- that could be detected

6 by them or can be detected by our vendor today.  The

7 system -- the detection system works on -- because it

8 hears, or it listens for noise on the system, such as

9 when you were to press the -- where you set the phone

10 or you hit the -- a button in order to transfer the

11 call, if it makes a noise, the system detects it.

12 That's what cues it that there is a three-way call

13 that's been processed.

14       This works -- has never, in the 15, 16 years

15 that I've been involved with the phone company -- has

16 never worked 100 percent.  In fact, it's arguable to

17 what extent it does work.  But we became aware and --

18 through discussions with the phone vendor back at that

19 time that there were -- there are systems that, when

20 you call, that they don't really create any noise,

21 that there is an automated process.

22       And with the advent of voiceover IP and the

23 computerization of the phone system and all that,

24 there is not that old fashioned -- nearly as much --

25 is not that old fashioned noise change or noise that

1    would cue the system that you have a three-way call,

2    and you need to block it.

3         So we -- we -- but we did determine, working

4    with MCI at the time, that there were systems and

5    companies out there who would provide local telephone

6    numbers, and that the -- and then an automated sort of

7    a seamless forwarding system that would not be

8    detected, where long distance calls could be made

9    through a -- a local number, and to reduce the charges

10   from what our company was charging by this company who

11   was offering this service.

12        And so -- which was a concern to us, for a

13   variety of security reasons.  We could still monitor

14   calls, but, as I'm sure you're aware, and I know all

15   the inmates are aware, we don't have the staff or

16   resources to listen to all of those telephone calls,

17   or even a majority of them by any means.  But we were

18   able to determine that, once they transferred these

19   calls, the only number or any kind of address or any

20   kind of hard data that we had on who they were talking

21   to was this transfer number, this local number.

22        And once -- once the call was moved, we didn't

23   know who they were talking to.  We didn't have a

24   physical location.  We didn't know the name of the

25   person they were talking to, which is very important

1   to us that we be able to track that in order to be

2   able to protect the public.

3        So working with MCI at the time, they

4   agreed -- and they were motivated to agree as well,

5   because they had to pay for all the security

6   recordings and monitoring and all that stuff.  So they

7   needed to be able to recoup those costs.  So they were

8   very interested in making sure that we -- there was a

9   verifiable billing address and that there was a name

10  and a physical address for that person so that they

11  could make sure that they could collect the money,

12  which was important to them.

13       And it was important to us for the reasons I

14  said from a security perspective.  So together we

15  worked it out.

16       And they agreed to verify and validate all the

17  numbers that were provided.  And they said that,

18  according to the way it worked then, that they felt

19  very confident that they could prevent these

20  forwarding services from being able to beat the system

21  and get around our security concerns.

22       So based on that, and realizing that it wasn't

23  going to be 100 percent, but still it was very likely

24  to be reasonably successful, then we decided that that

25  mitigated one of our concerns.  And then from there,

1   we also considered that -- and have always considered

2   that Prison Legal News is not a bad publication.

3   We've never, you know, made any allegations that the

4   general consent and what they provide to the inmates

5   is bad.

6           But we -- we were just interested in not

7   allowing advertising -- advertisements that promoted

8   violations of our rules, and legitimate rules, with

9   compelling security interests for having them.

10          So we determined at that time that we would

11  allow some leeway for the -- the publication, in terms

12  of some ads, I believe "incidental" is the term that

13  we used, in the publication should not or would not

14  result in it being rejected.

15          So it was not that we realized, as you had

16  said, that all of a sudden MCI realized they could

17  detect three-way calling.  It was because we had

18  determined a method that reduced the possibility that

19  these services that circumvented our system could be

20  managed better than it had been in the past.

21          I guess that's sort of a long, circuitous

22  answer to your question.

23      Q   It is.  I didn't cut you off.  But it is.

24      A   I will try to -- but you asked me --

25      Q   But back in 2004, 2005 --

ACCURATE STENOTYPE REPORTERS, INC.

```
 1      A    Right.

 2      Q    -- you changed your position on whether or not

 3  Prison Legal News, based on its advertising content,

 4  predominantly three-way calls, pen pals, purchasing

 5  with goods with stamps, and operating a business, the

 6  position of the department was, it could come in at

 7  that time; correct?  And that was the position you

 8  took at trial; correct?

 9      A    We made that change.  And I'm not disagreeing

10  with that.  But the reason, the justification that you

11  provided in your first question was not accurate.  And

12  that's why I went through all I went through.

13      Q    Well let me show you what's --

14          MR. BERG:  Let's have this marked as

15      Plaintiff's Exhibit No. 3.

16          (Exhibit No. 3 was identified for the record.)

17  BY MR. BERG:

18      Q    What I've handed you as Plaintiff's Exhibit

19  No. 3 is your affidavit back in 2004; correct?

20      A    Looks like.  Yes.

21      Q    And at the conclusion of that kind of

22  paraphrases your last answer to my question, the

23  department changed its position; correct?

24      A    Yes.  We changed our position.  I'm not

25  denying that we did not change the rule and put in the
```

1    terminology about the incidental and focus of --

2        Q    We will get to that in a minute.

3        A    But we did do that, yes.

4        Q    Okay.  And Prison Legal News was allowed to

5    come in, based on its advertising content at the time

6    of trial in 2005; correct?

7        A    At that time, yes.

8        Q    And that was the position of your employer,

9    the Florida Department of Corrections; correct?

10       A    Yes, consistent with the language that we

11   added to the rule, which was not the focus of and

12   incidental to.

13       Q    Now, the department changed its position after

14   going to trial and appealing and winning the appeal of

15   PLN-1; correct, on Prison Legal News and advertising

16   content?  You changed the rule; correct?

17            MR. NEFF:  Objection; vague.

18   BY MR. BERG:

19       Q    Let me try to clarify.

20            The department changed the rule after 2006;

21   correct?

22       A    Are you talking about the -- are you talking

23   about the -- the change that -- to include the "not

24   the focus of and incidental to" --

25       Q    Correct.

ACCURATE STENOTYPE REPORTERS, INC.

```
 1      A    -- or are you talking about the change where
 2   we added "prevalent or prominent"?
 3      Q    Well, let's deal with the current rule.  The
 4   current rule --
 5      A    Was changed in 2009.
 6      Q    Correct.
 7      A    Which was adding the "prevalent and
 8   prominent."  The other change which resulted in PLN
 9   being allowed in was the one with the "focus of and
10   incidental to."
11      Q    Right.
12      A    And that was much earlier.  I'm not sure
13   exactly the date on that.  But I believe that was 2004
14   or '5, sometime --
15      Q    Right.
16      A    -- in line with this PLN-1.
17      Q    Correct.  That was a proposed rule at the time
18   of trial, but it later became the rule; correct?
19      A    As long as it takes to do a rule; I'm sure it
20   was proposed for a while.
21      Q    Okay.
22      A    It did come into effect, yes.
23      Q    Okay.  Why don't we move to the current rule.
24      A    Okay.
25           MR. NEFF:  I agree.
```

ACCURATE STENOTYPE REPORTERS, INC.

1   BY MR. BERG:

2       Q    The current rule, which was the latest version

3   that I have, is 11 -- November 22nd, 2010; correct?

4       A    I have one that I printed off our website

5   yesterday that, as far as I know, is the latest.

6   Let's see.  11-22-10?

7       Q    Yes, sir.

8       A    Yes.

9       Q    And the portion that we're interested in here

10  today, 33-501.401(3)(l), was adopted in -- June 16th,

11  2009; correct?

12      A    That sounds right.  I would have to --

13      Q    Prior to the adoption of that portion of the

14  rule -- and let's just call it (3)(l), okay, for

15  purposes of identification.

16      A    Okay.

17      Q    Prior to the adoption of that, what caused

18  that portion of the rule to be adopted?

19      A    Because there was -- there was a lot of

20  difficulty in interpreting and applying what was the

21  intent of "focus of and incidental to."  And we wanted

22  to clarify what the intent was and what was meant by

23  that language.

24      Q    What was the problem with the "focus of,"

25  rather than being "incidental to"?  What was the

ACCURATE STENOTYPE REPORTERS, INC.

1    problem with that language, specifically?

2       A    Well, "incidental to" is the -- the

3    implication is, or the intent was that it's

4    incidental -- if it's found to be infrequent or is

5    a -- a small component, like the term "incidental"

6    means, that it's something of a very small degree of

7    significance relative to the overall composition of

8    the publication.

9           And the -- the clarification was needed,

10   because in just about any kind of circumstance, a --

11   something ceases to be incidental when it takes on a

12   prevalence and a prominence, which are antonyms to one

13   another.

14          And as it moves forward, then it becomes much

15   more of a focus, whether -- I can't comment on what

16   the intent was.  But it definitely becomes much more a

17   focus of the publication when the prominence and the

18   prevalence become significant in terms of how much

19   there is there.  It was to clarify that, whether --

20   you know, the expressed focus was to provide legal

21   information and so forth.

22          That focus becomes obscured somewhat when

23   you -- as happened with PLN -- when you create or

24   include more and more of these type of ads in your

25   publication.  And we wanted to clarify that.

```
 1      Q    And there came a time after the adoption of
 2   the rule in June of 2009 -- well, let me back up.
 3           The department began impounding and rejecting
 4   Prison Legal News prior to this change in the rule;
 5   correct?
 6      A    I don't -- I don't --
 7      Q    In 2008?
 8      A    I don't remember that.
 9      Q    In 2008?
10      A    I don't recall that, not right off the top of
11   my head, the exact dates.
12      Q    How is a publisher to know whether their ads
13   are prominent or prevalent?
14      A    Applying reasonable interpretation, and then
15   we advise them that it is when, in our determination,
16   it becomes such.
17      Q    Is there -- are there any criteria, fixed
18   criteria --
19      A    There's --
20      Q    -- allowing -- let me finish, please.
21      A    Yeah.
22      Q    -- allowing a publisher to know whether, for
23   lack of a better term, these four restricted ad
24   categories are prominent or prevalent?
25      A    There is no -- I can't envision how you would
```

```
 1   do that, in terms of frequency relative to size of the

 2   publication, relative to specific centimeter size of

 3   the ads, relative to -- it's not a concept that can be

 4   put into that level of specificity, and -- as with

 5   many things.  And I don't think we could -- I can't --

 6   I can't envision how you would do that.

 7        I've been writing procedures and policies for

 8   years.  And I -- I mean I try to write them so that

 9   they're very -- as specific as possible, provide

10   enough guidance to -- to attain what the intent is.

11   Some things you just can't.

12   Q    Well, let's talk about some things.  The

13   department does do some things with specificity;

14   correct?

15   A    Some things -- things that we can, we try

16   to -- yes.

17   Q    Like corrections has --

18   A    Set parameters, yes.

19   Q    -- set parameters of how many square feet per

20   inmate in a cell; correct?

21   A    Uh-huh.

22   Q    Correct?

23   A    Yes.

24   Q    The department has restrictions on how many

25   water closets have to be in a dorm for -- based on how
```

1    many inmates are in that dorm; correct?

2        A    That's --

3        Q    And that's very specific; correct?

4        A    ACA standard.

5        Q    Right.  And the ACA has a lot of standards

6    like that, as well as the department, and courts have

7    come in and said, you've got to have certain specific

8    things, based on either square feet per inmate or

9    distances from the bunk, or staffing ratios, for

10   example; correct?

11           MR. NEFF:  Objection.  Outside the scope of

12       inquiry.

13       A    There are no set staffing ratios.

14   BY MR. BERG:

15       Q    But there are specific sort of things that

16   both courts, as well as the Department of Corrections,

17   have stated that you have to have some specific

18   parameters; correct?

19       A    There are specific parameters in some areas,

20   yes, where that's feasible and reasonable and

21   possible.

22       Q    And a publication also has a number of square

23   inches per 44 pages, 64 pages, whatever is in the

24   publication; correct?

25       A    Right.  Right.

1    Q    And they have a number of ads in there.  And

2   ad space is based on a square inch charge; correct?

3    A    That's true.  The thing that we're missing

4   here is that we're not talking in terms of -- in terms

5   of what poses a risk to us and what in our opinion we

6   have a compelling interest in keeping out is one of

7   these ads, just one, because they teach and foment --

8   I'm sure it's not the right word.  I'm not sure.  But

9   they encourage by their presence inmates to violate

10  our rules.

11       And if there is one in there, then, from a

12  security perspective, it just is strictly what we

13  should be allowing and what we should not, that's too

14  many.

15       What we did was, is because we didn't want to

16  stop a whole publication because of one or two that

17  are -- or three are small, very small number that was

18  insignificant or incidental, we didn't want to keep

19  the publication out.  But the publication, after we

20  did that, then they accelerated and increased

21  significantly the number of ads and the size of the

22  ads and even types of ads that they're doing that

23  clearly, when -- I mean I sat and reviewed some more,

24  just looked at things that have been rejected, that

25  clearly not only advertise for services and things

1    that violate our rules, but you can read in there,

2    they're telling inmates how to get around our rule,

3    how to beat us.

4         So, I mean, we can talk about whether, you

5    know, specifically defining what "prevalent and

6    prominent" is, all we've tried to do, we try to do an

7    accommodation, and it was abused.  And so -- and it

8    was abused because, instead of incidental and a few of

9    them occurring that we thought we could try to live

10   with as an accommodation, they abused it.  And now

11   there is three or four times what there were when we

12   did that.

13        And to me and to the department, that's

14   prevalent and prominent.

15   Q    But if you state that one ad is one ad too

16   many, then having multiple ads is the same problem;

17   correct?

18   A    Oh, no, it's not the same problem.

19   Q    Why not?

20   A    That's like having one broken bone or having

21   25.  I would much rather have just one.  And that's an

22   exact analogy.

23   Q    So getting back to my question, how is a

24   publisher to know whether it's one or 25 ads that

25   pushes them over the threshold to being prevalent and

1    prominent?

2        A    Because that publisher -- particularly this

3    publisher -- very well knows what the law is and what

4    the rules are.  And they are familiar with prisons.

5    They talk about prison rulings and all that stuff all

6    the time in their publication.  And they know that

7    there are -- that some of the things they're

8    advertising and the things that are proposed in that

9    advertisement are like a how-to book on how to violate

10   our rules.

11            Now, you know, we might have made a mistake

12   when we -- when we didn't restrict it when it had one

13   that was teaching somebody or telling somebody or

14   encouraging someone to violate our rules.  But we did

15   it because we were trying to be reasonable and trying

16   to be accommodating because of the value of the

17   publication itself.

18            But all of a sudden they just -- it was taken

19   advantage of.  Now we've got a situation where this

20   stuff is going on all over the place.  This -- the --

21   I recall specifically when we were talking about

22   making this change to prevalent and prominent, the big

23   issue then had to do with the stamps, using stamps for

24   currency.  That was the one at the forefront right

25   then, along with the pen pal stuff that kind of called

1   it to my attention.

2         But all of these things -- all of those four

3   things have a -- you know, I've spent 42 years in

4   corrections, 43.  And I can tell you from that

5   experience that these areas pose a security threat to

6   our institutions and to the public.

7      Q   But getting back to my question, how is a

8   publisher to know whether it's one ad, two ads, three

9   ads, four ads, or based on square inches per issue

10  pushes them into violating the department's prevalent

11  or prominent prohibition on their ads?

12        MR. NEFF:  Objection; asked and answered.

13     A   I did answer it.  What I told you is, if they

14  cannot conclude it themselves from looking and making

15  a reasonable, logical determination, then when they

16  send it in and we get back to them, then they can

17  gauge from what we tell them is prevalent and

18  prominent.

19        We reserve the right to determine what poses a

20  threat and what risk it is to our institution.  And we

21  advise them.  And they can look, and they say, well --

22  they're telling us this is prevalent and prominent,

23  and they look at it --

24     Q   How have you advised them?

25     A   We've sent them the notice forms back and

```
 1    telling them why we're not allowing this to come in
 2    according to that rule.  They're familiar with the
 3    rule.  The rule is public record.
 4        Q    Not debating the rule is public record.  What
 5    I'm suggesting to you is, there is no fixed criteria
 6    to tell them what's prevalent and prominent --
 7        A    No.
 8        Q    -- other than what you feel is prevalent and
 9    prominent?
10        A    That's right.
11             MR. SCHIFINO:  Form.
12             THE WITNESS:  That's right.
13    BY MR. BERG:
14        Q    I want to get back to three-way calling.  MCI
15    went out of business; correct?
16        A    I don't know if they went out of business or
17    not.  We contracted with another vendor.
18        Q    And the vendor is Securus; correct?
19        A    Yes.
20        Q    And Securus has a contract with the
21    department; correct?
22        A    Yes.
23        Q    And the contract provides that they're to have
24    system restrictions, fraud control, and notification
25    requirements; correct?
```

1      A     Do what now?  I'm sorry.

2      Q     The contract provides that they're to have

3 system restrictions, fraud control, and notification

4 requirements; correct?

5      A     Yes.  Apparently you're reading from that.

6      Q     Yes.

7      A     Okay.

8      Q     Okay.  And Securus operates the phone system

9 throughout the entire Florida Department of

10 Corrections; correct?

11     A     Yes.

12     Q     Throughout our state of Florida, other than

13 the private vendors; correct?

14     A     All of our prisons -- Securus is the

15 contractor for all of our prisons.

16     Q     Okay.  Have you spoken with them about the

17 ability of their fraud control to detect three-way

18 calling and call forwarding?

19     A     Yes.

20     Q     Okay.  And they can do it; correct, to be in

21 compliance with this contract?

22     A     They can -- they can, as I said before,

23 earlier, that that -- the sophistication of phone

24 systems now does not allow for 100 percent, by any

25 means, detection of three-way calling, call

1   forwarding.  But they do it within the realm of what's

2   possible, yes.

3        Q    And you've testified at other depositions

4   that, you know, nothing is 100 percent; correct?

5        A    Yes.  Some things are closer than others.

6   But, no, not --

7        Q    This one is pretty close though; correct?

8        A    I'm not sure it is.  I'm not sure that being

9   able to detect three-way calling and call transfer on

10  these digital systems where the noise level that's

11  created, as I said before, is very minimal, I'm not

12  sure that we don't get beat quite a bit on that.  I

13  think if you asked the vendor, they would say the same

14  thing.

15       Q    Have you tested it?

16       A    Have I tested it?

17       Q    Yes, sir.  Or had it tested.

18       A    Other than talking to -- when I talked to the

19  MCI technicians back in the day and talking to some of

20  the Securus people.

21       Q    Yeah, that was Mr. Parrish; correct?

22       A    Yes.

23       Q    And that was back in 2004, 2003; correct?

24       A    Yes.  And when we did that contract, the

25  systems were much less sophisticated, much less

```
 1   digital and Internet setup.  And as I say, it's -- it

 2   detects that click.  It detects the noise on the

 3   system.  And if there is no noise, it doesn't detect.

 4        And you can transfer calls now with the kind

 5   of systems we have, the digital, computerized, all

 6   that, that click is nonexistent.

 7        Q    Do you have any statistics to show how many

 8   inmates are avoiding the Securus system and using the

 9   call forwarding or call transfer process?

10        A    If I had those statistics, that would mean

11   that I would know who was doing it, and they wouldn't

12   be doing it anymore.

13        Q    When is the last time you noticed or it was

14   reported to you that an inmate was using call

15   forwarding or call transfer?

16        A    That was reported to me?

17        Q    Yes, sir.

18        A    I don't know that it's been reported to me.

19        Q    Ever?

20        A    I don't know that I -- oh, well, in

21   conversations back with Chris Parrish --

22        Q    Yes, sir.

23        A    -- we -- we found out about these companies

24   that were providing this service of this forwarding.

25   And it's -- all you've got to do is look in the PLN
```

1    and look at these ads and then go to their Internet,

2    and then you will see -- they will tell you how they

3    do it and how it works.

4        Q    But PLN is a national publication; correct?

5        A    Right.

6        Q    You don't know what other states are allowing

7    or disallowing; correct?

8        A    No, I sure don't.

9        Q    So some states could be allowing for call

10   forwarding, call transfers so inmates can have cheaper

11   phone systems -- phone calls with their family

12   members; correct?

13       A    I guess it's possible.

14       Q    Okay.

15       A    But I --

16       Q    I mean there are a lot of states that do

17   things that Florida won't allow; correct?

18            MR. SCHIFINO:  Form.

19       A    Some things.

20   BY MR. BERG:

21       Q    In terms of communication; correct,

22   telecommunications?

23       A    Yeah, some things, yeah.

24       Q    In fact, you and I have talked about Federal

25   Bureau of Prisons, for example, has CorrLinks, e-mail

 1   system; correct?

 2       A    Yes.

 3       Q    And the Federal Bureau of Prisons allows

 4   inmates to converse with their lawyers, family

 5   members, and other people who are on an approved

 6   e-mail list; correct?

 7            MR. NEFF:  Objection to the form.

 8       A    Yes.

 9   BY MR. BERG:

10       Q    But Florida Department of Corrections won't

11   allow that; correct?

12       A    Not yet.

13       Q    In fact, you once told me it would be over

14   your dead body, or something to that effect; correct?

15       A    I don't recall that.  You will have to show me

16   that.  I do have concerns that I've expressed.

17            As long as we can control it -- my only

18   concern about their communication to outside is that

19   we prevent the victimization of the public, that we

20   don't allow them to do things that -- continuing their

21   criminal enterprises that allows them to communicate

22   with people in the public who -- gang leaders who can

23   communicate to gang members on the street, all the

24   kind of things that pose a threat to the public.

25   Because our number one priority at corrections is

1    protecting the public.  And that extends far beyond

2    keeping these people from escaping.

3        Q    Inmates are allowed, under the Securus phone

4    system and the rules of the department and chapter 33,

5    they're allowed to have 10 people on a phone list;

6    correct?

7        A    Yes.  I believe that's the number.

8        Q    And the department checks and makes certain

9    that those people who are being called, A, want to

10   receive calls and, B, are willing to pay for collect

11   calls; correct?

12       A    Well, I think -- I'm not sure that we check to

13   see if they're willing to pay for collect calls.

14       Q    But that's the way the system works; correct?

15   It's collect call only?

16       A    You ask me these questions, like that first

17   one you asked that I did all that clarification on.

18       Q    All right.

19       A    You put things in there that are not exactly

20   right, and I feel compelled to tell you that it's not,

21   because I don't want to agree with you when, you know,

22   your general premise may be accurate, and I could say,

23   yeah, that's right, but some of the stuff you put in

24   there is not accurate.

25       Q    Okay.  What's not accurate?

```
 1      A    Repeat the question again.

 2      Q    Inmates are allowed to have ten people on a

 3   phone list; correct?

 4      A    Right.

 5      Q    And they can only change that what, about once

 6   every six months or so; is that correct?

 7      A    Something like that.  I would have to look at

 8   the procedure.

 9      Q    And the people that are on that list are

10   people that are willing to receive phone calls;

11   correct?

12      A    That's established, as I understand it, by the

13   fact that when you call, they're advised that this is

14   a collect only call.

15      Q    Right.

16      A    And it's being -- yes, on the phone --

17      Q    Right.

18      A    -- and they accept it.

19      Q    Right.

20      A    When they accept it, to me, that's their

21   advisement that they're willing to pay for it.

22      Q    Right.

23      A    Okay.

24      Q    Okay.  And the department makes millions of

25   dollars off this phone system; correct?
```

```
 1          MR. NEFF:  Objection.
 2     A    I'm not sure how much we make.  I know that we
 3   don't make nearly as much as a lot of people.  We have
 4   very, very low, reasonable rates.
 5   BY MR. BERG:
 6     Q    Okay.  We won't get into the rates.  It's
 7   expensive though; correct?  It's much more expensive
 8   than you and I pay for long distance calls; correct?
 9     A    Not really.
10     Q    Okay.  Nonetheless --
11     A    I believe the last time I looked it was six
12   cents a minute, which is a fairly reasonable rate.
13     Q    Statewide or nationwide?
14     A    Statewide.
15     Q    Six cents a minute?
16     A    Six cents a minute.  We -- Secretary
17   McDonough -- do you remember McDonough?
18     Q    Yes.  I recall that whole incident.
19     A    When he lowered our rates.
20     Q    Right.
21     A    And he lowered them significantly.
22     Q    Right.
23     A    And we still carry those relatively low rates.
24   We're not doing as some other states are.
25     Q    At one point you were making like $16 million
```

```
 1  a year off the phone system; correct?
 2          MR. NEFF:  Objection; outside the scope.
 3     A   At one point --
 4          MR. BERG:  He can answer if he knows.
 5     A   At one point -- I don't know about the 16
 6  million exactly.  But at one point we bid our phone
 7  system based on who gave us the most money.
 8  BY MR. BERG:
 9     Q   Correct.
10     A   But that's not the case anymore.
11     Q   Okay.
12     A   And hasn't been for quite a while.
13     Q   There is a connect surcharge though; correct?
14     A   There is a surcharge.  And I --
15     Q   And the connect surcharge for a local extended
16  area is 50 cents a minute; correct?
17     A   That sounds right.  I can't --
18     Q   And for an intraLATA, which is within your
19  area code, it's $1.20 connect charge?
20     A   That sounds about right.
21     Q   Is that correct?
22     A   That sounds about right, yeah.
23     Q   And four cents a minute?
24     A   How much?
25     Q   Four cents.
```

```
  1        A    Forward?

  2        Q    Four.

  3        A    I think you're reading that from the private

  4   person deal; right?

  5        Q    No, sir.

  6        A    Where is that from?

  7        Q    Securus.  I will have that marked as

  8   Plaintiff's Exhibit No. --

  9             MR. BERG:  What number are we up to?

 10             (Exhibit No. 4 was identified for the record.)

 11   BY MR. BERG:

 12        Q    Let me show you what's been marked as

 13   Plaintiff's Exhibit No. 4.

 14        A    (Examining document.)  I -- okay.

 15        Q    How much is it, the connect charge, in the

 16   2010 addendum there?

 17        A    That's this one?

 18        Q    It's at the bottom, I think.  Yeah.

 19        A    Yeah, there is a surcharge of 1.20.

 20        Q    Per minute of?

 21        A    Per what?

 22        Q    Per minute charge?

 23        A    No.  No.

 24        Q    Yeah.  There is a connect charge; correct?

 25        A    Surcharge, connect surcharge, yes.
```

1    Q    Of $1.20?

2    A    Right.

3    Q    And then on top of that you're charged by the

4  minute; correct?

5    A    Right.

6    Q    And the per minute charge is 20 cents per

7  minute; correct?

8    A    I think that's -- the one that the inmates

9  most frequently use would be this one (indicating.)

10  This is a -- this is a one plus interLATA.  I believe

11  this is from the coin-operated telephones.  This is

12  different than our inmate collect system.

13        And I believe that -- and I'm probably -- that

14  rate is increased -- it's six cents now, is my

15  understanding.  I just saw something among the

16  thousands of e-mails I get about that.

17        But this is the rate, is my understanding.

18    Q    This, pointing to four cents a minute?

19    A    Yeah.

20    Q    So what's the 20 cents per minute?

21    A    I don't know, unless that's some other -- I

22  don't know.  I could be wrong.  I could have

23  misinterpreted what I read.  But I could have sworn it

24  was six cents a minute.

25    Q    Okay.  And on the '09 attachment to that

1   exhibit, it has in paragraph eight the security

2   requirements; correct?

3       A   (Examining document.)  That's what it says,

4   system restriction, fraud control, and notification

5   requirements.

6       Q   Okay.  Now, based on your experience, how many

7   reports of inmates being able to use three-way calling

8   have you seen in -- since this rule was adopted in

9   June of 2009?

10      A   Have I personally seen?

11      Q   Yes, sir.

12      A   None.

13      Q   Let's move to the purchase of products of

14  services with postage stamps.  That was also the

15  subject of the litigation back in 2005; correct?

16      A   Right.

17      Q   And the department has continued to list the

18  purchase of products or services with postage stamps

19  as being one of the prohibited ads in a publication;

20  correct?

21      A   Right.

22      Q   If it's prevalent and prominent?

23      A   Right.

24      Q   What has changed since the litigation in 2005

25  until the adoption of this rule in 2009?

1      A     The prevalence and prominence of those -- of

2    the number of those ads and the size of those ads in

3    the PLN has changed.

4      Q     Okay.  And have you had any incidents; can you

5    point me to any incidents where the inmates have

6    utilized postage stamps to purchase products or

7    services in the -- outside the institution which have

8    caused a security problem?

9      A     The fact that they purchase -- that I -- to

10   provide an incident where they purchase products with

11   stamps that caused a security problem to me sounds

12   like you're saying they purchased some kind of weapon

13   or purchased something that they shouldn't have

14   purchased that was a security problem.  The security

15   problem with the stamps relates to the fact that, if

16   they attain value as currency, and if they can be

17   utilized in -- to purchase things by the inmates, then

18   their value increases and can increase significantly,

19   because it's easily concealable, and there are lots of

20   issues with it.

21          Then it becomes a tool for bartering.  It

22   becomes a tool -- it becomes a reason for them to

23   extort those stamps from weaker inmates.  All kinds of

24   issues come up with that.

25      Q     Okay.  The department has done away with

 1    currency in the system; correct?

 2         A    A long time ago.

 3         Q    Maybe 20 years ago?

 4         A    I don't know when they did it in Florida.  We

 5    did it --

 6         Q    Before you came to Florida --

 7         A    Oh, absolutely.

 8         Q    -- from Arizona?

 9         A    Absolutely.  I don't know of anybody that

10    allows currency.

11         Q    Okay.  When an inmate wants to send a letter

12    out, the letter is not sealed in the envelope;

13    correct?

14         A    Right.

15         Q    And the letter is taken to a place at the

16    facility; it's viewed by a corrections officer --

17         A    No.

18         Q    -- and scanned --

19         A    No.

20         Q    -- before it's sealed; correct?

21         A    No.

22         Q    Tell me how it's done.

23         A    Well, it's not viewed by a correctional

24    officer, number one.  We used to have correctional

25    officers in the mail room.  Now we have clerks.

1      Q    Okay.  A clerk.

2      A    And the --

3      Q    An employee of the Florida Department of

4  Corrections?

5      A    And they don't -- I -- considering that we

6  process probably 50,000 pieces of mail a day in the

7  department, and we have -- for a 1500-bed prison, we

8  might have two people, clerical people processing the

9  mail.  I doubt seriously that they scan all that mail.

10  And I would suspect that they don't look at all of it

11  before they seal it.

12         Now, I would -- my preference would be that we

13  did exactly what you said, that we read every piece of

14  mail, and we had somebody there who knew about the

15  inner workings of prisons and scams and the things

16  they can do and abuse it and that we've thoroughly

17  searched it all, that we had dogs sniff it all, that

18  we looked for all kinds of things.

19         But that's not what works, what happens,

20  because we don't have the resources to do that.

21      Q    Okay.  Nonetheless the letter goes to the

22  clerk.

23      A    Yes.

24      Q    The letter is not sealed; correct?

25      A    Not sealed.  Submitted unsealed.

1        Q    It can be scanned to determine whether it's

2   just a paper letter or whether it is enclosing stamps

3   for goods or services and purchasing things outside;

4   correct?

5        A    It can be scanned for that, yes.

6        Q    And if the clerk finds that -- let's say he or

7   she's got 20 -- the inmate has got 20 stamps to try

8   and purchase something from outside, that can -- those

9   stamps can be impounded; correct?

10       A    Ideally that's the way it works.

11       Q    And that's the way it works, and --

12       A    Ideally.

13       Q    -- that's what the rule says?

14       A    Yes.

15       Q    Correct.

16            So the inmates are not allowed to purchase

17   things outside the institution with stamps; correct?

18   It's in the rule?

19       A    It's in the rule.

20       Q    Okay.

21       A    We've got a rule against --

22       Q    And the rule also --

23       A    -- stabbing each other, too.

24       Q    But the rule --

25            MR. NEFF:  Let him finish, please.

1    A    I said we have a rule against inmates stabbing

2  one another and extorting and robbing and hitting our

3  officers and all that stuff, and that doesn't stop

4  that.

5        MR. BERG:  I move to strike that as

6    nonresponsive to the question.

7        THE WITNESS:  I think it's responsive.  And

8    the fact that you're saying that because we have a

9    rule they don't do that, that's not reality.  That

10   is so far from reality.  I wish it was true.

11       I wish every -- I guarantee you every warden

12   that's ever worked in a prison wishes when they

13   left on Friday they could send a memo to the

14   inmates, y'all behave until I get back on Monday

15   morning.  It don't work like that.

16  BY MR. BERG:

17   Q    So -- but the postage and the mailing of

18  letters to the outside is controlled by the clerk in

19  the mail room; correct?

20   A    They -- it passes through the mail room, and

21  they have -- they process it.

22   Q    Inmates also have what are called inmate

23  accounts; correct?

24   A    Yes.

25   Q    And since you don't allow currency into the

```
 1     institution, loved ones can send money to be placed on
 2     the inmate account; correct?
 3         A    Yes.
 4         Q    Inmates can earn money working for PRIDE or
 5     the canteen, and their compensation for those jobs
 6     goes into their inmate account; correct?
 7         A    Part of it, yes.
 8         Q    Has the department ever considered, as an
 9     alternative to having stamps in the institution, to
10     ban stamps from coming in?
11         A    Yes.
12         Q    But instead the department allows for 20
13     stamps to be sent at any one time to inmates; correct?
14         A    Yes.
15         Q    And inmates are not supposed to have more than
16     20 stamps at any one time; correct?
17         A    I can't remember what the possession limit is,
18     but I know there is a possession limit.  There is an
19     amount that they allow to get in the mail, yes.
20         Q    Okay.  And it's very difficult, isn't it true,
21     to know whether mommy sent 20 stamps on Monday and
22     another 20 stamps on Wednesday and another 20 stamps
23     on Friday; correct?
24         A    Yes.  It would be hard to keep up with.
25         Q    So in essence, by allowing stamps to come into
```

1    the institution 20 at a time, the department is

2    basically setting up a currency system within the --

3    within the prison system; correct?

4        A    When we -- as I said, in answer to your other

5    question --

6        Q    I would like for you to answer this one.

7        A    We have considered doing -- in terms of

8    letting the stamps come in?  Yes.  There is a risk

9    associated, exactly as you say.  But when we

10   attempted -- we actually promulgated a rule and were

11   going to put it in place not allowing stamps to be

12   sent in in the mail.

13        But when we posted it for public review, we

14   had a hearing request.  And I was present at that

15   hearing, along with Perri Dale, where family groups,

16   inmate families and inmate family support groups came

17   to the hearing and protested and made some very

18   emotional statements at the hearing concerning the

19   fact that -- their concern was, if we don't allow them

20   to send the stamps to them, if they can send a stamp

21   in to their son or their loved one, that they're more

22   likely to get mail in return, and that they're

23   sacrificing to buy the stamps to start with in a lot

24   of cases.

25        But if they put the stamps on the inmate's

1   account, then the chances of him buying stamps with it

2   when he can buy food items and sodas and cigarettes

3   and stuff out of the canteen is -- it diminishes the

4   likelihood that they're going to get that mail that

5   they sent that stamp in for.

6        So based on that, and consideration by the

7   executive staff, including me, we determined to

8   withdraw that, because we -- we understand that it's

9   critically important -- maintaining those ties with

10  your family is a critical thing in terms of reentry

11  and being successful.

12       So we took that chance.  We balanced it, and

13  we took the chance.

14  Q    But the department could ban stamps.  And if

15  an inmate wanted to send a letter out, the postage

16  could be deducted from the inmate account; correct?

17  A    That's true.

18  Q    Okay.

19  A    Now there is -- when we considered doing that

20  as well, there is some logistical issues in getting

21  post machines and all that kind of stuff and how

22  you -- we would have people doing the posting and

23  keeping up with all that, the accounting.  That was an

24  issue as well.

25  Q    But it's done all the time; correct?  It's

1    done with canteen?  It's done with the purchases of

2    clothing items and deodorant and stuff like that?

3       A    It's very automated with the canteen.  It's

4    done through a contractor --

5       Q    Right.

6       A    -- who absorbs the cost out of the process.

7    And they have a card that they can swipe.

8            Posting letters that are being mailed and

9    keeping up with that kind of stuff you couldn't do by

10   swiping a card.  There is more involved in that.

11      Q    Why is that?

12      A    Because you wouldn't have the card.  The

13   inmate carries the card.  That's his ID card.

14      Q    If the inmate has the card, and he comes up to

15   the canteen with a letter, I want to send this to

16   mommy --

17      A    We don't --

18      Q    -- swipe the card, and the postage is

19   attributed to the inmate account; correct?

20      A    We don't -- you've got to get the postage

21   indicated on the letter to the -- somewhere indicated

22   on the letter itself, physically.  We don't -- we

23   don't process the inmates' mail through the canteen.

24   The inmate mail is done separately.  The canteen has

25   nothing to do with inmate mail.  There is an inmate

1   person selling stuff out of the canteen.

2       Q    Instead of banning a publication based on

3   this -- an ad for the purchase of products or services

4   with postage stamps, did you consider banning stamps

5   altogether so this would become a nonissue?

6       A    I just spent a long --

7            MR. NEFF:  Objection; asked and answered.

8       A    -- time telling you that we did and why we

9   didn't do it.

10  BY MR. BERG:

11      Q    Okay.  In your new position, are you still a

12  member of the literature review committee?

13      A    No.

14      Q    Mr. Vaughan is; is that correct?

15      A    He or his designee.

16      Q    Okay.  When did you become head of -- I'm

17  sorry, your title.  Director of what?

18      A    Actually it's the old deputy assistant

19  secretary for institutions is the formal title.

20      Q    Okay.

21      A    But it was changed under a prior secretary to

22  director of operations and support.

23           But it's -- it's the same position.  I work

24  directly for Mr. Cannon, assistant secretary.  And I

25  assumed that position in January.

1    Q    And prior to assuming that position in

2  January, you were a member of the literature review

3  committee; correct, or your designee?

4    A    No.  Prior to that I was warden at Franklin

5  Correctional Institution for five and a half months.

6    Q    And who took your position, then, as a bureau

7  chief for security?

8    A    I don't think it was filled.  I can't remember

9  if anybody was in it or not.

10   Q    What was the basis of you going to Franklin?

11   A    The administration that lasted about as long

12  as I was at Franklin sent me there.

13   Q    Mr. Buss?

14   A    Mr. Buss.  It was a great experience, though.

15  And I mean that.

16   Q    Are you the only hybrid expert in this matter

17  for the Florida Department of Corrections, to your

18  knowledge?

19   A    I have never heard that term, "hybrid expert."

20  But I think so, yes.

21   Q    Okay.  So there are no other experts, other

22  than you -- and Ms. Savage -- correct?

23   A    That's the only two that I'm aware of.

24   Q    Do you know Margaret Savage?

25   A    Yes.

```
 1       Q    Did you know her when she was in Florida or
 2   when she was in Arizona?
 3       A    When she was in Arizona.
 4       Q    Okay.  And she was there at the same time you
 5   were there?
 6            MR. NEFF:  Objection; outside the scope.
 7       A    Part of the time, yes.
 8   BY MR. BERG:
 9       Q    And what was she doing at the time you were
10   there?
11            MR. NEFF:  Mr. Berg, I'm not seeing which
12       number this falls under.
13            MR. BERG:  He is a hybrid expert.  I'm
14       deposing --
15            MR. NEFF:  This is 30(b)(6).
16            MR. BERG:  This is both.
17            MR. NEFF:  I don't think it is.
18            MR. BERG:  I can go into it.
19            MR. NEFF:  I don't think it is.  Objection.
20       Standing objection.
21            MR. BERG:  You can have a standing objection.
22            THE WITNESS:  Do I answer?
23            MR. BERG:  Sure.
24            THE WITNESS:  What was the question?
25            MR. NEFF:  Yes, sir; you may answer.
```

1          THE WITNESS:  What was the question again?

2     BY MR. BERG:

3          Q    When you were at -- in Arizona, where was

4     Ms. Savage?

5          A    Ms. Savage came to Arizona -- I was in Arizona

6     from 1982 until 1996.  And I don't remember the exact

7     year that she came to Arizona.  But it seems like it

8     was maybe '90, something like that.  I really can't

9     remember exactly.  But she came -- she came from

10    Florida to Arizona.

11         Q    Okay.  Did she work for you?

12         A    At one time.

13         Q    Okay.  Were you a warden at the prison in

14    Arizona at the time?

15         A    Yes.

16         Q    And she worked in that same prison when you

17    were the warden; is that correct?

18         A    Yes.

19         Q    Did you recommend her to the department as --

20    to be an expert in this matter?

21         A    Yes.

22         Q    Did you have any conversations with her

23    regarding her being an expert?

24         A    Very brief.

25         Q    What was the nature of those conversations?

1      A    I told her in general what the issues were.

2      Q    Did you have more than one conversation with

3  her?

4      A    No.

5      Q    Do you know what prison she worked at while

6  she was in Florida, prior to going to Arizona?

7      A    All I know -- I know she was in south Florida.

8  And I can't remember which prison she was at.  But she

9  started, as I recall, as an officer and worked her way

10 up.  But that was before I came to Florida, so I don't

11 know.

12     Q    Tell me in detail what opinions you have been

13 asked to give in this matter and the basis for your

14 opinions.

15     A    I'm not sure that we've discussed in, you

16 know, any kind of specific terms what opinions I've

17 been asked to give, other than the ones that I have --

18 I fairly well expressed previously in this discussion,

19 that I believe that, based on my experience, that we

20 have compelling security interest in the position we

21 have taken in reference to these ads and this type of

22 information being provided to the inmate population as

23 it relates to violation of legitimate security-concern

24 based rules.  And I'm even more concerned, after I

25 reviewed some of them, about some of the content that

1    describes and depicts how to go about not getting

2    caught.

3          So I'm -- I am -- I'm very concerned.  I think

4    we have legitimate reason to want to keep these out.

5    Q    State for me what incidents, if any, led the

6    department to change the rule pertaining -- in June of

7    19 -- 2009 -- in the area of the three-way calls.

8          Were there any such incidents?

9    A    I don't have any specific incidences that I

10   can recall.  In my job I interact and interface

11   frequently with wardens and people, chiefs of security

12   and people in institutions.  And we have occasion to

13   discuss a lot of concerns and issues and things that

14   they see and know about in institutions.

15         And, you know, I was trying to think of

16   incidents.  You know, I can think back, and I can

17   remember whenever there were major disturbances in

18   prisons I've run, or we have major incidents in

19   Florida.  But the things that are problematic for us

20   on a day-to-day basis, I'm not sure you call them

21   routine, but in some sense they may be, because they

22   occur relatively frequently, and we see them as

23   problems that cause disruption and problems for us.

24         Those don't usually stick out in a way that

25   you would remember them from year to year to year.

 1    I -- I remember, as I said, I remember the concern

 2    being expressed to me by people in the field.

 3    Particularly I remember about the stamps issue and

 4    about the stamps being misused and about stamps being

 5    utilized for -- to purchase things and for bartering

 6    and that kind of stuff.

 7          And I also remember, in terms of the -- the

 8    pen pals.  I remember incidents of inmates taking

 9    advantage and defrauding and abusing people in the

10    public based on these pen pal sites.

11          There was an article on it recently, I think

12    maybe we provided to you, that the inmate that we

13    executed, I think it's been less than a few months

14    ago, who the article -- it talked about how he was the

15    Death Row Romeo and saying how much money he had made

16    from writing to pen pals and getting money from them.

17          There is the -- the affidavit I think we had

18    by a former investigator from -- that worked at FSP

19    about the number of incidents that he investigated

20    firsthand of abuse of people in the public.  There is

21    all kinds of -- you know, we've never had a -- and

22    hopefully we won't have a situation like they did in

23    Mississippi or in Missouri where their issues with pen

24    pals and with that kind of stuff ended up making

25    headlines all over the country for the way that the

1    public was abused and victimized.

2         But as far as particular, specific instances

3    that I can recall, other than communication back and

4    forth in general with people in institutions, I don't

5    remember any.

6    Q    Okay.  As to three-way calling; correct?

7    A    Right.  As to that.

8    Q    Give me any incidences that you can recall

9    dealing with pen pal services between the trial in

10   2005 and the adoption of the rule in June of 2009.

11        Do you have any instances?

12   A    Specific instances --

13   Q    Yes, sir.

14   A    -- that I can recall?

15   Q    Yes, sir.

16   A    No, not off the top of my head, no.

17   Q    Give me any specific instances that you can

18   recall dealing with the purchases of products or

19   services with postage stamps between the trial in 2005

20   and the adoption of the rule in 2009.

21   A    Not one that I can recall, no, other -- I saw

22   one in some of the e-mails I was reviewing the other

23   day about some guy was sending out stamps to purchase

24   some kind of publication or something.  But I -- I

25   don't remember the details on it.  I just remember

```
 1   viewing it.
 2       Q    Give me, if you could, any incidences which
 3   occurred between the trial in June of 2005 and the
 4   adoption of the rule in -- excuse me -- between the
 5   trial in 2005 and the adoption of the rule in June of
 6   2009 regarding conducting a business or profession
 7   while an inmate was incarcerated.
 8       A    We had a couple of instances where inmates
 9   were operating businesses.  One we went to court on.
10   I can't remember the guy's name.  But --
11       Q    And when was that?
12       A    I don't remember the date.
13       Q    And when was -- what was the name of the
14   inmate?
15       A    It was -- he was dealing with a publisher.
16   And he was -- he was setting up to write short stories
17   and stuff.  And he was wanting -- contracting and
18   establishing a publishing or a literary type business.
19   I can't remember his name.
20       Q    The department allows inmates to write
21   articles; correct?
22       A    Absolutely.
23       Q    And they can even write at least one article
24   and be paid for that; correct?
25       A    I don't remember that.  But that's -- I think
```

 1    that's right.  I would have to look at that.

 2        Q    Right.  They can enter contests.  And if the

 3    contest has some remunerative value, the inmate can

 4    keep that money --

 5        A    I need to look at that --

 6        Q    -- at least once; correct?

 7        A    I have to look at that rule again, but I think

 8    you're right.

 9        Q    Okay.  If this matter goes to trial or summary

10    judgment, do you have any exhibits that you're going

11    to use to -- with your opinions that you're going to

12    give at trial?

13            MR. NEFF:  Objection.

14            MR. BERG:  What's the matter?  What's the

15        matter with the question?

16            MR. NEFF:  Form.

17            MR. BERG:  What's the matter with the form?

18            MR. SCHIFINO:  I join the objection too.

19            MR. BERG:  What's the matter with the form?

20            MR. NEFF:  That may be an attorney-client

21        issue.

22            MR. BERG:  Okay.  Other than attorney-client

23        issue, do you have any exhibits you're going to

24        use?

25            MR. SCHIFINO:  Form.

```
 1          MR. SEAGLE:  Join.

 2     A    Not that I'm specifically aware of at this

 3  point.  I do think there is information in that list

 4  of stuff that we provided you that I would -- I would

 5  say is supportive of my position.

 6  BY MR. BERG:

 7     Q    And this is in Plaintiff's Exhibit No. 2; is

 8  that what you're referring to?

 9     A    Uh-huh.

10     Q    You have to say yes or no.

11     A    Yes.  But there may be others.

12     Q    Well, that's what we're here for.  What

13  others?

14          MR. NEFF:  Objection; outside the scope.

15          MR. SCHIFINO:  Form.

16     A    I don't know yet.

17          MR. NEFF:  Mr. Berg, can you point to which

18     question this falls under?

19          MR. BERG:  Mr. Neff, he was tendered as a

20     hybrid exhibit (sic).  I was told by Ms. Maher I

21     could depose him as a hybrid exhibit today.

22          Are you saying I can't depose him as a hybrid

23     exhibit?  We're going to have to come back and take

24     his deposition again?

25          MR. NEFF:  I wasn't aware of that e-mail.  If
```

1    you show me the e-mail, I would be glad to look at

2    it.

3         MR. BERG:  Well, you were on duty and on

4    vacation or somewhere, and you weren't around.

5         Do you want to go talk to Ms. Maher?

6         MR. NEFF:  I was on active duty with the

7    United States Army, Mr. Berg.

8         MR. BERG:  I'm proud of you.

9         MR. NEFF:  I wasn't on vacation.

10        MR. BERG:  Thanks for your service.  I'm just

11   saying that he was tendered as a hybrid exhibit by

12   your colleague, Ms. Maher.

13        MR. NEFF:  And I'm not aware of that, and I'm

14   lead counsel.

15        MR. BERG:  Well, she was acting in your stead.

16   Why don't you just go ask her?  We can take a

17   break.

18        MR. NEFF:  Well, you can continue along with

19   the 30(b)(6) depo.  When she gets here, we will ask

20   her.

21        MR. BERG:  I was told I could depose him as a

22   hybrid exhibit today.  She had --

23        MR. NEFF:  And again, Mr. Berg, I am not aware

24   of that conversation.  I am lead counsel.  If you

25   can show me the e-mail on your Blackberry or your

1      smart phone, I would be glad to take a look at it.

2          MR. BERG:  It was a conversation I had with

3      her.

4          MR. NEFF:  So you don't have this in writing?

5          MR. BERG:  I may have it in writing.  I don't

6      recall.  I do recall that when we were discussing

7      his interrogatories that were sent --

8          MR. NEFF:  I find it interesting, because

9      Susan, who is my boss, has not informed me of that,

10     and that's certainly something that she would

11     inform me of.  She is a highly detailed individual.

12     She doesn't let things like that slip.  So I do

13     find it interesting that --

14         MR. BERG:  Is she here?  Is she here?

15         MR. NEFF:  She had other matters to attend to

16     this morning.  I'm not sure if she's arrived yet.

17         MR. BERG:  Well, we can take a break and call

18     her if you want.

19         MR. NEFF:  Sure.

20         MR. BERG:  I don't want to have to come back

21     here and take another deposition.

22         MR. NEFF:  And I completely understand that.

23     I just want to make sure that I --

24         MR. BERG:  If you want me to come back and

25     take his deposition again and go through that

1       problem, we will.  But I don't think it's

2       necessary.

3            MR. NEFF:  We will --

4            MR. BERG:  Ms. Maher said --

5            MR. NEFF:  Let's take a break, and we will get

6       it straightened out.

7            MR. BERG:  Okay.

8            MR. NEFF:  Go off the record, take a break --

9            MR. BERG:  Okay.

10           MR. NEFF:  -- and get it straightened out.

11           MR. BERG:  Okay.

12           (Short recess.)

13           (Susan Maher now present.)

14           MR. BERG:  Okay.  Where are we?

15           MS. MAHER:  Randy, this is Susan Maher.  I

16      guess I'm not on the record anywhere.  Apparently

17      you had an issue about whether you could inquire of

18      Mr. Upchurch with regard to expert witness

19      questions and had cited a conversation you said

20      that you had with me, where I had agreed to that.

21      I do not recall that -- saying that in any

22      conversation with you.

23           But I do recall discussing the expert witness

24      interrogatories, and I do recall discussing the

25      expert interrogatories that were directed to our

1   outside expert and discussing that those -- that

2   material had already been provided with her report,

3   and you subsequently withdrew those

4   interrogatories.

5       The hybrid interrogatories that are directed

6   to Mr. Upchurch are still outstanding and are not

7   yet due.  I did not agree that he could be deposed

8   as an expert at this deposition.  I do recall

9   speaking that some of the information that you were

10  looking for was already in the interrogatories that

11  were tendered to the department.

12      You've provided some case law that indicates

13  that you can inquire beyond the scope of the

14  noticed 30(b)(6) deposition.  I've looked at that

15  case law and some case law that's cited in that

16  opinion, which is King vs. Pratt & Whitney, I

17  believe, Paparadelli case that the Southern

18  District decided not to follow that says otherwise.

19  I've done some additional research, and I find case

20  law on both sides of the point.

21      So I think it's subject to debate on whether

22  you can inquire beyond the scope of what you

23  noticed in that deposition.  But you have not

24  noticed this as an expert deposition.  And we've

25  discussed it, and we've decided that we will allow

1    Mr. Upchurch to answer further questions that may

2    be beyond the scope of the noticed questions or

3    subject matter areas, but subject to the -- our

4    objections and limitations, that it will not bind

5    him in terms of what he will rely on as an expert.

6        Is there anything I need to add, Lance, to

7    that?

8        MR. NEFF:  No, just to clarify, there may be

9    further documents forthcoming.

10       MS. MAHER:  Right.

11       MR. NEFF:  We certainly haven't settled on the

12   documents we plan on using yet.  That's --

13       MS. MAHER:  And he has not yet answered his

14   hybrid interrogatories that will set forth any

15   other documents that he may be relying upon.

16       MR. BERG:  Let's go talk.  We will be back in

17   a second.

18       (Short recess.)

19       MR. BERG:  I guess what you're leaving us with

20   no choice is to take his deposition again, since

21   you're not going to lock him in as an expert.

22       MS. MAHER:  And that's your prerogative.

23       MR. BERG:  Got your calendar?

24       THE WITNESS:  Got whose calendar, mine?

25       MR. BERG:  Yep.

1          THE WITNESS:  I got -- I think --

2          MR. BERG:  Are you available the last --

3          THE REPORTER:  Do you want this on the record?

4          MR. BERG:  Yes, please.

5          MR. SCHIFINO:  On the record?

6          MR. BERG:  Well, the last date of discovery is

7     on the 15th.  How about the 15th?

8          MR. SCHIFINO:  We've got Ms. Schwarzkopf set

9     for the 15th.  Lance just gave me dates last

10    night -- or this morning.  She isn't going to be

11    all day; she'll only be a few hours.  But I just

12    wanted to let you know that's going to happen on

13    that day probably.

14         MR. BERG:  By phone?

15         MR. SCHIFINO:  Yeah.  By phone.

16    She's checking with your office, Lance, and

17    Susan, and with yours, Scott, your availability.

18         MR. SEAGLE:  It's already on my calendar.

19         MR. BERG:  Well, your interrogatories are

20    due -- can we agree on the record, Ms. Maher, that

21    if the interrogatories that were tendered are due,

22    say, February 5th?  They were served on the 2nd of

23    January.

24         MS. MAHER:  2nd of January?

25         MR. BERG:  I think.  I'm not positive about

```
 1        that though.
 2             MR. SCHIFINO:  Dante, do you know when he was
 3        served?
 4             MS. MAHER:  That would be February 3rd and
 5        4th.
 6             MR. TREVISANI:  No.
 7             MR. SCHIFINO:  I don't have the pleadings in
 8        here.
 9             MS. MAHER:  That would be 29 days in -- plus
10        four more days, so it would be February 4th.
11             What is February 4th?
12             MR. SCHIFINO:  Monday.
13             MR. BERG:  Yes.  Do you show when they were
14        served?  That's what I recall, Susan, is I sent
15        them to you on the 2nd of January.
16             MS. MAHER:  That sounds about right.  I don't
17        have them in front of me, so I don't --
18             MR. BERG:  I can see if I can find it.
19             MR. SCHIFINO:  I'm going to check too, Randy.
20             MS. MAHER:  So that would be due the 4th of
21        February.
22             MR. BERG:  So we can take his depo anytime
23        after that?
24             MS. MAHER:  (Nodding head affirmatively.)
25             MR. SCHIFINO:  We can split the 15th, Randy.
```

1    Ms. Schwarzkopf is going to be short.

2        MR. BERG:  Either that, or how about February

3    8th?

4        MR. SEAGLE:  I'm available on the 8th.

5        MR. BERG:  I will do it by phone.  I'm not

6    going to come back up here.

7        Is the 8th okay?

8        MS. MAHER:  Well, I'm not going to be in town.

9    But I'm -- it's Lance's show.

10       MR. BERG:  Well, he just said he's the lead

11   counsel.

12       MS. MAHER:  Yeah, he's lead.

13       MR. NEFF:  I didn't realize we were going to

14   do this.  I don't have my calendar or phone in

15   front of me.  I'm sorry.

16       MR. BERG:  Is your calendar here in this

17   building?

18       MR. NEFF:  It is in this building if you don't

19   mind me going and taking a look?

20       MR. BERG:  Huh?

21       MR. NEFF:  If you don't mind me going and

22   taking a look?

23       MR. BERG:  I would like to get this dealt

24   with.  I mean, you know, I think this is a little

25   absurd to begin with.  Whatever.

```
 1          MR. NEFF:  A notice would have been nice.  It
 2     would been much less absurd.
 3          MR. BERG:  Come on.  Get off of it, Lance.
 4          MR. SCHIFINO:  Are we doing afternoon or
 5     morning on the 8th, anytime, just to block it off.
 6          MR. BERG:  Sure.  How about 9:00,
 7     Mr. Upchurch?  Is that okay with you?  You're an
 8     early riser.
 9          THE WITNESS:  7:00?  (Laughter)  9:00 is fine
10     with me.
11          (Discussion off the record.)
12          MR. NEFF:  I have a deposition in another case
13     on the 8th.  I'm available the 11th through the
14     15th.
15          MR. BERG:  Well, I'm doing -- I'm flying out
16     on the 11th; I'm taking Ms. Savage on the 12th.
17     And I've got another deposition on the 13th.
18          MR. GARLAND:  When are you doing Susan?
19          MR. SCHIFINO:  I can do her in the morning, or
20     vice versa, afternoon.  Your call.
21          MR. BERG:  Why don't we do him in the morning
22     and Susan in the afternoon?
23          Does that make sense?
24          MR. TREVISANI:  Yeah, I think so.
25          THE WITNESS:  15th?
```

```
 1          MR. TREVISANI:  Yes, sir.
 2          MR. BERG:  Is that okay with you,
 3     Mr. Upchurch?  My issue would be the legislature.
 4     But I guess so.
 5          (Discussion off the record.)
 6          THE WITNESS:  Start at 9:00?
 7          MR. BERG:  Yeah.
 8          Would you read back the last question?
 9          (Testimony read.)
10     BY MR. BERG:
11       Q    Mr. Upchurch, you earlier stated that the
12     reason for implementing the new rule in June of 2009
13     was because of the ad increase in Prison Legal News;
14     correct?
15       A    That was part of it.
16       Q    And what was -- was there any other part?
17       A    Well, the continuing issues that were being
18     brought to my attention from the field about issues
19     with the postage stamp was the primary one being used
20     inappropriately, and the fact that the -- we had
21     trials and issues with -- as I said before -- and I
22     can't remember the case -- with the business rule, and
23     just that these things were becoming more prominent as
24     concerns.  And on top of that, then the prevalence of
25     those ads was increasing.
```

1    Q    By the ads increasing, do you mean the volume

2    of the ads increased?

3    A    Both.

4    Q    Do you mean that the size of the ads --

5    A    Size and volume.

6    Q    And the number?

7    A    The number, yes.

8    Q    Did you do any study or compile any statistics

9    that would show to me or to the publisher that the

10   volume size and number increased?

11   A    I did not.

12   Q    Did anyone at the Department of Corrections do

13   such a study?

14   A    Not that I'm aware of.  As far as I know, it

15   was more anecdotal from those participating on the

16   committee that were looking at the -- and that's not

17   firsthand knowledge for me.  That's just from my

18   interaction with committee members.

19   Q    Of which you were a member at the time;

20   correct, in 2009?

21   A    I was a member, but very seldom did I actually

22   serve.  I was consulted from time to time on issues

23   that would come up in the committee.  But either

24   Mr. Green, or there were others who I would designate

25   that may have sat on that committee.  Mr. Green was a

1    long-term member.

2        Q    And Mr. Green's first name is?

3        A    Wayne Green.

4        Q    Okay.  And do you know if any of the other

5    committee members did any sort of statistics gathering

6    dealing with the prevalence and prominence and the

7    increase in ad volume in Prison Legal News?

8        A    I don't know, no.

9        Q    Can you cite me to any problems which occurred

10   because of the old rule between 2005 and -- well, it

11   finally went into effect in 2006; correct?

12       A    I don't remember the exact date.

13       Q    Well, it was a proposed rule at trial in 2005;

14   correct?

15       A    I don't -- I don't remember that exactly.  I

16   mean, that sounds right.

17       Q    Right.

18       A    And I do remember that it was -- the

19   promulgation of that rule was related specifically to

20   the trial and to -- and to our effort to be

21   accommodating, but I don't know the dates.

22       Q    Between -- well, let me show you the rule.

23   Can you tell by the dates at the end of the rule?

24       A    The annotations?

25       Q    Right.

1    A    It's hard to tell what was added at what date.

2  I don't know if it tells you when it was amended.

3    Q    Well, it shows August 1st, 2006; correct?

4    A    It shows -- yes.  It shows August 1st, 2006.

5  And it shows June 16th of '09, which I think was the

6  one with the prominent and prevalent.

7    Q    Right.

8    A    So it's likely that --

9    Q    September 5th, 2005; correct?

10   A    Yes.  And I'm not sure -- between 8-1-06 and

11 9-5-05 I'm not sure which one it was.

12   Q    We went to trial on June 7th, 2005.

13       MR. NEFF:  Mr. Berg, Ms. Hughes has a document

14    that may be of assistance to you if you would like

15    to see it.

16       MS. HUGHES:  I just printed out the rule.  It

17    gives the dates of --

18       MR. NEFF:  Proposed rule and effective dates

19    if that's what you're --

20       MS. HUGHES:  The effective date for that

21    change was August 1st, 2006.

22       MR. BERG:  Okay.  Thank you.

23 BY MR. BERG:

24   Q    Between August 1st, 2006, and the rule that

25 we're here on today, which is June 16th, 2009, can you

1    cite me to any problems which occurred because of the

2    old rule, the one in effect?

3        A    You mean any significant, major event that I

4    recall?

5        Q    Yes, sir.

6        A    No.

7        Q    Can you give me any other reason for changing

8    the rules other than the increase in ad volume; size,

9    and number?

10       A    I thought I already said that my interaction

11   with people in the field and discussions and

12   monitoring with chiefs of security, assistant wardens,

13   and wardens indicated that there were increasing

14   problems with the postage stamp issue in particular,

15   and that there were indications that, for example,

16   that the business -- conducting business in prison

17   we've had chronic problems with the pen pal issue,

18   where we get notification from people in other law

19   enforcement, from people on the street about inmates

20   being present on pen pal sites, when all along we have

21   not allowed that to happen on some of these sites that

22   are being advertised.

23           So we've -- there has been just general

24   information in the course of business that indicates

25   that these items are problematic.  And we try to

1    interdict them the best we can.

2        Q    In your discussions with wardens and others

3    between the new rule in 2006 -- well, the old rule in

4    2006, which was implemented immediately following the

5    trial, and the new rule in June of 2009, what specific

6    instances do you know of dealing with stamps?

7        A    I think I've already answered that.  But I

8    don't have any.

9        Q    Okay.  Same question as to businesses.  What

10   specific incidences can you give me dealing with the

11   inmates conducting a business or profession while

12   incarcerated that occurred between --

13       A    I don't recall any.

14       Q    I need to finish my question.  Between the --

15       A    You already asked me this.

16            Go ahead.

17       Q    -- between the old rule that was in effect

18   immediately following the trial and June of 2009?

19            MR. NEFF:  Objection; I agree, Mr. Upchurch,

20       I'm fairly certain we've covered this ground.

21       Asked and answered.

22   BY MR. BERG:

23       Q    Same question as to pen pals.  Can you --

24            MR. NEFF:  Same objection.

25       A    I don't recall any.

```
 1   BY MR. BERG:
 2      Q    Do you know of any other states which have
 3   adopted rules similar to Florida which prohibit an
 4   advertisement promoting the offending things of
 5   three-way calling, pen pals, purchase of products with
 6   stamps, or conducting a business as being the focus of
 7   rather than incidental to the publication?
 8           MR. NEFF:  Objection; form.
 9      A    Not -- not -- no, I don't, not personally, no.
10   BY MR. BERG:
11      Q    In fact, no other state, to your knowledge,
12   has ever adopted a rule as restrictive as this as to
13   publications; is that correct?
14           MR. NEFF:  Objection to the form.
15      A    I don't know if they have or not.
16   BY MR. BERG:
17      Q    But you don't know of any?
18      A    No.
19      Q    And the Federal Bureau of Prisons has never
20   adopted --
21      A    I don't know.
22           MR. NEFF:  Objection to the form.
23      A    I don't know what they do.
24   BY MR. BERG:
25      Q    Okay.  Did you conduct, or has the department
```

1   conducted any training to -- so people in the field

2   who have to impound publications that come in on how

3   to interpret this rule that we're here on today?

4       A   Not to my knowledge.

5       Q   Has the department issued any guidance to the

6   institutions on how to interpret what is prevalent or

7   prominent?

8       A   It's -- we've issued guidance in the sense

9   that the process itself allows for us to provide

10  guidance.  And what I mean is that the institutional

11  mail room staff, in conjunction with the assistant

12  warden, who signs off on the impoundment notice, make

13  a decision that this looks like that it does not

14  comply, or that it does violate one of these

15  prohibited acts or prohibited inclusions, then they

16  would impound it, and it goes up to a committee, which

17  is a multi-disciplinary committee composed of a

18  security staff member, a library services, and a

19  grievance -- department of grievance personnel.

20          And they, in fact, have a much greater

21  opportunity to view a lot of this.  And in order to

22  ensure consistency -- and as I said, if Mr. Green,

23  when I was the security chief, and the designee, he

24  would approach me from time to time about questions,

25  if something came up that was of a questionable

1   nature.

2          They also would consult with other department

3   heads, such as Alan Overstreet, former bureau chief.

4   And if necessary -- and I feel confident that they

5   will confirm this -- we would consult with our legal

6   staff if we felt that there was something that was

7   questionable, and we wanted to be sure that what we

8   were doing was appropriate.

9          So the concept is that they would interpret

10  the rule at the institutional level.  Then there was a

11  review process.  And based on the decisions made at

12  the review process, and if it was upheld or not, that

13  was an indication of them of what they could feel

14  comfortable with rejecting and not rejecting, which is

15  training in a very real sense.

16      Q   I was wondering if that was training.  Did you

17  conduct any training --

18      A   I already said no.

19      Q   Okay.

20      A   But I clarified with what I told you.  And

21  there may have been training that I don't know about.

22  I'm not going to say there wasn't any training at all.

23  I'm not aware of any.

24      Q   Who would know?

25      A   Possibly -- I don't know.

```
 1          THE WITNESS:  (To Ms. Hughes).  You might
 2     know.  Or somebody else in the agency.  I don't
 3     know.
 4          MR. NEFF:  We can ask her later.  "Her" being
 5     Ms. Hughes.
 6  BY MR. BERG:
 7     Q    When you adopted the rule in June of 2009,
 8  which changed the old rule which allowed in my
 9  client's publication, did you consult with anyone else
10  on the adoption of this rule?
11     A    Consult with anyone else?
12          MR. NEFF:  Objection; vague.
13     A    I consulted with -- I think we provided you
14  the rule promulgation file, which it listed a number
15  of -- provided a number of e-mails back and forth
16  among various staff members discussing this change.
17  And there were attorneys in our legal services.  There
18  was Mr. Overstreet.  And I'm not sure who else was
19  involved.
20          It's also I think important to recognize that,
21  once we had agreed with this -- to this change, and we
22  had put it into the proposed rule, it then goes
23  through a process where a JAPC, which is a separate
24  agency of attorneys, actually reviews the rule change
25  for its appropriateness and legality, and either
```

1  approves it or disapproves it before it's ever

2  promulgated.  And it's posted for public notice.

3       So there is quite a bit of opportunity for

4  input and professional review in the process.

5  BY MR. BERG:

6    Q   JAPC only deals with whether or not it

7  complies with a statute which gives the department

8  pretty broad authority to act; correct?

9    A   I don't -- I guess they interpret -- they do

10  say we have the statutory authority.

11   Q   Right.

12   A   Right.  Which generally there is usually

13  constitutional stuff.

14       MR. BERG:  I would like to have marked as

15    Plaintiff's --

16       THE REPORTER:  5.

17       MR. BERG:  -- 5 one such comment to the rule.

18       It was part of the e-mail attachment.  Now the

19    e-mail may have a Bates stamp on it.  It's draft

20    dated at the top June 11th, 2008, with PKD comments

21    of 6-12-08.

22       Who is PKD; do you know?

23       THE WITNESS:  Perri Dale.

24  BY MR. BERG:

25   Q   Perri King Dale?

```
 1      A    Yes.

 2      Q    Okay.  Let me show you what's been marked as

 3  Plaintiff's 5.

 4           (Exhibit No. 5 was identified for the record.)

 5      A    (Examining document.)  I don't believe that --

 6  I recall this being in some of the e-mail traffic.

 7  And I believe that particular -- there is also some

 8  comments in here by a -- a junior attorney with our

 9  division, Jamie Jordan, I believe, also has some

10  comments in here that are -- are -- are in here as

11  well.  I'm not sure which is -- because she was

12  working on this primarily with Perri Dale.  And I'm

13  not sure how much of the comment came from -- actually

14  came from Perri Dale, what came from her.

15           I guess it would be open to --

16           MR. BERG:  Let me have marked as Plaintiff's

17      6, I guess that is.

18           (Exhibit No. 6 was identified for the record.)

19           MR. BERG:  As well as Plaintiff's 7.

20           (Exhibit No. 7 was identified for the record.)

21  BY MR. BERG:

22      Q    Plaintiff's 5 and 6 and 7, which may help.

23      A    (Examining documents.)  Okay.

24      Q    They all deal with putting in a disclaimer;

25  correct?
```

```
 1      A    It appears that they -- they deal with -- are
 2   you talking about the disclaimer, about the purchase
 3   of products or services with postage stamps --
 4      Q    Right.
 5      A    -- that inmates incarcerated in the Florida
 6   Department of Corrections Institution are prohibited
 7   from purchasing goods --
 8      Q    Right.
 9      A    -- or services with stamps?
10           Yes.
11      Q    That was considered; correct?
12      A    Yes.
13      Q    And you thought that was a good idea?
14      A    No.
15      Q    No.  Why not?
16      A    Because I don't think it -- it implies,
17   because we put a disclaimer like that, that that's
18   going to stop the inmates from doing it or that the
19   fact that they receive ads that tell them how to do
20   it, that because there is a disclaimer in there that
21   you can't do it is going to stop them from doing it.
22   I don't think it serves a purpose.
23      Q    Are you aware that other states have done
24   that?
25      A    No, and don't really care what they do.  I'm
```

1    concerned about what works for us and what makes our

2    security.

3        Q    Even if it requires you to reject a

4    publication and basically sensor it?

5        A    We're not rejecting it based on this one

6    issue.  We're rejecting it on a prominent and

7    prevalent.

8        Q    But that's one of the issues; right?

9        A    It's one of the prominent and prevalent.

10       Q    And that was one of the ones that was of

11   concern to you; correct?

12       A    Yes, that's one of them.  But this does not

13   address the security concern.  That's part of the

14   reason it was rejected.  As I said before --

15       Q    Who proposed that --

16       A    -- I --

17       Q    -- based on your review of the e-mails?

18       A    My recollection is I think this Jamie Jordan

19   might have.  But I -- that was quite a while ago.  And

20   it looked like it to me that that may have been her

21   recommendation.

22            And I didn't see anything in there where I

23   necessarily rejected it.  But after looking at it just

24   now, I would have if I was -- if it was presented to

25   me today, I would.

1      Q    So that's one alternative that the committee

2  considered, but rejected?

3      A    It's not a viable alternative.

4      Q    That wasn't my question.

5      A    It is a submission.

6      Q    Was that one of the alternatives that was

7  suggested, and it was rejected?

8      A    It was alternative language that was rejected.

9      Q    By you?

10     A    I don't recall that I rejected it.  But if I

11  saw it I would have.

12     Q    Were there any other alternatives that you

13  considered, in addition to the disclaimer, that was

14  ultimately rejected?

15     A    In any of these -- those four areas that we

16  covered?

17     Q    Yes, sir, that would deal with the issue.

18     A    I don't recall any, no.

19     Q    Okay.

20     A    I mean there may have been.  We had a lot of

21  discussion.  There could have been things that came

22  up, but I don't recall.

23     Q    At the bottom of the proposed rule for June of

24  2009 it lists Alan Overstreet as the person proposing

25  the rule.

1          Was there anyone else other than

2  Mr. Overstreet that proposed the change to the rule?

3      A    I think that the reason he's listed as

4  proposing the change to the rule is because it was

5  a -- all of our rules are broken in sections by

6  primary responsibility area.  And he was over library

7  services, and somehow he ended up being -- and because

8  of the reading materials part of this rule, he was

9  the -- his area was the responsible party for

10 admissible reading materials.

11         But -- as with all of the things that we do,

12 they go out to -- you know, they're circulated among

13 all the divisions and bureaus and impact -- because

14 they can impact a lot of people.  But it was --

15 primarily fell within his area of rulemaking, yes.

16     Q    Was there anyone else involved in proposing

17 the rule change in June of 2009, other than

18 Mr. Overstreet?

19     A    Well, yes.  As is indicated in the rulemaking

20 file there and all the e-mails, I was involved.

21 The -- Ms. Jordan, Perri Dale.  I'm sure there were

22 other names; there were other people involved.  I

23 don't remember them right offhand.

24     Q    Were you the primary purpose -- person

25 proposing this change in June of 2009?

     A    I was -- in terms of clarifying the issue of

incidental focus of prominent and prevalent, I would

say that I was a strong contributor to that, yes.

     Q    Anyone else?

     A    Other than the people that I had discussed

that caused me to want to do it?

     Q    Yes.

     A    No.

          MR. BERG:  Do we have the notice?

          THE REPORTER:  I have it right here.

BY MR. BERG:

     Q    Have you given us here today all penological

and security justifications served by rule -- and I

will just call it (3)(l) for purposes of

identification?

          MR. NEFF:  Object to the identification.

BY MR. BERG:

     Q    Okay.  I will use Rule 33-501.401(3)(l).

     A    Well, I think it depends on how much detail

you want to go in on each area.  If you want to go

into the legitimate penological and security concerns

associated with the pen pal issue, then I'm not sure

that I have covered everything that could be of

concern.  The three-way calling issue, I'm not sure

that today I have covered everything that is a concern

1   and why.

2        So in that sense, no.  But when you ask me

3   what my security and penological justification for

4   wanting to deny access of this material, I gave you

5   the general statement.  But I haven't gone in in

6   detail to each area as to why I think it poses a

7   security risk.  I've covered some of it in my

8   rambling, but not all of it.

9     Q   Well, I would like for you to cover all of it.

10  Are there any other penological and security

11  justifications for Rule 33-501.401(3)(l)?

12    A   Well, do you want to go through them one at a

13  time?

14    Q   Yes, sir.

15    A   Okay.  Then let's -- you know, I believe in

16  this thing you start with -- let's start with the

17  phone service.

18        I noted in some of the ads here that they --

19  they talk about that when they're answering questions

20  from family members and stuff about subscribing and --

21  to the inmates, they talk about that by allowing for

22  these cheaper calls, by circumventing our system, that

23  the calls are still monitored regardless of whether

24  they're being forwarded or not.

25        And the implication being that there is not --

1    that it doesn't pose or violate the rules or pose a

2    problem for the institution.  And that's untrue,

3    because as I said before, we don't know, once that

4    call is moved, we don't -- or forwarded or

5    transferred, we don't know where it's going or to whom

6    they're speaking.  And we have no way of finding that

7    out unless we go through this -- one of these vendors,

8    and they agree to give us all this information, we

9    don't have it.

10        One of the first things we do when we have

11   a -- as an example, when we have an escape from a

12   prison, something that's going on outside, and we get

13   a contact from a local law enforcement person is we

14   will go to the individual's visitation list and their

15   phone list.  And we will find the physical address and

16   who they write to and who they call.

17        And while we're out with the dogs and looking

18   for the person, that kind of stuff, we're also calling

19   ahead to law enforcement to get them to stake out

20   those areas, persons of interest, if that person is

21   seeing a certain person a lot of times.  So we use

22   that physical address and that ability to know who

23   those people are to help us in apprehending escapees.

24        And if we have some kind of criminal activity,

25   that we get an indication from local law enforcement

1    or somebody that's going on, we go to our files, and

2    we look so we can find out where those people are and

3    how they could be implicated or how they're involved.

4    It may be that we work -- our IG works with local law

5    enforcement to observe those people and watch their

6    activities and that kind of stuff.

7           So it's very important to us that we know who

8    the inmate is talking to.  That's why we have the

9    list.  That's why we want to make sure that we keep up

10   with who we have, in addition to the fact that if

11   there is any kind of fraud going on, any kind of plans

12   for introduction of contraband, anything like that.

13          As I said before -- and I'm sorry it's this

14   way, but we don't have the resources.  If we had the

15   resources we would listen to every one of these calls

16   so that we could make sure that there is nothing going

17   on that is a threat to the public or to the security

18   of the institution.  But we don't.  Inmates know that.

19          Therefore, you can probably go to any phone

20   monitoring service in any institution, and if you sit

21   there -- you have to sit there a couple of hours or

22   more, you're going to find people talking blatantly

23   about stuff that they shouldn't be doing.

24          So we monitor as much as we can.  We pull

25   staff on secondary duties, that can't work because of

1    some physical issues, we'll pull them to do it.  We do

2    the best we can with our resources, but our resources

3    are very limited.

4         So there is a lot of this stuff that goes on.

5    We have to have a good archive, a good system of

6    records to know where the inmates are, where the

7    person that's getting the call is, who they are, so

8    that we can follow up if we need to.  That's a

9    critical part of the three-way calling section.

10        As far as the pen pal section, I don't think

11   there is any -- I have gotten, as a warden, I got so

12   many calls about -- from family members and from

13   people and non-family members and people who have been

14   preyed upon, who will call and say, can I pick up

15   so-and-so on Tuesday -- when I pick up so-and-so on

16   Tuesday, do I pick him up at the gate, or do I pick

17   him up at the bus station?  Where do I pick him up?

18        I say, who are you picking up?  And they will

19   tell me.  And I will say, well, let me check his

20   record.  I don't believe he's going to be going

21   anywhere on Tuesday, not legally.  And so I'll check

22   it, and I'll find out and then the person will say,

23   well, I paid the $1,000 he said I had to have to get

24   my fine taken care of.

25        All then of a sudden, you know, we realize

1    what's been going on.  I will say, if you will give me

2    your name, you know, let me contact you with our

3    inspectors and investigators, we will try to get your

4    money back; we'll try to help you.

5         A lot of these people don't even want to admit

6    it.  They're so embarrassed; they're ashamed that they

7    got conned like that.  There are a lot of people out

8    there who are victimized by these inmates.  And

9    there's all kind of examples of that.

10        I mean, this stuff -- the thing that happened

11   in Missouri, the things that happened at Parchman in

12   Mississippi, where they used these pen pal people,

13   when they get their name out of that -- off of this

14   service, and they're dealing with them, there is no

15   personal identification with it.

16        They've got a target, somebody else to target.

17   And that's the way they treat them.  They get a good

18   letter that gets them some money.  They pass that

19   letter around in the prison.  I mean, if this letter

20   is effective, this inmate is selling that letter for

21   honey buns or something to the guy down the rank.

22   Before long that letter is being used on multiple

23   people who are seeking somebody to care about.  And

24   they take advantage of them.

25        I mean, it's a -- it's been occurring for a

1   long time, and we -- we're never going to stop it, as

2   evidenced by the fact that you can go on some of these

3   sites, and you see prisoners from Florida.  But we are

4   not going to be complicit in it.  We're not going to

5   tacitly condone it.  We're not going to condone it

6   because we don't try to stop it.  That's why we do

7   that, or our primary reason.

8        As far as that business stuff goes, we don't

9   have the staff to monitor the business activities of

10  an inmate.  Not only do we not have the number of

11  staff, we don't have the staff with the training or

12  sophistication to do it.  They can't look at a --

13  review a contract or some sort of a business agreement

14  and determine if this is on the up and up.

15       And if we allow inmates to participate in

16  these businesses, and we're helping them set up

17  accounts and do all that kind of stuff, I would

18  think -- and our legal staff, from my discussions with

19  them in the past, if we allow it to happen, then we

20  may be subjecting ourselves to liability when they get

21  themselves entangled in these business-related fraud

22  and misrepresentation, all that stuff.

23       So -- added on top of that is there is an

24  increase in the amount of mail that -- particularly if

25  somebody is running some sort of a publishing or

1   editing or writing thing where it becomes a business

2   and a profession, then you've got all of this stuff

3   going and coming back and forth.  I already talked

4   about the amount of mail we have and the few amount of

5   staff that we have to check it.

6         So, I mean, there is all kinds of implications

7   with -- as I put in the responses in the affidavit I

8   gave, that would not want us to allow inmates to

9   engage in businesses.  And the courts have said that's

10  okay.  They understand.  It's clearly general.

11        Then we have the staff issue.  I have been

12  over and over that.  And there is -- this thing has

13  gotten so sophisticated, and these ads that are in PLN

14  and in other publications that we restrict that they

15  not only will tell them, we will give you 75 cents on

16  a dollar, they will tell them, we will send it to you

17  electronically.  We will send it to wherever you want

18  to send it.

19        If you have one of these things where you can

20  get a package like from one of these vendors that

21  sells -- which we may be doing eventually here pretty

22  soon in Florida, and they do it in a lot of other

23  states -- they will send it to the package vendor and

24  pay for a package for him to send in.  So he just very

25  feasibly, this inmate could have ripped off or

1   extorted the stamps from some young guy there in the

2   prison with him, sent those stamps to this person for

3   this exchange.  And they send it and buy him a package

4   of goods, and it comes back in to him legitimately

5   through us.  That's wrong.  We have to control that.

6        Are we going to stop it?  If we stopped

7   everything, and if we could put out something that

8   said you don't do this, I wouldn't have a job.  These

9   prisons would be running independently.  We'd just put

10  out a bunch of memos and directives, and they wouldn't

11  do it.  It does not work that way, and any reasonable

12  person would realize that.

13        The other one -- let's see.  That was the

14  stamps.  What was the other one?  I may have left one

15  off.  Three-way calls -- wait just a minute.  Make

16  sure I haven't left off anything.  Postage stamps,

17  business and professions.

18        I think that's pretty much addresses it.

19  Q    So you addressed all of your security and

20  penological justifications for the rule?

21  A    For those four things, yes, I think I pretty

22  much covered them in here and in the affidavit I

23  submitted.

24  Q    You mentioned in this long explanation, you

25  gave Parchman, Mississippi and some other place.  What

1   incidences are you talking about?

2       A    I'm talking about in -- sometime back there

3   was a major issue at Parchman with altered money

4   orders.  And one of the ways that they took advantage

5   of the fact that they could alter these money orders

6   was that they would take a money order that was, say,

7   for a dollar, and these guys were masters at taking it

8   and changing the one to a seven.  And they would make

9   it -- alter the money order so it was a significantly

10  greater amount.

11         Then they would use a person that they had

12  gotten off of a pen pal service, some sort of one of

13  those pen pal deals, and they would send them -- they

14  would be writing to them and kind of cultivate them.

15  That's part of the training we give to our staff about

16  how people are cultivated by the inmates.

17         And then they take, and they -- after they've

18  got them where they're interacting with them, then

19  they would send them $3,000 or so many thousand

20  dollars worth of these ads -- I mean not ads, these

21  money orders that had been altered.  And they would

22  say, I got this money, and I need to get it to

23  so-and-so so that I can pay off something that I owe,

24  some legitimate thing that's going on.  If you cash

25  these for me, you can keep $500 just for handling this

1   and send it over to such and such for me.  And they'd

2   do it.

3         Then what happens is, the bank, when they

4   realize that they've just cashed these money orders

5   for this amount that's huge, and they realize that

6   these money orders are only worth $6, $7, $8, then

7   they come back, and they come back on the person that

8   cashed them.  So the person that's been victimized is

9   the pen pal person.

10        And there was hundreds of those throughout --

11  I mean it was a major issue.  There were --

12      Q    In Mississippi?

13      A    In Mississippi, four, five staff members

14  indicted.  It was a major issue.  And it didn't stop.

15  I mean it slowed down.  But it's still an issue, still

16  a problem you have to monitor.  These --

17      Q    Now inmates are allowed to write --

18        MR. NEFF:  Mr. Berg, I don't know if he was

19      finished yet.

20      A    I said if these -- specifically these pen pals

21  were people that they had gotten off of pen pal

22  services, not friends, family, not relations.  These

23  are people that they were picking out to victimize.

24  BY MR. BERG:

25      Q    Inmates are allowed to write to people; right?

1      A     Absolutely.   Encourage them.

2      Q     Allowed to write to pen pals; correct?

3      A     Absolutely.

4      Q     And you can obtain a pen pal through a variety

5  of things other than websites and pen pal services;

6  correct?

7      A     Yes.

8      Q     And in fact, the chaplaincy service brings in

9  volunteers and churches, and they arrange for inmates

10  to get pen pals to write to; correct?

11      A     Yes.   That's different though.

12      Q     Why is it different?

13      A     It's different because there is a relationship

14  there.   And traditionally there is sort of a

15  monitoring.   These volunteers who establish these

16  people to -- as pen pals, these volunteers and stuff,

17  they know to be on the watch.

18          These volunteers, they go through training

19  that we provide them.   They pass that information on.

20  They're not going to turn over the name of some person

21  that they know from their church and -- without

22  cautioning them, if he starts asking you for money, or

23  he starts getting you to do things for him outside of

24  what you would expect, just a normal communication and

25  emotional support, then you need to -- you need to

1    come see me, or you need to be cautious.

2           There is a certain degree of monitoring or --

3    it's different than just picking somebody off of an ad

4    where the inmate can misrepresent themselves if they

5    choose to, and then take advantage of the person who

6    is writing in that there is no connection and no tie

7    to.

8       Q    The department does no background check

9    whatsoever on those pen pals that -- religious

10   volunteers come in and arrange with the inmate;

11   correct?

12      A    We do background checks on the volunteers, but

13   not on the --

14      Q    But not on the pen pals; correct?

15      A    Not that I'm aware of, no.

16      Q    What does the department do to ensure that the

17   institution sends notice to the publisher that its

18   publication has been impounded?

19      A    Well, we have a rule requirement that they do.

20   And there is a form that the assistant warden signs

21   that has a distribution.  And I assume that that's how

22   they get it.

23          That might be a question better answered --

24          MR. NEFF:  What number is this?

25          MR. BERG:  Six.

```
 1          MR. NEFF:  Six is going to be Ms. Hughes.

 2          MR. BERG:  Yes.

 3     A    Turned me off there.

 4  BY MR. BERG:

 5     Q    We will move on to eight.  Let me ask you a

 6  couple of questions about other publications that come

 7  in.

 8          Are you a member of the National Rifle

 9  Association?

10     A    The what?

11     Q    Are you a member of the National Rifle

12  Association?

13     A    No.

14     Q    Are you a member -- are you a hunter?

15     A    I used to be.  No, not currently.

16     Q    Okay.  Does the department allow Field &

17  Stream to come in?

18     A    You know, I -- I have not been involved

19  personally in reviewing these.  I understand that

20  the -- I think it depends on the content of the

21  individual issue.  And it would depend if there is

22  something in there that could violate the -- what's

23  stipulated in the rule.  I don't really know.  I'm not

24  sure.

25     Q    Would a publication that has -- guns are not
```

1    allowed in prisons; correct?  That's a safe

2    assumption.

3        A    No.  We try to limit those as much as

4    possible.

5        Q    Are publications which have guns for sale

6    allowed into prisons?

7        A    Well, yeah, yeah, I'm sure they are.

8        Q    They are allowed?

9        A    Yeah, yeah.

10       Q    And are --

11            MR. NEFF:  Again, I'm curious, what number

12       does this fall under?  This may be Ms. Hughes' area

13       of questioning.

14            MR. BERG:  Well, it deals with the whole

15       incidence dealing with publications, whether they

16       can come in in terms of the rule.

17            MR. NEFF:  What number was that?

18            MR. BERG:  Are you going to refuse to let him

19       testify about anything outside of those --

20            MR. NEFF:  I'm curious what number that is.

21            MR. BERG:  I'm asking you, are you going to

22       refuse to allow him to testify --

23            MR. NEFF:  Once I know what number it is, I

24       will make my decision.

25            MR. BERG:  I think it's kind of subsumed

1    within a number of them, including number one,

2    number three, number eight, number 11.  I'm asking

3    him specifically about the admissible -- well,

4    Rule 33-501.401(3)(l) and whether certain

5    publications are allowed in.

6          MR. NEFF:  I'm not so sure it falls within

7    those, but I will let him answer it.

8    A    And just -- in response to your question you

9    just clarified, under those (3)(l), they can come in

10   all day.  It doesn't have any of that in it.

11   BY MR. BERG:

12   Q    How about (m)?

13   A    (M), now that might be a different story.  It

14   depends on -- I believe there is another one up here

15   that says it depicts or describes procedures for the

16   construction of or use of weapons, ammunition, bombs,

17   chemical agents, or incendiary devices.  If it were to

18   tell you how to construct a gun, or tell you how to

19   make a bullet or tell you how to make -- things

20   that -- and, again, this is not, as I said before, cut

21   and dried where you can specify every little thing.

22   This group and this institutional staff have to make a

23   discretionary decision as to whether this is something

24   that poses a threat or not.

25          But I would think in a lot of cases, from

1    Field & Stream and some of those, as -- again, I don't

2    know, from not having sat on the committee personally

3    myself, I would think that a lot of times they could

4    come in.  As far as there being guns and weapons in

5    there, those references to guns and weapons and all

6    that kind of stuff is in newspapers every day.  So,

7    yeah, it can come in.

8        Q    And the purchase of those sort of things;

9    correct?

10       A    The purchase of weapons?

11       Q    Guns and knives and weapons are in these

12   publications?

13       A    I think it would depend on how -- what kind of

14   weapons and what kind of stuff it is.  And, again, I

15   think Ms. Hughes and the committee members that do it

16   every day would probably be better.

17       Q    Okay.  Alcohol, for example, is not allowed in

18   prison; correct?

19       A    No.

20       Q    And yet there are publications all the time

21   which are allowed in, such as Newsweek, Time, that may

22   have ads for beer or some type of alcohol; correct?

23       A    Right.

24       Q    Those publications come in; correct?

25       A    Right.

ACCURATE STENOTYPE REPORTERS, INC.

```
 1      Q    And those ads aren't merely incidental?

 2      A    If it teaches you how to make alcohol --

 3      Q    Not making.  I'm just talking advertising for

 4   that.

 5      A    Yeah.  Yeah.

 6      Q    Making alcohol would fall under (m),

 7   certainly, of the rule; correct?

 8      A    It -- I would have to look at which one.  But

 9   I'm sure it falls under something.

10      Q    Okay.

11           MR. BERG:  Let me take a break for a second.

12           (Short recess.)

13           MR. BERG:  I don't think I have any further

14      questions for Mr. Upchurch today.  Lance is giving

15      us another opportunity with you, though.

16           MR. NEFF:  In your expert capacity, that is.

17           MR. BERG:  You have Lance to thank for that.

18           (Discussion off the record.)

19           (The deposition was concluded at 12:30 p.m.)

20

21

22

23

24

25
```

1                    **CERTIFICATE OF OATH**

2

3     STATE OF FLORIDA          )
      COUNTY OF LEON            )

4

5

6          I, the undersigned authority, certify that said
      designated witness personally appeared before me and was
7     duly sworn.

8

          WITNESS my hand and official seal this _____ day
9     of February, 2013.

10

11                              s/ _____
12                              SARAH B. GILROY
                                sbrinkhoff@comcast.net
13                              NOTARY PUBLIC
                                850-878-2221
14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA      )
COUNTY OF LEON        )

    I, SARAH B. GILROY, Registered Professional Reporter,
and Notary Public, do hereby certify that the foregoing
proceedings were taken before me at the time and place
therein designated; that a review of the transcript was
requested, and that the foregoing pages numbered 1
through 106 are a true and correct record of the
aforesaid proceedings.


    I further certify that I am not a relative, employee,
attorney or counsel of any parties, nor am I a relative
or employee of any of the parties' attorney or counsel
connected with the action, nor am I financially
interested in the action.

    DATED this _____ day of February, 2013.




                        s/_____
                        SARAH B. GILROY, RPR, CRR
                        sbrinkhoff@comcast.net
                        850-878-2221

```
 1                          ERRATA SHEET
      Under penalties of perjury, I declare that I have read
 2    the foregoing transcript of my deposition and hereby
      subscribe to same, including any corrections and/or
 3    amendments listed below.

 4    _____          _____
 5    Signature                                  Date

 6    PAGE           LINE           CORRECTION AND REASON FOR
      CHANGE
 7
 8    _____     _____        _____
                                 _____
 9    _____     _____        _____
10    _____     _____        _____
11    _____     _____        _____
12    _____     _____        _____
13    _____     _____        _____
14    _____     _____        _____
15    _____     _____        _____
16    _____     _____        _____
17    _____     _____        _____
18    _____     _____        _____
19    _____     _____        _____
20    _____     _____        _____
21    _____     _____        _____
22    _____     _____        _____
23    _____     _____        _____
24    _____     _____        _____
25
```

```
              ACCURATE STENOTYPE REPORTERS
                 2894-A Remington Green Lane
                 Tallahassee, Florida 32308
                       850-878-2221
```

February 4, 2013

C. IAN GARLAND, ESQUIRE
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050


re:  January 24, 2013 deposition of James R. Upchurch

Dear Mr. Garland:

This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for your review and signature at your
attorney's office, or if you wish, you may sign below to
waive review of this transcript.

It is suggested that the review of this transcript be
completed within 30 days of your receipt of this
letter, as considered reasonable under applicable
rules; however, there is no Florida Statute to this
regard.

The original of this transcript has been forwarded to
the ordering party and your errata, once received,
will be forwarded to all ordering parties for
inclusion in the transcript.

Sincerely yours,



SARAH B. GILROY, Court Reporter

cc: Randy Berg, Esquire
      ^ Name

Waiver:
I, _____, hereby waive the reading and
signing of my deposition transcript.

_____          _____
Deponent signature                Date
```

ACCURATE STENOTYPE REPORTERS, INC.