UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

Case No: 4:12-cv-239-MW/CAS

| | |
|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER, a not-for-profit, Washington charitable corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE GEO GROUP, INC., et al. | ) ) |
| Defendants. | ) ) ) |

### UNSWORN DECLARATION OF E. EUGENE MILLER

I, E. Eugene Miller, pursuant to 28 U.S.C. § 1746, hereby make the following Unsworn Declaration Under Penalty of Perjury, and declare that the statements made below are true, and state:

1. My name is E. Eugene Miller. I am *sui juris*, over the age of 18, and make this declaration of my own personal knowledge.

2. I have been retained as an expert in the field of penology by Randall C. Berg, Jr., of the Florida Justice Institute, who is an attorney representing the plaintiff in the case of <u>Prison Legal News v. The GEO Group, Inc., et al.</u> I was asked to determine whether or not the defendants' practice of banning Prison Legal News from several of their prisons pursuant to Rule 33-501.401 (3), F.A.C. comports with generally accepted practices in the field of penology, and whether this practice serves legitimate penological justifications.

{07067929;1}

3. This is an update to my earlier expert's report which provided a written statement of my findings and opinions regarding this case. Please note that I respectfully reserve the right to supplement or amend this declaration, should I receive any additional, relevant information.

## METHODOLOGY

4. Prior to preparing this declaration I reviewed:

- The "First Amended Complaint";

- Rule 33-501.401 (3), F.A.C., Rule 33-210.101, F.A.C., Rule 33-602.205, F.A.C.

- Comparable policies and procedures from the following correctional agencies:

    - Federal Bureau of Prisons
    - California Department of Corrections and Rehabilitation
    - Illinois Department of Corrections
    - New York State Department of Correctional Services
    - Texas Department of Criminal Justice;
    - Arizona Department of Corrections.

- Eighteen (21) issues of Prison Legal News from before and after the implementation of the current Rule 33-501.401 (3), F.A.C. (Feb., '07; July,'07; Apr. & May, '08; July, '08; Oct., '08; Feb., '09; Oct., '09 – Feb., 10; May-July, '10; Nov. & Dec., '10; Oct., '12, Dec. '12, and Jan., '13, and Feb. '13);

- Two "Declarations of Paul Wright", including four (4) exhibits;

- Two Depositions of James Upchurch;

- May '12 issue of *XXL*;

{07067929;1} - 2 -

- Feb. '12 and Apr. '12 of *Tatoo*;

- Deposition of Margaret Savage;

- The "Inmate Telephone Service Agreement" between The GEO Group, Inc. and Global Tel*Link for Blackwater River Correctional Facility;

- The "Prison Inmate Telephone Agreement" between Corrections Corporation of America and Evercom Systems, Inc. and amendments;

- The "Contract Between the Florida Department of Corrections and Securus Technologies, Inc. Through its Wholly Owned Subsidiary, T-Netix Telecommunications Services, Inc." and contract amendments 1 – 5;

- Portions of the Securus web site;

- Washington State Dept. of Corrections policies related to offender subaccounts, DOC 450.100 and 200.000;

- American Correctional Association, <u>Standards for Adult Correctional Institutions</u>, <u>Fourth Edition</u>;

- American Correctional Association, <u>2012 Standards Supplement</u>.

5.  It should be noted that in 2005 I testified as an expert for the plaintiff in the case of <u>Prison Legal News v. James V. Crosby, et al.</u>, which dealt with many of the same issues as this litigation. I have reviewed the following material from that case:

- The "Complaint";

- The "Unsworn Declaration of E. Eugene Miller", dated March 16, 2005;

- The "Deposition of E. Eugene Miller", dated May 11, 2005.

6.  It should be noted that I am very familiar with adult correctional institutions in the State of Florida. I was the compliance counsel's corrections expert in <u>Arias v. Wainwright</u>, (N.D. Fla.) which was before the Honorable Maurice Paul. I was later

appointed by the Honorable Susan Black to be one of three corrections experts in <u>Costello v. Wainwright</u> (M.D. Fla.) for the Court Master Richard Julin and Court Monitor Robert Cullen.  Independent of my work in those two cases, I have had occasion to also inspect numerous other jails and prisons throughout Florida.  Under various auspices I have also evaluated prisons and detention facilities run by The GEO Group and Corrections Corporation of America.

7. In preparing this report I have also relied upon my more than forty-eight (48) years of education, training and experience in the field of adult, institutional corrections.  This experience has included the supervision of a state-wide prison system, the actual hands-on administration of correctional institutions, inspections of/visits to literally hundreds of jails and prisons throughout the United States and twelve (12) foreign countries; and, familiarity with professional standards and literature.  I have also written numerous articles which have appeared in the principal journals in the field, and am the author of one book and co-author of another dealing with issues in the field of correctional administration.  (Please see the attached <u>curriculum vitae</u> for details.)

**SUMMARY OF RELEVANT FACTS**

8. In approximately February 2003, the Florida Department of Corrections (FDOC) began to refuse the receipt of <u>Prison Legal News</u> (<u>PLN</u>) in its institutions, citing Rule 33-501.401 F.A.C. This prohibition was said to be based upon advertisements for services by vendors, which offered three-way calling services, pen-pal services, and the sale of postage stamps.  This prohibition reversed the previous practice of the FDOC with regard to <u>PLN</u>.  During the ensuing lawsuit, the FDOC amended Rule 33-501.401 F.A.C. three (3) separate times to permit the resumption of delivery of <u>PLN</u> to inmates in Flori-

da's prisons. Based on these changes, the United States District Court and the 11th Circuit Court of Appeals found PLN's claims in the lawsuit regarding censorship to be moot.

9. Effective June 16, 2009, the FDOC revised Rule 33-501.401 F.A.C. and reverted to its previous practice of banning PLN. Included in this ban are the Blackwater River Correctional Facility, which is run under contract for the FDOC by The GEO Group, Inc., (GEO) and the Graceville Correctional Facility, which is run under contract by the Corrections Corporation of America (CCA).

10. Both GEO and CCA run numerous correctional facilities throughout the United States, none of which, aside from the two (2) institutions specified in this lawsuit, ban PLN. In fact, both GEO and CCA operate other correctional facilities in Florida which do permit inmates to receive PLN, i.e., the Citrus County Detention Center (CCA) and the South Bay Correctional Facility and the Florida Civil Commitment Center (GEO).

11. PLN has inmate subscribers in all fifty (50) states and the Federal Bureau of Prisons. Florida is the only state that does not allow PLN in its institutions. PLN has nearly five hundred (500) inmate subscribers throughout the Federal Bureau of Prisons (BOP), including in all fifteen (15) prisons designated by BOP as "High" security. This includes twenty-one (21) inmate subscribers at BOP's supermax prison in Florence, Colorado, which incarcerates the most dangerous and notorious prisoners in the entire federal prison system.

12. I found it very probative that defendant's expert witness Margaret Savage, who was once a warden for the Arizona Department of Corrections' prisons at Florence and Eyman and its regional administrator, was unaware and had made no effort to inquire

as to whether Arizona was censoring *Prison Legal News* in the very prisons where once the warden, and Arizona admits the publication at issue.  This is particularly troubling because she knew that Arizona had an admissible reading material mail policy almost identical "word for word" with the one at issue in this lawsuit.

13. The applicable contracts to provide inmate telephone service require the vendors to have technology in place to detect and immediately terminate three-way phone calls.

14. The New York Department of Correctional Services (NYDOCS) temporarily barred PLN because of its advertisements for three-way calling and accepting postage stamps as a means of payment for publications. Litigation ensued, which was settled by a change in NYDOCS's policy to once again allow PLN in its institutions. NYDOCS now distributes a written notice to inmates, when they receive their copies of PLN, advising them of advertised services that are not allowed in New York's prisons.

15. In 2010, PLN added the following notice in a prominent position on its book order form on page 56 of each issue:

> "Prisoners can pay with first-class stamps
> (strips or books only) or pre-stamped envelopes,
> if allowed by prison policies". (emphasis in original)

16. In addition, the masthead on page 3 of each issue of PLN contains the following notice:

> "Advertising offers are void where prohibited by law
> and constitutional detention facility rules".

**FINDINGS AND OPINIONS**

17. The defendants' policy and practice of barring PLN from their institutions pursuant to Rule 33-501.401 F.A.C. does not comport with prevailing and generally ac-

cepted practices in the field of penology. In fact, with regard to GEO and CCA, this practice is not even consistent with what they do in their non-FDOC contract facilities elsewhere in the State of Florida or nationally.

18. PLN has inmate subscribers in correctional institutions in all fifty (50) states and the BOP. This includes subscribers, who are incarcerated in some of the most high security prisons in the nation, e.g., the BOP's supermax prison in Florence, Colorado. No other prison system restricts its inmates from receiving PLN. Surely, the Director of the BOP and the heads of prison systems in such states as California, Illinois and Texas would not compromise the security and safety of their facilities by allowing inmates to receive a publication, which posed a legitimate threat to the maintenance of order. While NYDOCS temporarily excluded PLN from its prisons due to several advertisements, officials initiated a simple procedure and now allow its inmates to receive PLN unfettered.

19. FDOC itself has a history of permitting PLN into its institutions. Until approximately February, 2003, Florida's inmates were able to receive the publication. In response to a lawsuit the FDOC amended its own rule three (3) times to permit the resumption of delivery of PLN to its inmates, which resulted in both a United States District Court and the 11th Circuit Court of Appeals finding the lawsuit to be moot. Although none of the material facts have apparently changed since that time, effective June 16, 2009, the FDOC reverted to its previous practice and once again barred PLN.

20. As a general rule-of-thumb, correctional officials should employ the least restrictive means necessary to achieve the goal of maintaining order and security. In practical application the FDOC already employs effective measures to address its perceived potential problems with certain PLN ads or has the means to do so readily at hand.

For example, FDOC objects to ads for three-way calling services. Yet, in its contract with Securus for inmate telephone service for the facilities it runs and in the contracts between GEO, and CCA, and their respective vendors for phone service at Blackwater River Correctional facility and the Graceville Correctional Facility respectively, all of these phone companies are obligated to employ readily available technology to detect three-way phone calls and immediately terminate them. In the real world of contemporary security technology, the banning of ads for three-way calling services is a policy in search of a problem, as the means to eliminate three-way calling has been available on the market for many years. Furthermore, if the FDOC were truly concerned with the ability to know where the recipient of an inmate phone call was physically located in the event the inmate was to escape, it would not allow inmates to call cell phones as set forth in its telephone rule. In my opinion allowing the calling of cell phones undercuts the FDOC's basis for its objection to ads for discount inmate phone services.

21. With regard to the issue of ads that allow inmates to pay for goods or services with postage stamps, the solution is readily available in virtually every prison in the country. Specifically, the applicable national standard recognizes the solution, as follows:

> "Written policy, procedure, and practice provide that inmate mail, both incoming and outgoing, may be opened and inspected for contraband…"
> (ACA standard #4-4491, page 154)

22. If the FDOC prohibits the use of stamps to pay for goods or services, then the stamps constitute contraband and should be confiscated during the inspection of outgoing mail and subject the inmate to disciplinary action. In order to ensure that its sub-

scribers in Florida prisons comply with FDOC's regulation, PLN states on its order form on page 56 of each issue that stamps will be accepted for payment only "…<u>if allowed by prison policies</u>".  A similar admonition with regard to all of its ads is contained in PLN's masthead on page 3 of each issue.  Rather than enabling its inmate subscribers to violate FDOC rules, PLN proactively encourages its readers to comply with them.   Moreover, if the FDOC were truly concerned about stamps being used as currency, there several alternative solutions to solve the problem.  Other states have done so.  For example, they could sell pre-stamped envelopes or postcards in their canteen which does not require any additional manpower.  In addition, Washington State has banned postage stamps from being used in its prisons.  If an inmate wants to send a letter or postcard, the inmate takes the mail to the mailroom or canteen where the postage is affixed at the time of mailing.  The cost of posting is then deducted from the inmates account.

23.     Other correctional systems have cut down on the need to scan mail and inmate possession of stamps by instituting a restrictive, electronic correspondence system, much like email but of course without the inmate having access to the web.  For example, the Federal Bureau of Prisons' inmate messaging system is called "Corrlinks."  And the Washington State Department of Corrections and other states have "eMessaging."  Both work on essentially the same principle.  Inmates are allowed to email persons who agree in advance to receive emails from the inmate so persons do not receive unwanted emails.  Either the inmate's account is charged for the service or the recipient pays.  The cost is less than a First Class stamp.  The email runs through a software program that recognizes key words so it can detect whether any criminal or forbidden activities are being discussed.  These electronic correspondence services cut down on mail-

room personnel needed to read or scan incoming or outgoing mail and, more importantly for this discussion, the need for stamps.

24. The other component to Washington's ban on the use of stamps and cutting down on any scams of the public is the use of subaccounting for inmate trust accounts. If a friend or family member sends in money to the inmate's account, it has to be accompanied with a form on which the sender can designate where the money can be used by the inmate to seven different, restricted subaccounts – postage, medical, educational, work release savings, savings account, spendable, and community services revolving fund. The use of these restricted subaccounts resolves the ban on postage stamps and their use as currency in the institution, and alleviates the scamming of money from the public for unintended purposes.

25. With regard to pen pal service ads, the FDOC knows the addresses listed in the advertisements. As part of its screening of outgoing and incoming mail, the institutions' mail rooms can simply check the addresses on the envelope to prevent inmates from sending mail to pen pal services.

26. The NYDOCS has found a simple way to achieve compliance with regard to inmates following its rules by not patronizing proscripted goods and services. The institution provides a notice warning inmates that patronizing certain types of goods or services may violate facility rules and subject the inmate to disciplinary penalties. As has been mentioned previously, PLN provides a similar instruction at the bottom of its masthead on page 3 of every issue.

27. Neither my opinions nor the generally accepted practices in the field with regard to these issues have changed, since I prepared my "Unsworn Declaration" in March, 2005. To reiterate:

> "…I do not believe there is any legitimate penological justification for banning <u>PLN</u> because of the ads contained therein."
> (pages 3 & 4)

28. The American Correctional Association (ACA) standards, which are generally accepted as the national standards in the field of corrections, does not advocate or require correctional agencies to ban publication for the reasons proffered by the FDOC. (The ACA is the largest national association in the field for correctional professionals.). Similarly, the National Institute of Corrections, an agency of the U.S. Department of Justice, has no report which advocates banning of publications for the reasons asserted by the FDOC. This is my opinion as well as that of defendant's expert witness Margaret Savage.

29. With the exception of the Blackwater River Correctional Facility, apparently neither does The GEO Group, at any of its other facilities around the country and elsewhere in Florida. With the exception of the Graceville Correctional Facility, apparently neither does CCA at any of its other facilities around the country and elsewhere in Florida.

30. As I further stated in my "Unsworn Declaration":

> "…The Department (FDOC) allows any number of mainstream publications and newspapers into correctional facilities which contain advertisements for articles that are banned in prison. . . . Similarly, there are numerous advertisements on radio and in newspapers for liquor, wine and beer. There are advertisements on TV

{07067929;1} - 11 -

> for beer. Beer, wine, liquor . . . and a whole host of other commonly advertised items are, of course, prohibited in Florida's prisons. Yet, none of those publications, TV shows, or radio programs which contain advertisements for those prohibited products are banned or censored.
>
> Just because an inmate can read, see or listen to an advertisement about a product or service which is prohibited does not mean that the inmate can act on it, purchase it, or sign-up for it. The Department controls inmates' physical access to products outside prisons, <u>via</u> regulations on the use of the telephone, the use of money, and the use of the mail system as well as by the physical restriction inherent in being incarcerated." (pages 3 and 4)

31.     The only change in the Rule at issue here since my testimony at trial in 2005, was the addition of the terms "prevalent or prominent."  These terms are purely subjective and fail to provide a corrections professional with any objective standards on which to base one's decision whether to admit a publication with offending advertisements.  My opinion that the rule lacks objective criteria is shared by defendant's corrections expert witness Margaret Savage.

### SUMMARY

32.     Based on my many years of experience, education and training in the field of adult, institutional corrections, it is my opinion that there is no legitimate penological justification for the defendants' banning <u>PLN</u> because of some of the advertisements contained therein.  First, <u>PLN</u> is a national publication and an ad, which may be in full compliance with one prison system's rules, may be in violation of another's. The defendants' have at their disposal the readily-available means to thwart any inmates' attempts to avail themselves of any goods or services thus advertised, that may be in violation of prison

rules, and these means fully accommodate their security concerns without threatening the security and order of the institutions.

33. Second, the Federal Bureau of Prisons and forty-nine (49) other states allow inmates to subscribe to and receive each issue of <u>PLN</u>. Some of the most, if not <u>the</u> most, secure prisons in the country have no problem whatsoever with their inmates receiving <u>PLN</u>. Surely, corrections administrators in those jurisdictions are every bit as concerned with the maintenance of order and security within their institutions as are the defendants.

34. Third, <u>PLN</u> specifically admonishes its readers on pages 3 and 54 of every issue to comply with institutional rules with regard to advertising offers. In so doing, <u>PLN</u> is acting responsibly while providing a legitimate and much-lauded service.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 8, 2013                          *s/E. Eugene Miller*
                                             E. Eugene Miller