UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


PRISON LEGAL NEWS, a
project of the HUMAN
RIGHTS DEFENSE CENTER,
a not-for-profit,
Washington charitable
corporation,

      Plaintiff,

vs.                          CASE NO:  4:12-cv-239-RH/CAS

THE FDOC GROUP, INC., a
Florida corporation,
CORRECTIONS CORPORATION OF
AMERICA, a Tennessee corporation,
registered and doing business
in the state of Florida; and
KENNETH S. TUCKER, in his
official capacity as Secretary
of the Florida Department
of Corrections

      Defendants.
_____/


THE DEPOSITION OF:      SUSAN L. HUGHES

AT THE INSTANCE OF:     The Plaintiff

DATE:                   Thursday, January 24, 2013

TIME:                   Commenced at 1:08 p.m.
                        Terminated at 1:50 P.M.


PLACE:                  Collins Building
                        107 West Gaines Street
                        Tallahassee, Florida

REPORTED BY:            SARAH B. GILROY, RPR, CRR
                        sbrinkhoff@comcast.net
                        Notary Public in and for
                        the State of Florida at
                        Large

```
 1   APPEARANCES:

 2
     REPRESENTING THE PLAINTIFF:
 3
             RANDALL C. BERG, JR., ESQUIRE
 4           DANTE P. TREVISANI, ESQUIRE
             Florida Justice Institutes
 5           3750 Miami Tower
             100 SE Second Floor
 6           Miami, Florida 33131

 7
     REPRESENTING THE DEFENDANT CCA:
 8
             JOHN A. SCHIFINO, ESQUIRE
 9           Burr Forman
             One Tampa City Center, Suite 3200
10           Tampa, Florida 33602

11
     REPRESENTING THE DEFENDANT DEPARTMENT OF CORRECTIONS:
12
             LANCE NEFF, ESQUIRE
13           C. IAN GARLAND, ESQUIRE
             Office of the Attorney General
14           PL-01, The Capitol
             Tallahassee, Florida 32399-1050
15

16   REPRESENTING THE DEFENDANT GEO GROUP:

17           SCOTT J. SEAGLE, ESQUIRE
             Coppins, Monroe, Adkins & Dincman
18           1319 Thomaswood Drive
             Tallahassee, Florida 32308
19

20   ALSO PRESENT:

21           WAYNE GREEN, DOC

22

23

24

25
```

1                                I N D E X

2    WITNESS                                       PAGE NO.

3    SUSAN L. HUGHES
          Direct Examination by Mr. Berg         4
4         Cross Examination by Mr. Neff          33

5

     CERTIFICATE OF OATH                         36
6    CERTIFICATE OF REPORTER                     37
     ERRATA SHEET                                38
7    READ AND SIGN LETTER                        39

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   The following deposition of SUSAN L. HUGHES was taken on

2   oral examination, pursuant to notice, for purposes of

3   discovery, and for use as evidence, and for other uses

4   and purposes as may be permitted by the applicable and

5   governing rules.  Reading and signing is not waived.

6                          *    *    *

7              THE COURT REPORTER:  Do you solemnly swear or

8              affirm the testimony you are about to give will

9              be the truth so help you God?

10             THE WITNESS:  Yes.

11  Thereupon,

12                      SUSAN L. HUGHES

13  the witness herein, having been first duly sworn, was

14  examined and testified as follows:

15                   DIRECT EXAMINATION

16  BY MR. BERG:

17     Q    Please state your name for the record.

18     A    Susan J. Hughes.

19     Q    Ms. Hughes, you've been designated to testify

20  in this matter regarding items two, six, seven, nine,

21  ten, and 18?

22     A    Yes.

23             MR. NEFF:  I --

24             MR. BERG:  Pardon me.

25             MR. NEFF:  I have six, seven, nine, ten, and

ACCURATE STENOTYPE REPORTERS, INC.

```
 1      18.

 2           MR. BERG:  Six, seven, nine, ten, and 18.  But

 3      also two; right?

 4           THE WITNESS:  That was the one we weren't

 5      sure.

 6           MR. BERG:  That's fine.

 7           MR. NEFF:  Mr. Upchurch went into that.  If

 8      you have questions for her, she will attempt to

 9      answer them, yes.

10           (Discussion off the record.)

11 BY MR. BERG:

12      Q    Where do you work?

13      A    Florida Department of Corrections.

14      Q    And what do you do?

15      A    I am the research and tracking specialist in

16 library services.

17      Q    How long have you had that job?

18      A    Thirteen months.

19      Q    Uh-huh.

20      A    This specific job, yes.

21      Q    What did you do before that?

22      A    I had been a librarian and a regional library

23 program specialist, you know, different jobs, since

24 1999.

25      Q    For the department?
```

1      A    For the department.

2      Q    Was that dealing with libraries at the

3   institutional level or at the headquarters?

4      A    About half the time at -- in institutional

5   libraries, and the other half regional library,

6   program specialist doing training --

7      Q    Okay.

8      A    -- and circulating amongst the libraries.

9      Q    Did you ever work with the library literature

10  review committee?

11     A    For the last year, yes.

12     Q    Okay.  And prior to that, did you ever -- were

13  you ever involved in the literature review committee?

14     A    Not specifically, other than printing out and

15  posting materials for inmates in the library.

16     Q    Are you familiar with Rule 33-501.401(3)(l)?

17     A    Yes.

18     Q    And when did you first have to deal with this

19  particular rule?  Was it just --

20     A    From as long as I was on --

21     Q    -- this past year?

22     A    -- the committee.  Yes.

23     Q    So you've only had to deal with it since -- in

24  the years, what --

25     A    January of 2012.

1    Q    Okay.  To the present?

2    A    Yes.

3    Q    Okay.  In your capacity on the literature

4  review committee, what do you do?

5    A    I'm the chairperson.

6    Q    Okay.  And as chair, do you deal with

7  publications that are referred to you from the

8  institutional level that have been impounded?

9    A    Yes.  They come to me.  I -- I organize all

10  the paperwork, get it ready for the meetings, post the

11  results.

12    Q    And the meetings are held once every two

13  weeks; is that correct?

14    A    Approximately.  Occasionally they might go a

15  little further.  We're required by rule to meet once a

16  month.

17    Q    Once a month.

18    A    We generally do it twice a month.

19    Q    Okay.  And in that capacity, other than

20  performing kind of a ministerial function, do you do

21  anything else for the committee?

22    A    I come to meetings, and we review the

23  materials, as well as they do.

24    Q    Okay.  The rule -- so the rule that's

25  currently in place that was passed in -- I think you

 1   aided us.  It was June of 2009; correct?

 2       A    Uh-huh.

 3       Q    That rule was in place when you went to work

 4   in your present job; is that correct?

 5       A    Yes.

 6       Q    And your prior involvement with the rule was

 7   only at the institutional level; is that correct?

 8       A    Yes.

 9       Q    While you were at the institutional level, did

10   you have to deal with making decisions about the

11   permissible reading rule?

12       A    No.

13       Q    Okay.  So it was only in this new job that

14   you've only held for a year?

15       A    Yes.

16       Q    So you -- you don't have any knowledge as to

17   why the rule was devised or implemented?

18       A    No, only what I've seen in e-mails, you know.

19   That's basically just --

20       Q    What have you seen in e-mails?

21       A    Proposed rules with, you know, some of the

22   conversations where they talked about the wording.

23   But nothing -- I couldn't find anything that depicted

24   why, the conversations that probably went on, you

25   know, so --.

1     Q    What in the proposed wording of the rules was

2     the subject of e-mails that you saw?

3     A    Basically the wording of the -- did I bring

4     that with me?  Basically it was just the wording of

5     the different -- you know, Mr. Upchurch, Ms. Jordan

6     were conversing about adding -- they weren't

7     conversing about it.  They put it in there, and then I

8     guess they talked about it, the prominent and

9     prevalent section of (3)(l).

10             And I did see the conversation about the --

11     the other part where -- that they didn't actually put

12     in there, about the disclaimer.

13     Q    Okay.

14     A    But other than that, it's just, here is the

15     proposed rule.  Here is some changes to it.  And then

16     there is the final rule.

17     Q    Let's talk about the discussions about

18     prominence and prevalence.  What did those discussions

19     pertain to; what it meant?

20             MR. NEFF:  Objection; misrepresentation.

21     BY MR. BERG:

22     Q    Did the --

23     A    All I saw was just the --

24     Q    Let me --

25     A    -- wording that was proposed.

1    Q    Yeah.  Let me just back up.

2         Did the discussion that Mr. Upchurch and

3    Ms. Jordan -- it's Ms. Jordan?

4    A    I believe so.

5    Q    Okay.  That they had about the wording, was it

6    concerning what "prevalence" and "prominence" meant?

7    A    No.

8    Q    What was it about?

9    A    It was just, here is the wording, and it ended

10   up in the rule.  I mean, there was no discussion in

11   those e-mails about why.

12   Q    Okay.  After -- during the past year that

13   you've been in this position, has there been a

14   discussion at the committee about what "prevalence"

15   and "prominence" means?

16   A    Not specifically, no.

17   Q    How about non-specifically?

18   A    Well, when we are reviewing things, we go

19   through it looking -- I'm sure the words have come up

20   in conversation, but not, how do you define it, how do

21   I define it.

22   Q    How does the committee define it?

23   A    If it's throughout a publication it's going to

24   be prevalent.  If it's big ads, it's going to be

25   prominent.  If it's a combination of the two, it's

1    prevalent and prominent.

2        Q    And how is that -- are there any criteria that

3    have been developed by the department or by the

4    committee as to what is "prevalent," meant by

5    "prevalent"?

6        A    No.  What we have is the rule.

7        Q    Okay.  Is there any criteria developed by the

8    department as to what "prevalent" means?

9        A    No.

10       Q    Has the department ever considered devising

11   any definitions of what "prominent" means?

12       A    Not that -- not to my knowledge.  It's -- it's

13   a dictionary thing.

14       Q    Has the department attempted to devise any

15   definition as to what "prevalent" means?

16       A    I think that was the last question, but --

17       Q    I thought it was prominent that was the last

18   one.

19       A    No.  Not specifically, no, because it's a

20   definition in a dictionary.

21       Q    So other than a definition in a dictionary as

22   to what "prevalent" and "prominent" mean, there is no

23   definition or criteria to give a publisher, for

24   example, knowledge as to what those terms mean; is

25   that correct?

1    A    That's correct.

2    Q    So it's based on the decision of three people

3    sitting on the literature review committee as to what

4    those terms mean; is that correct?

5    A    Yes.

6    Q    Were you provided with any training when you

7    took this job?

8    A    To a certain extent, just mainly of the

9    procedures of handling the paperwork and things.  And

10   I sat in on a few meetings before I took over.

11   Q    Okay.  Was there ever any training given to

12   you as to what constitutes "prominent" and

13   "prevalent"?

14   A    No.

15   Q    When institutions impound a publication and

16   send them to you, as part of them sending it to you,

17   do they call you, asking you what is meant by

18   "prevalent" and "prominent"?

19   A    No.  They go by their judgment, and they send

20   me what they think needs to be reviewed, and we review

21   it.

22   Q    There was some discussions yesterday in

23   depositions that the institution sends any publication

24   which has any of the offending ads for lack of

25   knowledge as to whether it's prevalent or prominent.

1          Is that what's occurring?

2     A    I wouldn't say that --

3          MR. SEAGLE:  Object to the form.

4     A    -- no.

5          MR. SCHIFINO:  Join.

6   BY MR. BERG:

7     Q    Do you often receive publications that have

8   been impounded that the literature review committee

9   makes a decision that the offending advertisement

10  under rule (3)(l) is not prevalent and prominent?

11    A    Yes.

12    Q    And you then do not reject them; is that

13  correct?

14    A    Right.

15    Q    How often does that happen?

16    A    It's a fairly small percentage.  I don't have

17  an exact number.  But it's probably less than 10

18  percent.  I'm just throwing out a number.  I'm not,

19  you know, I haven't added it up.

20    Q    Does the literature review committee count the

21  number of advertisements in a publication in making a

22  determination whether the offending ads are prevalent

23  and prominent?

24    A    Well, we can only count what we have presented

25  to us from the institution.

1    Q    Right.

2    A    Generally -- we will count the pages, knowing

3    the approximate size of a -- you know, Prison Legal

4    News.  And when you're sent 20 pages with advertising,

5    it's pretty prevalent.  But it's subjective.

6    Q    Does the institution send you the entire

7    publication, or just the offending ads?

8    A    Just the specific pages that they're referring

9    to in their paperwork, in their impoundment notice.

10   Q    Okay.  So you don't see the publication in

11   toto with all the articles and everything; you only

12   see the offending ads --

13   A    Yes.

14   Q    -- is that correct?

15   A    Or articles, yes.

16   Q    Or articles.  So let's say if the publication

17   is 64 pages long, they only send you -- let's say

18   there is 20 pages of ads, you only see the 20 pages of

19   ads, not the 64 pages of articles and ads; is that

20   correct?

21   A    That's an estimate.  I mean, they send varying

22   numbers.

23   Q    Okay.  Does the committee make an attempt to

24   calculate the square -- number of square inches in a

25   publication devoted to offending advertisements?

1      A      No.

2      Q      Is there -- has the committee established a

3  maximum number of ads before the publication falls

4  over the --

5      A      No.

6      Q      -- let me finish -- falls over the cliff and

7  becomes an offending publication which is rejected?

8      A      No.

9      Q      Has the committee ever considered coming up

10 with fixed criteria as to what constitutes "prevalent"

11 and "prominent"?

12     A      Not to my knowledge.

13     Q      Have publications other than Prison Legal News

14 made complaints to the secretary regarding what

15 constitutes prevalent and prominent offending

16 advertisements?

17     A      Not that I've been made aware of.  I'm sure

18 that they're out there, but they don't come down to

19 the level we're at, generally.

20     Q      Let's talk about the due process aspect of

21 this case.  You're aware of that; correct?

22     A      Uh-huh.

23     Q      You have to say yes.

24     A      Yes.  I'm sorry.  You're right.  I forgot.

25     Q      And I should have asked you at the beginning,

```
 1    have you had your deposition taken before or not?

 2        A    Yes.

 3        Q    Okay.  In what instance?

 4        A    A lawsuit, a personal lawsuit.

 5        Q    Okay.  So you know the dos and don'ts of

 6    taking a deposition?  I should have --

 7        A    Yes.

 8        Q    Okay.  Is there any discussion at the

 9    literature review committee regarding the penological

10    justification for rule (3)(l)?

11        A    I'm not sure I understand the question.  We're

12    talking about -- we may talk about, okay, it has

13    three-way calling.  It has pen pal.  But it depends on

14    what we're looking at.

15        Q    Yeah.  Do you ever have any discussion about

16    whether certain aspects of the rule have any

17    penological or security justification?

18        A    Yes.

19        Q    Okay.  And what parts of the rule?

20        A    Well, just in general, you know, if --

21    depending on what the magazine is being impounded for,

22    whichever the reason, we have a security person on the

23    committee.  And he brings up if there is a --

24    Mr. Green brings up if there is a -- something that's

25    a security.  Or we've been known to ask him, is this
```

1    something that's a security issue?

2          But I don't have a specific incident.

3    Q    Okay.  When the publication comes to you from

4    the institution, do you, as the chairman, make any

5    sort -- or any -- or any other member of the

6    committee -- make a determination as to whether notice

7    has been given to both the inmate and the publisher

8    that the publication has been impounded?

9    A    There is a date on the form by the assistant

10   or warden's signature that -- that they have to fill

11   in telling us what the date is.  If they don't, I

12   notify them, ask them to send me that information.

13   Q    And that is -- the form is 5-101; is that

14   correct?

15   A    Yes.

16   Q    I believe.

17   A    DC5-101.

18   Q    And it's on the back; correct?

19   A    Yes, sir, right there.

20   Q    Do you check every single one to make sure

21   that that's been initialed as -- and dated as being

22   sent to the publisher?

23   A    I do.

24   Q    And if it's not signed and dated, do you

25   return it to the institution to do so?

```
 1     A    I will generally e-mail them and ask them to

 2   provide the information to me.

 3     Q    Okay.  Do you know if this was being done

 4   prior to your joining the committee?

 5     A    No, I do not.

 6     Q    What about for the inmate?  Do you do the same

 7   with the inmate getting -- receiving notice?

 8     A    No.  It has the inmate's name and DC number

 9   and everything on there.  So I guess I'm assuming that

10   the institution is following the rule at that point,

11   but there is --

12     Q    Is there --

13     A    -- no way to follow up.

14     Q    Is there --

15          MR. NEFF:  Please let her finish her answer.

16   BY MR. BERG:

17     Q    I understand.

18     A    There is no way to follow up on that because

19   we can't just call up and ask an inmate.

20     Q    DC5-101 doesn't have a place on it in the back

21   or anywhere on the form for the warden to indicate

22   that he or she has given notice to the inmate;

23   correct?

24     A    Correct.

25     Q    So there is no way for you to determine or
```

1    anyone else on the literature review committee to

2    determine whether the inmate has received notice that

3    the publication sent to them by Prison Legal News or

4    any other publisher has been impounded; correct?

5        A    Unless the inmate sends us a letter or a

6    grievance.

7        Q    Does that often happen?

8        A    Frequently, before I even get the notice,

9    which tells me they got a notice.

10       Q    Well, if the inmate is a subscriber to the

11   publication -- which is a monthly publication;

12   correct?

13       A    I think so, yeah.

14       Q    And doesn't receive it --

15       A    I think it's biweekly; isn't it?  I'm not

16   sure.  Sorry.

17            MR. BERG:  Hand her a copy.

18            MR. TREVISANI:  I don't have a copy.

19       A    It's at least monthly, yes.

20   BY MR. BERG:

21       Q    It's a monthly publication?

22       A    Yeah.

23       Q    If an inmate doesn't receive his or her copy

24   of Prison Legal News, the inmate might send you a

25   grievance saying, I didn't receive it; is that

1   correct?

2       A    No.  He would send -- that would go through

3   his institutional mail room.  We get the grievance

4   when they get the notice.  They grieve because they

5   want --

6       Q    The publication?

7       A    They want the publication.

8       Q    Have you received a number of notices from

9   inmates grieving the fact that they have not received

10  their subscription to Prison Legal News?

11      A    I'm -- frankly I don't think very many, no,

12  but I don't get all of them.  The majority of them go

13  right to the -- what's it called, the inmate -- where

14  they handle inmate grievances.

15      Q    The inmate grievance --

16      A    Occasionally one of them will --

17      Q    -- coordinator?

18      A    -- come addressed to me, so it comes to me,

19  and I take them down to inmate grievances.

20      Q    Okay.  The rule provides that a publisher, if

21  they receive notice, can appeal the impoundment;

22  correct?

23      A    Yes.

24      Q    And they can also -- can they also appeal the

25  rejection?

1    A    Yes.

2    Q    And has that happened in -- for publications

3    other than Prison Legal News for the violation of rule

4    (3)(l)?

5    A    I believe so.  For (3)(l), I don't know.  I

6    don't know for sure which -- at this point and last

7    year, no.  But there is a process that they can.  And

8    they don't always come to me.  They might --

9    Q    To your knowledge, is Prison Legal News the

10   only publisher that has complained about the

11   impoundment and rejection of its publication?

12   A    No.  No, they're not.

13   Q    Do you know the names of the other publishers

14   that have appealed the impoundment or rejection of

15   their publications, based on violation --

16   A    In past history -- on these specific ones,

17   though?

18   Q    Right, (3)(l).

19   A    (3)(l)?  I believe there is one called

20   prison -- Florida Prison Legal Journal that has

21   complained.  I don't know if that's -- I'm not sure.

22   There is one other one that occasionally complains,

23   but I don't, off the top of my head -- because I don't

24   generally see those.  Those will go right to the

25   secretary or to legal.

1    Q    Okay.  So I guess --

2    A    I guess that's hearsay.

3    Q    So how is -- how is an appeal handled by a

4  publisher who appeals the impoundment or rejection of

5  its publication?

6    A    Well, my understanding of the process is they

7  would appeal -- like an inmate would appeal to us and

8  ask us -- they may ask us to review it again.  We've

9  done that for inmates and for intuitions, you know,

10  revisited a review.

11         But to my knowledge, in the last year anyway,

12  nobody has.  And I don't remember seeing much of

13  anything in the minutes.  The process is there.  They

14  can.  They can ask us to review it again.  They can

15  correct what we see as a problem and ask us to review

16  it again.

17    Q    Can you recall receiving complaints from

18  Prison Legal News regarding the impoundment and

19  rejection of its publications?

20    A    Me personally, no, I have not.

21    Q    Do you know if the literature review committee

22  has received any objection to the impoundment or

23  rejection of Prison Legal News from the publisher?

24    A    That would probably be a question that Shannon

25  Milliken would answer, because she works in inmate

 1    grievances.  I don't see them.

 2        Q    It was my -- well, the grievance process

 3    doesn't apply to publishers; correct?

 4        A    No.  But they can write an appeal.  I mean, I

 5    don't --.

 6        Q    But why would Shannon Milliken -- Shannon

 7    Milliken --

 8        A    You're right.

 9        Q    -- handles --

10        A    She gets all the --

11        Q    -- inmate grievances; right?

12        A    She gets inmate grievances.  You're right.  So

13    at this point I couldn't tell you.  Legal, probably

14    somebody in legal would handle that.  I don't see

15    them.

16        Q    Okay.  Did you make an assessment prior to

17    today's deposition as to how many times Prison Legal

18    News has been impounded and rejected since the

19    institution of this new rule in June of 2009?

20        A    I haven't actually counted them.  Starting in

21    November of 2009, you know, it's just about every

22    month.

23        Q    Okay.  And --

24        A    But I guess not always.  There was only three

25    in 2009 and probably 10 or 15 in 2010.

1    Q    That got through?

2    A    No, that -- since 2009, one has been approved.

3    Q    One has been approved?

4    A    Yes.

5    Q    And what's the date on that?

6    A    That was -- how did I miss that?  It was

7    October of 2011.  And I'm not seeing it on here.  I

8    wonder if I missed a page.

9         Here we go.  There is more pages in there.

10   That's why.  November 3rd -- well, it was the October

11   of 2011 issue.

12   Q    And that's the only one that was approved?

13   A    Yes.

14   Q    Okay.  And those issues were returned to the

15   inmates at the institutions that didn't receive them?

16   A    That's the procedure.  They should have been.

17   Q    Okay.  But every other month, from June 2009

18   until the present, other than October 2011 --

19   A    Actually since November.

20   Q    Excuse me.

21   A    Yeah.

22   Q    Since November 2009?

23   A    Yes.

24   Q    Is that the month that it went into effect?

25   A    No.  It went into effect in June.

1    Q    Okay.  So between June and November of 2009,

2  were there some issues that got through?

3    A    We didn't receive any.

4    Q    Oh, you didn't receive any?

5    A    From April 30th, 2009, to the November 5th

6  meeting, we didn't receive any.

7    Q    Okay.  From institutions?

8    A    Right.

9    Q    Even though the rule was final on June 9th, I

10  believe, of 2010; is that correct?

11    A    (No audible response.)

12    Q    You have to say yes.

13    A    June 16th, 2009.

14    Q    2009.

15         MR. NEFF:  Mr. Berg, please don't ask her to

16     say yes if she disagrees with the question.

17         MR. BERG:  I thought she was nodding her head

18     yes.

19  BY MR. BERG:

20    Q    No or yes?

21         MR. NEFF:  She gave you the specific date.

22         THE WITNESS:  Just whatever was the question,

23     I gave you a specific date.

24         MR. SCHIFINO:  There was just a

25     miscommunication.

```
 1              THE WITNESS:  Yeah.

 2              MR. SCHIFINO:  He inadvertently said 2010 --

 3              THE WITNESS:  Right.

 4              MR. SCHIFINO:  -- that the rule was enacted;

 5      right?

 6              THE WITNESS:  It was 2000 --

 7              MR. SCHIFINO:  And she said 2009.  And you

 8      asked her to --

 9              THE WITNESS:  I was disagreeing.  I was

10      disagreeing with you.

11   BY MR. BERG:

12      Q    Let me correct it, then.

13      A    Okay.

14      Q    From June of 2009 until the present there has

15   been one issue that's been approved; correct?

16      A    Yes.

17      Q    And that issue was October 2011 --

18      A    Yes.

19      Q    -- correct?

20      A    Yes.

21      Q    Prior to June 2009, how many issues of Prison

22   Legal News were disapproved?

23      A    Three.

24      Q    And what issues were those?

25      A    April 2004, July 2004, January 2006.
```

1      Q     Do you know why -- does your sheet tell you

2  why those issues were rejected prior to the rule being

3  implemented in June of 2009?

4      A     No.  They didn't start tracking -- didn't

5  start tracking the reason on the database until

6  November of 2009.

7      Q     Okay.  But those issues were rejected?

8      A     Those three, yes.

9      Q     Okay.

10     A     Many were approved.

11     Q     Is there any way for me to determine why those

12  three issues were rejected?

13         MR. NEFF:  Objection to form.

14         MR. BERG:  What's the matter with the form?

15         MR. NEFF:  She would determine, not you

16     determine.  You said, is there any way for me to

17     determine.

18  BY MR. BERG:

19     Q     To find out?

20     A     Yes.  The minutes for the meeting would say --

21     Q     The reason?

22     A     -- why.

23     Q     Okay.

24     A     Yes.

25     Q     Fair enough.  Is -- when you reject the

 1    publication, and notice is sent to the publisher of

 2    the rejection, does the literature review committee

 3    give any written explanation as to the reason for the

 4    rejection?

 5        A    The minutes from the meeting have the reason,

 6    which (3)(l), (3)(m), whatever, on the minutes.

 7        Q    Okay.  Does the department send the minutes to

 8    the publisher giving the reasons?

 9        A    No.  The institution is responsible for any

10    notification to -- to publishers and inmates, not the

11    department -- not the central office.

12        Q    Does central office, after the literature

13    review committee rejects the publication, does it send

14    to the publisher notice that the impoundment has now

15    been rejected and that the publication cannot come in

16    to the institution?

17        A    No.

18        Q    How is the publisher to know whether the

19    impoundment has now been affirmed by the department

20    and is now rejected if the department doesn't send

21    notice to the publisher?

22        A    I don't know.  Unless the institution sends

23    it, I don't know.

24        Q    But the institution only sends notice of the

25    rejection; isn't that correct?

1      A     Uh-huh.

2      Q     Yes?

3      A     Yes.

4            MR. SEAGLE:   Object to the form.

5            MR. SCHIFINO:   Join.

6   BY MR. BERG:

7      Q     The institution doesn't send notice that the

8   central office has affirmed the impoundment and is now

9   rejected; correct?

10      A     Correct.

11            MR. SEAGLE:   Randy, I want to make sure we're

12      clear for the record.   You used the term

13      interchangeably.   You said institutions give notice

14      of rejection.   I think you meant give notice of

15      impoundment.

16            MR. BERG:   Impoundment.   Yes.

17            MR. SEAGLE:   Wanted to make sure we got that

18      straight.

19   BY MR. BERG:

20      Q     Let me make sure we're correct on this.

21            The institution gives notice of the

22   rejection -- or excuse me --

23      A     Impoundment.

24      Q     -- of the impoundment; correct?

25      A     Yes.

1    Q    Then sends it to the department central

2  office; correct?

3    A    Correct.

4    Q    And the literature review committee looks at

5  the publication and either overturns the impoundment

6  and informs the institutions the publication can come

7  in; correct?

8    A    Uh-huh.  Yes.

9    Q    Or it affirms the impoundment and rejects the

10  publication; correct?

11    A    Correct.

12    Q    And if central office rejects the publication,

13  no notice is sent to the publisher that the -- that

14  the publication has been rejected; correct?

15    A    Not to my knowledge, no.

16    Q    Has the literature review committee had any

17  communications with Corrections Corporation of America

18  concerning rule 33-501.401(3)(l)?

19    A    Other than the fact that they send us

20  documents -- the impoundment notices that they've been

21  pulled from their institution.  That's -- that's it.

22    Q    Do you provide any training of any type to the

23  private prison providers, CCA and GEO?

24    A    No.  They have access to the rule, and the

25  institutional level does the training.

1    Q    And by "institutional level," you mean at

2  their local institutional level --

3    A    Yes.

4    Q    -- not the department's; correct?

5    A    Yes.

6    Q    If -- how many institutions are there in the

7  state of Florida; do you know?

8    A    I'm not absolutely certain.  There are 70

9  libraries.  That's my area of knowledge.

10    Q    Right.  But there are over 100; wouldn't

11  you --

12    A    No.

13    Q    No?

14    A    Because there is a library in every one, and

15  sometimes two.  There is 64, 65.

16    Q    Major institutions?

17    A    Well, they're pretty much all major

18  institutions or annexes to major institutions.

19    Q    So if a publication is sent -- a national

20  publication is sent in the mail that might have some

21  offending ads, would you get copies of the offending

22  ads from all of these institutions saying, we think

23  this ought to be impounded?

24    A    No.  The procedure tells them to -- the first

25  one that posts it sends the notice to the publisher,

```
 1    and they post it on what we have a bulletin board so

 2    that other institutions check that every day to see

 3    what's been impounded.  It reflects what they've

 4    reviewed.  If it's already been impounded they don't

 5    send it.

 6        Q    Okay.  It's only sent once; is that correct?

 7        A    We usually only get one of each, yes.

 8        Q    When you get one of each, it's a copy of just

 9    all the offending ads; correct?

10        A    Yes.

11        Q    And not the entire publication?

12        A    Yes.

13        Q    And that's done electronically?

14        A    Some is electronically; a lot of it is still

15    snail mail.

16        Q    Okay.

17        A    I get lots of mail.

18             (Discussion off the record.)

19    BY MR. BERG:

20        Q    My colleague just pointed out I asked you

21    about communications with CCA.  Same question as to

22    GEO.  Have you had any communications with GEO?

23        A    Not specifically, no, just they send

24    impoundments.  Occasionally they will send an e-mail

25    and ask a question.  I'm not responsible for the
```

1    training or anything.

2       Q    What types of questions do you get concerning

3    this rule?

4       A    Usually it would be something along the lines

5    of how did they want me to send it to them.  I don't

6    get content questions from the rule.

7       Q    Okay.  Did you replace Allen Overstreet in

8    this position you're in now?

9       A    Yes.  He was the last one in this position.

10      Q    Okay.  And Frank Ontko, did he work for you or

11   for Allen or both of you?

12      A    He worked for Allen.

13      Q    Okay.

14      A    He was in central office for a while before I

15   came.

16         MR. BERG:  Okay.  I don't think I have any

17      further questions.

18         MR. NEFF:  I may have one.  Give me one second

19      to confer with my colleague.

20                       CROSS EXAMINATION

21   BY MR. NEFF:

22      Q    I do have one question.  Maybe more than one,

23   but we will start with the first.

24         The pre June of '09 rule and the post June of

25   '09 rule, has the notice requirements changed

1     whatsoever?  If you're not sure, would you please take

2     a look at the rule and let us know.

3          A    Without sitting and reading the whole rule, I

4     couldn't tell you off the top of my head.

5          Q    Please sit and --

6          A    I don't have the whole rule with me.  I just

7     brought the parts that were about three -- I did not

8     bring the whole rule with me.

9               MR. SCHIFINO:  Ms. Hughes, take your time.

10         I'm going to run to the restroom real quick if

11         we've got a minute here while you read that.

12              (Discussion off the record.)

13         A    I just said I don't have the whole thing, so I

14    can't tell him.

15    BY MR. NEFF:

16         Q    Is it a possibility that's the same?

17         A    It may not -- when they were making the

18    changes, I did not see changes when it came to

19    procedure of how to handle impoundment notice.

20         Q    Okay.

21         A    It was that section, and there was another

22    section on religious books.  Those were the main

23    changes that were made that time.

24              I could look at it before tomorrow.

25              MR. NEFF:  I'm waiting for them.

1           (Discussion off the record.)

2           MR. NEFF:  I have no further questions.

3           MR. SCHIFINO:  We have none.

4           MR. SEAGLE:  None.

5           MR. BERG:  Thank you.  Appreciate it.

6           (The deposition was concluded at 1:50 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     **CERTIFICATE OF OATH**

2

3      STATE OF FLORIDA          )
       COUNTY OF LEON            )

4

5

6           I, the undersigned authority, certify that said
       designated witness personally appeared before me and was
7      duly sworn.

8

9           WITNESS my hand and official seal this _____ day
       of February, 2013.

10

11                              s/ _____

12                              SARAH B. GILROY
                                sbrinkhoff@comcast.net
13                              NOTARY PUBLIC
                                850-878-2221

14

15

16

17

18

19

20

21

22

23

24

25

1                **CERTIFICATE OF REPORTER**

2 STATE OF FLORIDA     )
  COUNTY OF LEON      )

3

4    I, SARAH B. GILROY, Registered Professional Reporter,

5 and Notary Public, do hereby certify that the foregoing

6 proceedings were taken before me at the time and place

7 therein designated; that a review of the transcript was

8 requested, and that the foregoing pages numbered 1

9 through 36 are a true and correct record of the

10 aforesaid proceedings.

11

12    I further certify that I am not a relative, employee,

13 attorney or counsel of any parties, nor am I a relative

14 or employee of any of the parties' attorney or counsel

15 connected with the action, nor am I financially

16 interested in the action.

17    DATED this _____ day of February, 2013.

18

19

20

21                s/_____

22                SARAH B. GILROY, RPR, CRR
               sbrinkhoff@comcast.net
               850-878-2221

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

ERRATA SHEET
Under penalties of perjury, I declare that I have read
the foregoing transcript of my deposition and hereby
subscribe to same, including any corrections and/or
amendments listed below.

_____        _____
Signature                                        Date

PAGE            LINE              CORRECTION AND REASON FOR
CHANGE

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

ACCURATE STENOTYPE REPORTERS, INC.

ACCURATE STENOTYPE REPORTERS
2894-A Remington Green Lane
Tallahassee, Florida 32308
850-878-2221


February 6, 2013

C. IAN GARLAND, ESQUIRE
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050

re:  January 24, 2013 deposition of Susan L. Hughes

Dear Ms. Garland:

This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for your witness to review and sign, or she
you may sign below to waive review of this transcript.

It is suggested that the review of this transcript be
completed within 30 days of your receipt of this
letter, as considered reasonable under applicable
rules; however, there is no Florida Statute to this
regard.

The original of this transcript has been forwarded to
the ordering party and your errata, once received,
will be forwarded to all ordering parties for
inclusion in the transcript.

Sincerely yours,



SARAH B. GILROY, Court Reporter

cc:  Randy C. Berg, Jr., Esquire
     C. Ian Garland, Esquire

Waiver:
I, _____, hereby waive the reading and
signing of my deposition transcript.

_____          _____
Deponent signature                        Date

ACCURATE STENOTYPE REPORTERS, INC.