```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
                    TALLAHASSEE DIVISION
```

PRISON LEGAL NEWS, a
project of the HUMAN
RIGHTS DEFENSE CENTER,
a not-for-profit,
Washington charitable
corporation,

      Plaintiff,

vs.                          CASE NO:  4:12-cv-239-RH/CAS

THE FDOC GROUP, INC., a
Florida corporation,
CORRECTIONS CORPORATION OF
AMERICA, a Tennessee corporation,
registered and doing business
in the state of Florida; and
KENNETH S. TUCKER, in his
official capacity as Secretary
of the Florida Department
of Corrections

      Defendants.
_____/


THE DEPOSITION OF:      JEANNINE MOORE

AT THE INSTANCE OF:     The Plaintiff

DATE:                   Friday, January 25, 2013

TIME:                   Commenced at 11:10 a.m.
                        Terminated at 11:30 a.m.

PLACE:                  Collins Building
                        107 West Gaines Street
                        Tallahassee, Florida

REPORTED BY:            SARAH B. GILROY, RPR, CRR
                        sbrinkhoff@comcast.net
                        Notary Public in and for
                        the State of Florida at
                        Large

```
 1    APPEARANCES:

 2
      REPRESENTING THE PLAINTIFF:
 3
              RANDALL C. BERG, JR., ESQUIRE
 4            DANTE P. TREVISANI, ESQUIRE
              Florida Justice Institutes
 5            3750 Miami Tower
              100 SE Second Floor
 6            Miami, Florida 33131

 7
      REPRESENTING THE DEFENDANT CCA:
 8
              JOHN A SCHIFANO, ESQUIRE
 9            Burr Forman
              One Tampa City Center, Suite 3200
10            Tampa, Florida 33602

11
      REPRESENTING THE DEFENDANT DEPARTMENT OF CORRECTIONS:
12
              LANCE NEFF, ESQUIRE
13            C. IAN GARLAND, ESQUIRE
              Office of the Attorney General
14            PL-01, The Capitol
              Tallahassee, Florida 32399-1050
15

16    REPRESENTING THE DEFENDANT GEO GROUP:

17            SCOTT J. SEAGLE, ESQUIRE
              Coppins, Monroe, Adkins & Dincman
18            1319 Thomaswood Drive
              Tallahassee, Florida 32308
19

20

21

22

23

24

25
```

1                          I N D E X

2    WITNESS                                    PAGE NO.

3    JEANNINE MOORE
         Direct Examination by Mr. Trevisani      4

4

5    CERTIFICATE OF OATH                          23
     CERTIFICATE OF REPORTER                      24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

1    The following deposition of JEANNINE MOORE was taken on

2    oral examination, pursuant to notice, for purposes of

3    discovery, and for use as evidence, and for other uses

4    and purposes as may be permitted by the applicable and

5    governing rules.  Reading and signing is waived.

6                          *    *    *

7          THE COURT REPORTER:  Do you solemnly swear or

8          affirm the testimony you are about to give will

9          be the truth so help you God?

10         THE WITNESS:  Yes.

11   Thereupon,

12                        JEANNINE MOORE

13   the witness herein, having been first duly sworn, was

14   examined and testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. TREVISANI:

17       Q    Could you state your name, please.

18       A    Jeannine Moore.

19       Q    Where are you currently employed?

20       A    Florida Supreme Court.

21       Q    And what are your job duties there?

22       A    I am currently a systems project consultant.

23   I work for the ISS department, computer technology.

24       Q    Okay.  When did you start working there?

25       A    In November -- excuse me -- November 2012.

1      Q    And what did you do before that?

2      A    I worked at department of --

3           THE WITNESS:  Do y'all have some water?  I'm

4      sorry.

5           (Discussion off the record).

6  BY MR. TREVISANI:

7      Q    Okay.  So let's go back to when you first

8  started working for the Department of Corrections,

9  what year was that?

10     A    It was May 1991.

11     Q    And what was your job then?

12     A    I worked at the prison in Orlando at Central

13  Florida Reception Center as a data entry operator.

14     Q    Okay.  And could you just tell me -- tell me

15  about where you worked in the department from then up

16  until November 2012.

17     A    Okay.  I worked there a couple years.  Then I

18  moved up to Tallahassee.  I worked as a -- worked in

19  victims -- I can't tell you the years.  But I worked

20  in victims.  I worked in senate structure.

21          Then I worked in -- then I moved up to -- hold

22  on here.  It's been quite a while.  Then I went to

23  inmate appeals.

24          I was in -- that's been my last job at

25  corrections, and it's probably been about 16 years I

1  worked in inmate appeals.

2      Q    Sixteen years up until November 2012?

3      A    Yes.

4      Q    Were you ever on the literature review

5  committee?

6      A    Yes.

7      Q    Were you someone's designee?

8      A    Yes.

9      Q    Whose designee?

10     A    The bureau chief.

11     Q    Who was the bureau chief?

12     A    Well it changed.  It was Celeste Kemp.

13  Whenever she retired, it was Allen McManus.

14     Q    And I'm going to refer to the literature

15  review committee just as "the committee," for the

16  record.

17     A    Yeah.

18     Q    What was the first year that you were on the

19  committee?

20     A    I took over when Chuck Shockley retired.  And

21  I believe that was in 2009.

22     Q    Do you know what month in 2009?

23     A    No, I don't.

24     Q    Okay.  Any kind of estimate; beginning of the

25  year, end of the year?

```
 1      A    Maybe May.  I'm not for sure.

 2      Q    Okay.  If we look at the committee meeting

 3  minutes, would that be able to tell us?

 4      A   Yes.  Yes.

 5      Q    Okay.  Were you on the committee from 2009

 6  continuously until November 2012?

 7      A   Yes.

 8      Q    Okay.  Who else was on the committee while you

 9  were on the committee?

10      A    When I first started, it was Frank Ontko and

11  Wayne Green.  And then whenever Frank retired,

12  LaKesha -- I can't remember her last name -- she took

13  over when Frank retired.  And then she only stayed on

14  for a few months.

15          And then Susan Hughes took over LaKesha --

16  when LaKesha left.  And then it was LaKesha, Wayne

17  Green, and myself.

18      Q    Okay.  Do you know any past members of the

19  committee before you were on it?

20      A    Well, Chuck Shockley, of course.

21      Q    Besides the people that you've already

22  mentioned here?

23      A    Allen Overstreet.  Other than that I don't --

24  no.

25      Q    Okay.  Does the committee have any staff, like
```

1    are there any staff members that work for the

2    committee?

3        A    Not that I'm aware of.

4        Q    Okay.

5        A    I mean there may be like in library services

6    or something.  But I don't -- I'm not aware of any.

7        Q    When the committee prepares paperwork, who

8    prepares it?

9        A    I believe it's under library services.

10       Q    Okay.  When you were not on the -- serving on

11   the committee during the 2009 to November 2012, what

12   was your job at the department?

13       A    I processed inmate appeals.

14       Q    Okay.  And what level in the chain were you in

15   the processing of inmate appeals?

16       A    I was a correctional services administrator.

17   I reviewed -- there was assistant administrator who

18   processed them, and I reviewed their, you know,

19   responses to ensure that their responses were correct.

20       Q    Okay.  So --

21       A    And, you know, I processed all the -- I did

22   all the appeals that were admissible reading material.

23       Q    So let's back up so I understand the process.

24   If an inmate submits a grievance at the institution,

25   he can -- and he gets a decision back, he can appeal

1    that decision then to the warden; is that right?

2        A    Yes.

3        Q    And then if he doesn't like the answer to

4    that, he can appeal it to someone in Tallahassee; is

5    that right?

6        A    Yes.  To our office.

7        Q    Is that person you?

8        A    Yes, to our office.

9        Q    And do you make the decision on whether or not

10   to grant or deny the appeal?

11       A    Yes.

12       Q    And then after that, if the inmate disagrees,

13   is there another level of appeal?

14       A    Well, then he goes to the courts.

15       Q    So you're the final decision within the

16   department?

17       A    Right.

18       Q    Does anyone have to sign off on your decision?

19       A    We're the designee for the secretary.

20       Q    Okay.

21       A    Our office is.  I mean there is -- you know,

22   we have three administrators.  And then we have -- I

23   think there was, what, four -- four assistant

24   administrators that actually processed the appeals.

25   And then we reviewed their work to ensure their

1   responses, and we sign off on it.  Does that make

2   sense?

3       Q    Yes, it does.

4       A    Sorry.

5       Q    If an inmate disagrees with the decision to

6   impound a publication that he's supposed to receive,

7   does he submit a regular grievance form, or is there a

8   specific grievance form for publications?

9           MR. NEFF:  Objection; relevance.  I find this

10          fascinating, but I'm not sure what it has to do

11          with the current lawsuit.  I think we're on a

12          fishing expedition here.

13          MR. TREVISANI:  Okay.  Well, the appeals

14          process for impoundment of publications is relevant

15          to the lawsuit.

16          MR. NEFF:  From the inmate's perspective?

17          MR. TREVISANI:  Yes.

18          MR. NEFF:  It is?

19          MR. TREVISANI:  Yes.

20          MR. BERG:  Just note your objection.  Let's

21          move on.

22          MR. NEFF:  I see Prison Legal News and Human

23          Rights Defense Center.

24          MR. TREVISANI:  Are you instructing her not to

25          answer?

1          MR. NEFF:  No.  I object to this line of

2     questioning on relevance.  At this point I have not

3     objected -- or instructed her not to answer.  So

4     you can continue on.

5          MR. SEAGLE:  I join the objection.

6  BY MR. TREVISANI:

7     Q    Unless he tells you not to answer, you can go

8  ahead and answer the question.

9     A    I don't think those came to our office.  I

10  think they went to library services, yeah.

11    Q    So you don't know if there is a different

12  form, other than a regular grievance form that had

13  been --

14    A    They appealed to our office, and we respond to

15  those.  But there is also a form whenever they --

16  whenever they -- I mean all the ones that they -- I

17  guess I'm getting confused.  There is also a form that

18  whenever the inmate -- I guess I'm trying to think of

19  that form that they submit to library services

20  whenever they are rejected.  Is that what you're

21  talking about?

22    Q    Yeah.

23    A    It's been so long.  Those go to library

24  services.

25    Q    Okay.

1    A    And I don't deal with those.  I didn't deal

2  with those.

3    Q    Okay.  If --

4    A    Except just to review them on the literature

5  review committee.

6    Q    Okay.  Are you familiar with the process that

7  a publisher has to use if a publisher wants to appeal

8  the impoundment of the publisher's publication?

9    A    (Shaking head negatively).

10    Q    You have to answer out loud.

11    A    Oh.  No.

12    Q    You're familiar with the admissible reading

13  material rule; right?

14    A    Yes.

15    Q    Okay.  And specifically with section (3)(l) of

16  the rule that deals with advertisements?

17    A    Yes.

18    Q    And you had to apply that rule when you were

19  on the committee?

20    A    Right.

21    Q    You had to decide whether or not a publication

22  violated the rule?

23    A    Right.

24    Q    Okay.  Were -- were you familiar at all with a

25  change in the rule that happened in June of 2009?

1    A    Right.

2    Q    You were familiar with it?

3    A    Yes.

4    Q    What's your understanding of what happened?

5    A    Well, from what I remember -- I mean, it had

6  to do with the advertisements and the prevalent and

7  predominant of them.

8    Q    Okay.  What's your understanding of how the

9  rule changed?

10   A    I guess it was the number of the ads in there.

11   Q    No.  I guess my question is, what's your

12 understanding of how the rule itself changed, not the

13 publications.

14   A    I don't -- it's been so long ago, with this

15 change of jobs -- I remember the rule changing.  But

16 as far as the specifics of it, I don't quite remember.

17   Q    Okay.  You do remember that after the rule

18 changed, then, the committee had to determine whether

19 or not an advertisement was prominent or prevalent

20 throughout the publication; right?

21   A    Yes.  Yes.

22   Q    What was the process for determining whether

23 or not it was prominent or prevalent throughout a

24 publication?

25   A    Well, that it -- the size of the ads, the

1    number of ads.

2        Q    Did you count the ads?

3        A    I know there was a discussion of, you know,

4    determining, you know, the size.  But I don't know if

5    there was ever a discussion of a number, a specific

6    number, no.

7        Q    Okay.  What --

8        A    If there was ever a specific number to it, no.

9        Q    Did the committee ever measure the size of the

10   ads in making its decision?

11       A    No.  No.

12       Q    When you received the impoundment notice it

13   contained a copy of the offending ads; is that right?

14       A    Well, we didn't never -- I didn't never

15   receive -- library services actually received the

16   notice.  They always, you know, presented what we had

17   to review at the meeting.

18       Q    Okay.  Let me rephrase it.  When you met to

19   determine whether or not an impoundment was correct,

20   you got the impoundment notice and a copy of the ad;

21   is that right?

22       A    Uh-huh.  Right.

23       Q    The -- so you didn't get the whole

24   publication?

25       A    Right.

1    Q    Okay.  How did you determine whether or not

2   those ads were prevalent throughout the publication if

3   you didn't have the whole publication?

4    A    What we had in front of us.  I mean, it was

5   just -- it was a judgment call.

6    Q    So, for example, if you got two offending ads,

7   if the publication was 500 pages long, that wouldn't

8   be prevalent; right?

9    A    No.

10   Q    But you didn't know if the publication was 500

11  pages long?

12   A    No.

13   Q    So how did you determine whether or not it

14  would be prevalent?

15   A    Well I think there was at times where Susan

16  would go back and look and actually see -- had to pull

17  up the whole publication and see if the publication

18  was, you know, 500 pages.  So there was instances

19  where we had to go back and view, you know, pull up

20  the whole publication at times.

21   Q    So that happened sometimes?

22   A    Yeah.  Yes.

23   Q    Did it happen every time?

24   A    No, not every time.

25   Q    Okay.  Did anybody at the DOC give you any

1    guidance on how to determine whether ads were

2    prominent or prevalent?

3        A    No.

4        Q    Okay.  Were there any written guidelines on

5    how to determine whether an ad was prominent or

6    prevalent?

7        A    No.

8        Q    Were you involved -- sorry.  Was the

9    literature review committee involved at all in the

10   change to the rule in 2009?

11       A    No.

12       Q    Has the committee -- when you were on the

13   committee, did the committee receive any guidance on

14   how to determine whether an advertisement was

15   prominent?

16           MR. SEAGLE:  Object to the form.  Asked and

17       answered.

18       A    Not that I can remember.

19   BY MR. TREVISANI:

20       Q    Okay.  So you didn't get, say -- nobody ever

21   told you that a certain size ad is prominent, but

22   another certain size ad is not prominent?

23       A    We may.  But I just -- I can't remember if --

24   you know, specifics.

25       Q    Okay.  Did the committee have any informal

```
 1   guidelines that it followed in determining whether or

 2   not it was prominent?

 3       A    I'm trying to think back.   I mean I just know,

 4   you know, depending on the -- you know, it was a big

 5   ad, if it was small ads.   But -- I can't remember.

 6       Q    Okay.   So was there a maximum size that the ad

 7   could not exceed --

 8       A    No.

 9       Q    -- for it to be prominent?

10       A    No.

11       Q    Let's say it was an eighth of a page ad; was

12   that prominent?

13       A    It just depended on how many there was.

14       Q    Okay.   Okay.   So the -- when determining if

15   the ads are prevalent, you were looking to see how

16   many ads there were distributed throughout the

17   publication; right?

18       A    Right.

19       Q    When you were determining whether or not it

20   was prominent, it was just the size of the ad; is that

21   right?

22       A    Right.

23       Q    Okay.   So if you had an ad that was an eighth

24   of a page, did the committee consider that prominent?

25       A    No.
```

1    Q    No?

2    A    (Shaking head negatively).

3    Q    So one -- if there was an ad for a three-way

4    calling service that was an eighth of a page, that

5    would not violate the rule?

6         MR. SEAGLE:  Object to form.

7    A    No.

8    BY MR. TREVISANI:

9    Q    Was a half a page ad prominent?

10   A    Yes.

11        MR. NEFF:  Objection; vague.

12   BY MR. TREVISANI:

13   Q    Was a quarter page ad prominent?

14        MR. NEFF:  Objection; vague.

15        MR. SEAGLE:  Join.

16        MR. TREVISANI:  What's vague about it?  I'm

17   sorry.

18        MR. NEFF:  I don't see an ad that's that

19   specific.

20   BY MR. TREVISANI:

21   Q    Let's assume that an ad was for one of the

22   four things that the rule prohibits, and it was a

23   quarter of the page for a regular eight and a half by

24   11 size piece of paper.  Was a quarter page prominent?

25   A    I mean are you saying the -- a quarter of -- a

```
 1   quarter being --?
 2      Q    Yes.  A quarter of the page like this
 3   (indicating).
 4           MR. NEFF:  Objection; vague.
 5      A    I don't know.  I guess it would be a judgment
 6   call.
 7   BY MR. TREVISANI:
 8      Q    It was just a judgment call?
 9      A    Yeah.
10      Q    It was subjective?
11      A    Yeah.
12      Q    Did the committee ever disagree about what was
13   prominent or prevalent?
14      A    I think at times we had our -- you know,
15   nothing was ever, you know, all agreeable times.
16      Q    Can you recall a specific instance where the
17   committee disagreed about whether a publication
18   violated the rule?
19      A    Oh, no.
20      Q    Are you familiar with the publication Prison
21   Legal News?
22      A    Yeah.  I mean I remember it, but I couldn't
23   tell you, you know, all the details about it.
24      Q    Okay.  Do you remember the committee deciding
25   whether Prison Legal News violated the rule?
```

```
 1      A    What do you mean?
 2      Q    Do you remember an instance of the committee
 3   deciding whether an issue of Prison Legal News
 4   violated the admissible reading rule?
 5      A    No.
 6      Q    Okay.  Do you remember any disagreement about
 7   whether an issue of Prison Legal News violated the
 8   rule?
 9      A    No.
10      Q    Okay.  Did the committee ever have any
11   difficulty in applying the prominent or prevalent
12   standard?
13      A    I can't recall any specific certain time.
14      Q    Were the decisions of the literature review
15   committee final?
16      A    No, because, I mean, we've had -- at times
17   have gone back and had to relook, you know, if
18   somebody has sent something back in to maybe -- if we
19   had missed something or didn't see something clear,
20   you know, in the photocopy they had sent, you know, we
21   had went back and, you know, have changed our
22   decision.
23      Q    Okay.  So if -- if someone disagrees with the
24   decision of the committee, they can ask the committee
25   to revisit it?
```

```
 1     A    Uh-huh.  Yes.

 2     Q    If that person disagrees with that decision,

 3  is there anyone that the person can appeal to?

 4     A    I don't know.  I'm not for sure about that.

 5     Q    Do you remember any instance -- well strike

 6  that.

 7          When the committee decided to reject a

 8  publication, was notice of that rejection sent to the

 9  publisher?

10     A    As far as I know it was.  But I wasn't

11  responsible for that.

12     Q    Okay.  Who was responsible for that?

13     A    I believe library services.

14     Q    Okay.  When the committee -- well strike that.

15  Did you do anything to prepare for this deposition?

16     A    No.

17     Q    It's okay.  I just need the answer.

18     A    Should I have?  (Laughter).

19     Q    That I can't tell you.  So no?  Did you talk

20  to anyone?

21     A    No.

22          MR. NEFF:  Object --

23          THE WITNESS:  Or -- no.

24  BY MR. TREVISANI:

25     Q    Did you speak with Mr. Neff?
```

```
 1          MR. NEFF:  Object to form.
 2   BY MR. TREVISANI:
 3      Q    You can answer.
 4      A    Yes.  Yes.
 5      Q    Did you speak to anybody else about the
 6   deposition?
 7      A    No.
 8          MR. TREVISANI:  I think that's all the
 9      questions I have.
10          THE WITNESS:  Okay.
11          MR. NEFF:  Nothing.
12          MR. SEAGLE:  No questions.
13          MR. SCHIFINO:  We have no questions.
14          (The deposition was concluded at 11:30 a.m.)
15
16
17
18
19
20
21
22
23
24
25
```

ACCURATE STENOTYPE REPORTERS, INC.

1  **CERTIFICATE OF OATH**

2

3  STATE OF FLORIDA          )
   COUNTY OF LEON            )

4

5

6       I, the undersigned authority, certify that said
   designated witness personally appeared before me and was
7  duly sworn.

8

       WITNESS my hand and official seal this _____ day
9  of February, 2013.

10

11
                              s/ _____
12                            SARAH B. GILROY
                              sbrinkhoff@comcast.net
13                            NOTARY PUBLIC
                              850-878-2221
14

15

16

17

18

19

20

21

22

23

24

25

─────────────ACCURATE STENOTYPE REPORTERS, INC.──────────────

**CERTIFICATE OF REPORTER**

1

2  STATE OF FLORIDA     )
   COUNTY OF LEON       )

3

4      I, SARAH B. GILROY, Registered Professional Reporter,

5  and Notary Public, do hereby certify that the foregoing

6  proceedings were taken before me at the time and place

7  therein designated; that a review of the transcript was

8  not requested, and that the foregoing pages numbered 1

9  through 23 are a true and correct record of the

10 aforesaid proceedings.

11

12     I further certify that I am not a relative, employee,

13 attorney or counsel of any parties, nor am I a relative

14 or employee of any of the parties' attorney or counsel

15 connected with the action, nor am I financially

16 interested in the action.

17     DATED this _____ day of February, 2013.

18

19

20

21                    s/_____
                      SARAH B. GILROY, RPR, CRR
22                    sbrinkhoff@comcast.net
                      850-878-2221
23

24

25

ACCURATE STENOTYPE REPORTERS, INC.
