**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**PRISON LEGAL NEWS,**

      **Plaintiff,**

**v.**                                        **Case No.  4:12cv239-MW/CAS**

**JULIE L. JONES, in her
official capacity as Secretary of the
Florida Department of Corrections,**

      **Defendant.**

_____/

## ORDER

This case involves an as-applied First Amendment challenge to Florida

Administrative Code Rule 33-501.401(3)(l) and (m), as well as a procedural due

process claim brought under 42 U.S.C. § 1983.  Prison Legal News[1] and Julie L.

Jones, on behalf of the Florida Department of Corrections, litigated this case to a

four-day bench trial beginning on January 5th, 2015.[2]  This order sets forth the

findings of fact, analysis of law, and verdict.

---

[1] In 2009, PLN, the corporation, changed its name to the Human Rights Defense Center. Tr. of Trial 36:24-:25 (Jan. 5, 2015).  This order continues to refer to the entity as PLN.

[2] The sole remaining defendant in this action, Julie L. Jones, is the current Secretary of the FDOC.  Two other secretaries have cycled through the FDOC during this litigation, Kenneth S. Tucker and Michael D. Crews.  Some early documents are directed at these individuals.  The Secretary of the FDOC is responsible for the overall management of the Florida prison system

# I

The parties dispute the constitutionality of the FDOC's impoundment and rejection of PLN's magazine, *Prison Legal News*, a monthly publication comprising writings from legal scholars, attorneys, inmates, and news wire services.  FDOC regulates inmate mail with Rule 33-501.401 of the Florida Administrative Code, titled "Admissible Reading Material."  Rule 33-501.401 authorizes the FDOC to screen all mail entering its facilities and sets forth a detailed process by which it may impound that mail.

Section (3) of Rule 33-501.401 contains thirteen subsections, labeled (a) through (m), providing distinct criteria by which incoming publications "shall be rejected" from the prison population.  The First Amendment action specifically challenges subsections (l) and (m), ECF No. 14 ¶ 22, which state:

[A] [p]ublication[] shall be rejected when . . .

(l) It contains an advertisement promoting any of the following where the advertisement is the focus of, rather than being incidental to, the publication or the advertising is prominent or prevalent throughout the publication.

> 1. Three-way calling services;
> 2. Pen pal services;
> 3. The purchase of products or services with postage stamps; or
> 4. Conducting a business or profession while incarcerated.

---

and has ultimate responsibility for the promulgation and enforcement of all FDOC rules, policies and procedures, and administrative code provisions. *See* ECF No. 14 ¶ 15; ECF No. 68 ¶ 15. For simplicity, this order refers to Defendant Jones as the FDOC.

[or]

(m) It otherwise presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person.

Fla. Admin. Code R. 33-501.401(3)(l), (m) (2009) (amended 2010).[3]

As relief, PLN requests a declaratory judgment that Rule 33-501.401(3) is unconstitutional as applied to *Prison Legal News*.  ECF No. 14, at 13.  PLN also seeks an injunction that prohibits the impoundment and rejection of *Prison Legal News*, orders the delivery of all previously censored and withheld issues, and requires individualized notice and an opportunity to be heard whenever a copy of an issue is rejected.[4]  Finally, PLN seeks the same due process remedies for the books and information packets it has mailed to FDOC inmates, which it maintains the FDOC impounded without notice.  Tr. of Trial 4-5 (Jan. 8, 2015).

---

[3] That is the 2009 version.  The Rule was amended in 2010.  That amendment did not change subsections (3)(l) and (m).  In the version before 2009, the prohibition against advertisements for three-way calling services, pen pal services, the purchase of products or services with postage stamps, and conducting a business while incarcerated appeared in section (4), not subsection (3)(l).  *See* Fla. Admin. Code R. 33-501.401(4) (2006) (amended 2009).  For clarity, this Court refers to these prohibitions as (3)(l).  The other subsection at issue in this case is (3)(m), the Rule's residual clause.  Prior to 2009, the residual clause appeared under subsection (3)(l).  *See* Fla. Admin. Code R. 33-501.401(3)(l) (2006) (amended 2009).  This Court refers to the residual clause as (3)(m).

[4] PLN attempted to add a void-for-vagueness claim.  It sought leave to file a second amended complaint on February 19, 2013.  ECF No. 119.  That motion was denied for failure to show good cause.  ECF No. 127, at 3.  At the time, the trial was set for May 13, 2013.  ECF No. 106.  The trial would eventually be delayed by more than a year.  Had this Court known, perhaps it would have ruled differently on the motion to amend.  Either way, PLN did not again move to amend the complaint until *trial*.  By then it was far too late, and the motion was denied.

**II**

This part of the order sets forth background facts that help situate the lawsuit in the broader contest between the parties.

**A**

This is not the parties' first rodeo—that would have been in February 2003, when the FDOC began censoring *Prison Legal News* due to its advertisement of services accepting postage stamps as payment, three-way calling services, pen pal services, and offers to purchase inmate artwork. *See Prison Legal News v. Crosby*, No. 3:04-cv-14-JHM-TEM, slip op. at 5-8, ¶¶ 4, 7, 14-16 (M.D. Fla. July 28, 2005), Pl.'s Trial Ex. 23 (the "Moore Order"). PLN sued the FDOC in January 2004 challenging that censorship under the First Amendment.[5]  *Id.* at 2.

While the suit was pending in March 2005, the FDOC amended Rule 33-501.401 to clarify that publications would not be rejected for the advertising content in that case, so long as those ads are "merely incidental to, rather than

---

[5] The First Amendment challenge to the censorship was not the sole claim. PLN also argued that Rule 33-602.207 of the Florida Administrative Code, which prohibits prisoners from engaging in outside businesses or professions and which the FDOC interpreted as proscribing compensation for writing for *Prison Legal News*, infringes on PLN's First Amendment rights as a publisher. Moore Order 17. The Eleventh Circuit would eventually disagree. *See Prison Legal News v. McDonough*, 200 F. App'x 873, 875 (11th Cir. 2006). Lastly, PLN had originally asserted a due process claim under the Fifth and Fourteenth Amendments, but abandoned that claim at the start of the bench trial. Moore Order 2 n.1.

being the focus of, the publication."[6]  Moore Order 15.  Following this amendment, the FDOC promised to no longer impound *Prison Legal News* for its advertising content.  *Id.* at 13-15.  The FDOC ceased impounding and rejecting *Prison Legal News* for the duration of the litigation and argued that PLN's First Amendment challenge to the Rule was moot.

This convinced the district court.  Four months after the amendment was implemented, it found that the FDOC had "shown that the [newly adopted] procedures . . . allow for distribution of [*Prison Legal News*] in its current format" and that the magazine would not be rejected solely on the basis of the advertising content at issue.  *Id.* at 15-16.  The Eleventh Circuit reiterated these sentiments on appeal.  In rejecting PLN's argument that an injunction was necessary to prevent further censorship, the Eleventh Circuit stated:

> We agree with the district court's finding that, although the FDOC previously wavered on its decision to impound the magazine, it presented sufficient evidence to show that it has "no intent to ban PLN based solely on the advertising content at issue in this case" in the

---

[6] Rule 33-501.401 has been amended several times.  The FDOC's interpretation of the Rule has also fluctuated.  In the first lawsuit, "the FDOC changed its position several times as to whether PLN's magazine contained prohibited material.  In early 2003, the FDOC began impounding issues of PLN's magazine because they contained ads for three-way calling services, which are prohibited for Florida inmates because they pose a threat to prison security.  In November 2003, the FDOC reversed its decision and allowed for delivery of eight issues that it had previously impounded.  However, a month later, in December 2003, the FDOC again decided to impound the magazine for including three-way calling service ads due to ongoing security concerns.  By March 2004, the FDOC was satisfied that its telephone provider could properly monitor prisoners' calls and that the three-way calling service ads were no longer a security concern.  Therefore, the FDOC again approved delivery of the magazine."  *McDonough*, 200 F. App'x at 875.

> future.  The FDOC demonstrated that its current impoundment rule
> does allow for distribution of PLN in its current format and that the
> magazine will not be rejected based on its advertising content.  The
> FDOC officially revised its impoundment rule and has not refused to
> deliver issues of the magazine since this amendment. . . .  We have no
> expectation that FDOC will resume the practice of impounding
> publications based on incidental advertisements.

*McDonough*, 200 F. App'x at 878.  Since the Eleventh Circuit disposed of the

claim as moot, it further declared that, "[a]s to the current rule, we offer no opinion

on its constitutionality."  *Id.*

## B

Less than three years after the Eleventh Circuit's ruling in *McDonough*, the

FDOC amended the Rule to provide an additional ground for rejection under (3)(l).

Under the revised Rule, publications with "*prominent* or *prevalent*" advertisements

for services prohibited by (3)(l) would also be rejected.  Fla. Admin. Code R. 33-

501.401(3)(l) (emphasis added).

The 2009 amendments became effective on June 16, 2009.  Def. Crews'

Obj. to Pl.'s First Set of Interrogs. to Def. Crews 2-3 (Jan. 18, 2013), Pl.'s Trial Ex.

30.  The FDOC has impounded every issue of *Prison Legal News* since September

2009.  Tr. of Trial 105:24-106:2 (Jan. 6, 2015).

PLN initiated this suit on November 17, 2011.  ECF No. 1.  On December

16, 2011, PLN filed its First Amended Complaint.  ECF No. 14.  Only two counts

remain, both against the FDOC.  *See* ECF No. 117 (confirming the dismissal of the

other two original defendants under a settlement agreement). Count III is a First Amendment as-applied challenge to subsections (3)(l) and (m) of the Rule. ECF No. 14, at 11, ¶¶ 40-43. PLN alleges that the FDOC's actions "in refusing to deliver or allow delivery of Plaintiff's publications to Florida inmates in its custody, solely because of the presence of certain advertisements within these publications, violate Plaintiff's rights to free speech, press and association as protected by the First and Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983." *Id.* ¶ 43. And, in Count VI, PLN contends that the FDOC's "failure and refusal to provide Plaintiff with constitutionally required notice and an opportunity to be heard and/or protest the decision each time Plaintiff's publications are censored . . . violates Plaintiff's rights to due process of law protected by the Fifth and Fourteenth Amendments . . . and by 42 U.S.C. § 1983." *Id.* at 14, ¶¶ 52-55.

On January 5, 2015, the parties began a four-day bench trial on these two counts. ECF No. 235. At its conclusion, the Court extended the parties an opportunity to brief certain key issues. *See* ECF Nos. 241-44, 246.

### III

In this part are the facts of the case, as found by this Court after careful consideration of all the evidence presented at trial. Most facts are undisputed. For those in dispute, the order lays out the competing views before resolving them.

**A**

Established in 1990 by Paul Wright and Ed Meade, *Prison Legal News* is a monthly magazine that reports on news and legal developments related to the criminal justice system.  Tr. of Trial 32:8-:22 (Jan. 5, 2015).[7]  PLN, a nonprofit with its principal place of business in Lake Worth, Florida, publishes *Prison Legal News*.  Tr. of Trial 36:18-37:2 (Jan. 5, 2015).  Its mission is to inform the public about events in prisons and jails and the need for progressive criminal justice reform, to inform prisoners and their advocates about these events and how to advocate for their rights, and to enhance rehabilitation for prisoners, ensure transparency and increase accountability of prison officials.  Tr. of Trial 32:23-33:9 (Jan. 5, 2015).

Over the past 25 years, *Prison Legal News* has published over 700 articles on the FDOC and Florida prisons and jails, with coverage ranging from misconduct by FDOC contractors to individual cases involving a host of legal issues.  Tr. of Trial 51:15-:22 (Jan. 5, 2015).  Prisoners are the magazine's primary audience.  Tr. of Trial 123:6-:10 (Jan. 5, 2015).

---

[7] The magazine was initially titled *Prisoner's Legal News*.  Tr. of Trial 122:22-123:5 (Jan. 5, 2015).  In 1992, the editors changed the name to *Prison Legal News* because they "thought that [the] news and information was too important to . . . restrict it to prisoners." *Id.*

*Prison Legal News* started carrying advertisements in 1996.[8]  Tr. of Trial 41:16-:22 (Jan. 5, 2015).  But it was not until February 2003 that the FDOC censored *Prison Legal News* for its advertising content.  Tr. of Trial 41:23-42:8, 184:9-:10 (Jan. 5, 2015).  The FDOC specifically took issue with the publication's advertisement of services accepting postage stamps as payment, three-way calling services, pen pal services, and offers to purchase inmate artwork; proscribed mostly by subsection (3)(l).  Moore Order 5-8.  The justification was that those advertisements presented a security risk because they promoted prohibited services.  *Id.* at 3.

PLN sued and the FDOC subsequently amended the Rule several times during the 2005 litigation, vacillating between admitting publications containing (3)(l) advertisements and rejecting them.  Moore Order 7.  Eventually the FDOC settled on a rule that would not reject publications such as *Prison Legal News* for advertising services prohibited by subsection (3)(l), so long as the advertisements were "merely incidental to, rather than being the focus of, the publication." *Id.* at 8.

This Court finds that there were several reasons for this change.  First, the FDOC believed that it had in place security measures to alleviate some of the concerns associated with the prohibited services advertized in *Prison Legal News*.

---

[8] The FDOC says that advertisements are unnecessary.  The evidence overwhelmingly refutes that argument.  This Court finds that without advertisements PLN could not print *Prison Legal News*.  This Court further finds that printing a Florida-only edition of *Prison Legal News* would be cost-prohibitive.  Tr. of Trial 60:23-71:14 (Jan. 5, 2015).

Significantly, the FDOC trusted that its telephone vendor, at the time MCI, could detect and block three-way calls and call-forwarding.  *See, e.g.*, *id.* at 7; Tr. of Trial 78:11-:22 (Jan. 6, 2015).  Second, the FDOC recognized that "incidental" advertisement did not pose a significant security threat to the prisons.  Moore Order 15.  Following this recognition, the FDOC promised that it would no longer impound and reject *Prison Legal News* "in its current format."  *Id.* at 16.  The Rule was not, as PLN claims, amended to "moot" the 2005 case.  Tr. of Trial 78:11-:22 (Jan. 6, 2015).

Finally, this Court finds that the 2005 litigation did not concern services prohibited by subsection (3)(m).  *See* Tr. of Trial 69:9-70:8 (Jan. 6, 2015) (discussing the major concerns in the prior litigation); Tr. of Trial 214 (Jan. 7, 2015) (testifying that prior litigation was not about subsection (3)(m)).  This litigation does.

**B**

From 2005 to 2009 the FDOC, proceeding under the revised Rule, did not reject *Prison Legal News*.  Then, in June 2009, the FDOC once again amended subsection (3)(l) of the Rule.  Along with this revision came the decision to resume rejection of publications such as *Prison Legal News* for advertising services

prohibited by subsection (3)(l).[9] [10]   At trial, the parties vigorously disputed what

prompted these changes.  Everyone agrees it was not any major incident or tragedy

related to (3)(l) services, since none occurred between 2005 and 2009.[11]  Tr. of

Trial 5:9-:12 (Jan. 6, 2015).

FDOC administrators gave three primary reasons for amending subsection

(3)(l) in 2009, each of which this Court deems credible.  *See* Tr. of Trial 58:20-:21

(Jan. 6, 2015).  The first was a disagreement among the administrators "over

_____

[9] At times during this litigation the FDOC has taken the position that the 2009 revisions were not substantive—that is, that the sole purpose was to clarify "incidental" to assist mailroom staff.  The witnesses at trial could not agree on whether the change was substantive, and the parties never directly addressed the issue.

If truly not substantive, adding "prominent or prevalent" should not have resulted in heightened censorship, generally.  Yet that is precisely what happened.  Within a few months the FDOC resumed rejection of *Prison Legal News*, even though there was no noticeable change in the magazine between June 2009, when the rule was implemented, and September 2009, the first issue impounded since 2005.  *See* Def.'s Trial Ex. 1; Pl.'s Trial Ex. 79.

What explains this inconsistency?  First, it may not be an inconsistency at all.  It could be the case that *Prison Legal News*' advertising content had ballooned well beyond "incidental" back in October 2008, when it made the permanent jump from 48 pages per issue to 56.  *See* Pl.'s Trial Ex. 79, at 38.  This would mean that FDOC mailroom staff mistakenly admitted *Prison Legal News* for nearly a year.  Under this view, the 2009 amendment worked.  The staff has gotten it right ever since, impounding and rejecting *every* issue of the magazine from September 2009 to the present.

This Court finds, however, that the *true* and more obvious answer is that the 2009 amendment was *not* a simple "restyling"—to borrow from the judicial Committee on Rules of Practice and Procedure—of the Rule.  The evidence at trial bears this out.  For instance, Susan Hughes, chairwoman of the Literature Review Committee from 2012 to October 2013, testified that she understood the 2009 revision to be a change in the rule.  Tr. of Trial 2:13-:17, 6:9-7:8 (Jan. 7, 2015).  And, as this Court will discuss, the FDOC provided additional justifications for the *substantive* decision to again reject *Prison Legal News*, such as renewed security concerns.

[10] The FDOC also began censoring *Prison Legal News* for advertisements prohibited by subsection (3)(m).

[11] While no single, major incident prompted the amendment, this Court finds that there *is* evidence that companies and prisoners disregarded prison rules against exchanging stamps for money and services.  *See, e.g.*, Tr. of Trial 36:18-40:13 (Jan. 6, 2015).

whether the prior policy met the needs of the department."  Tr. of Trial 59:8-:10
(Jan. 6, 2015).  According to James Upchurch, new technology, such as the advent
of Voice over Internet Protocol ("VoIP") technology, forced the FDOC to
reconsider previous security decisions.  Tr. of Trial 19:12-:22 (Jan. 6, 2015).
Securus is the FDOC's current telephone vendor.  Like MCI, it works by detecting
noises and clicks made on a phone line that signal the initiation of three-way calls
and call-forwarding.  Tr. of Trial 15-16 (Jan. 6, 2015).  Circumventing the system
generally requires obfuscating those specific noises or transferring calls without
any noise at all.  VoIP employs the latter.  Tr. of Trial 19:12-:22 (Jan. 6, 2015).
The changes in technology proved wrong the FDOC's belief that it had adequate
security measures to curb three-way calling and call-forwarding.

　　　　The second reason given was dissatisfaction with the vagueness of
subsection (3)(l).  FDOC administrators sought to clarify the circumstances under
which publications should be censored for their advertising content.  *See* Tr. of
Trial 59:11-:14 (Jan. 6, 2015); *see also* Pl.'s Trial Ex. 30 (identifying clarity as the
goal of the 2009 revisions).  They did so with the antonyms "prominent or
prevalent," which the FDOC believed would assist mailroom staff in their
decision-making.  Lastly, the FDOC had noticed an increase in the volume of
advertisements related to postage stamps.  Tr. of Trial 59:16-:18 (Jan. 6, 2015).

A major theme in PLN's First Amendment challenge is that the FDOC had no legitimate reasons for amending subsection (3)(l).  So, PLN endeavored to undermine these reasons all through trial.

PLN asserts that the first reason—the purported circumvention of Securus—is false.  Securus, like MCI, is contractually obligated to block the call services at issue.  This contract was recently renewed by the FDOC.  That means the system works, says PLN.  Otherwise, the FDOC would not have renewed the contract.

FDOC offers evidence to refute PLN's argument.  First, Securus itself admits it is not 100% effective.  Second, FDOC personnel monitoring phone calls have heard inmates successfully transfer calls.  Third, hundreds of thousands of attempted calls have been detected by Securus.  According to the FDOC, this means that some prisoners successfully transfer calls, or else there would not be so many attempts.

FDOC officials also said that increasing Securus' effectiveness would be too costly.  They explained that Securus could be made more effective by increasing its sensitivity to noise.  The heightened sensitivity would capture more attempts, but also result in more false positives.  It would shutdown inmates placing rule-abiding phone calls.  This would lower prisoner morale and increase tension to untenable levels.  Tr. of Trial 15-16:25 (Jan. 6, 2015).  So it goes.

With respect to the first reason, this Court makes the following determinations.  At the time of the 2005 litigation, the FDOC believed that its telephone vendor could detect all attempts at three-way calling and call-forwarding.  After all, Securus, its current vendor, is contractually obligated to block three-way calls and call-forwarding attempts.  Yet it is unable to do so.  Some calls, including those transferred using VoIP technology, elude the system.  There is no evidence to suggest that any other provider could do a better job than Securus.  And while it is theoretically possible to increase Securus' efficacy, any benefit from doing so would be offset by attendant prison instability.

As to the third reason, PLN points out that the FDOC never ran a study to determine whether advertisements accepting stamps as payment increased between 2005 and 2009.  Tr. of Trial 59:19-60:7 (Jan. 6, 2015).  The FDOC instead relied on plain observations and noticed that the number of such advertisements had grown "substantially."  Tr. of Trial 59:19-60:18 (Jan. 6, 2015); *accord* Tr. of Trial 8:22-9:1 (Jan. 6, 2015).

That is beside the point.  In fact the magazine did increase in size.  Tr. of Trial 109:18-110:6 (Jan. 5, 2015).  In four years the magazine went from 48 pages to 56 pages per issue, containing both more substantive, non-offending content and prohibited advertisements.  *See* Pl.'s Trial Ex. 79 (providing total number of pages for every issue of *Prison Legal News* dating back to January 2002); Def.'s Trial

Ex. 7.  Qualitatively, the advertisements have changed as well.  The number of "half page or greater" (3)(l) ads have increased.  Def.'s Trial Ex. 7.  And since 2010, PLN has run an offending advertisement on the back cover of the magazine. *Id.*  Today, *Prison Legal News* is 64-pages long.  *See* Pl.'s Trial Ex. 79.  No formal study is necessary to see that.

PLN additionally argues that the FDOC is wrong to look to the total number of advertisements.  Tr. of Trial 49:9-:12 (Jan. 7, 2015).  Instead, as PLN would have it, the proper measure is the percentage of the magazine that is prohibited advertisement.  Tr. of Trial 49:14-50:2 (Jan. 7, 2015).  The merits of this argument are explored later.  For now, suffice to say that the percentage of advertisements for three-way calling services, stamps as payment, pen pal services, and conducting a business services—that is, those prohibited by subsection (3)(l) of the Rule—increased only slightly from 9.21% in 2005 to 9.8% in 2009.  *See* Pl.'s Trial Ex. 79, at 85.  In 2014, (3)(l)-prohibited advertisements averaged 15.07% of the publication.  *Id.*[12]

Notably, neither this "study" nor anything else introduced by the parties examines the percentage for advertisement prohibited by (3)(m).  *See* Tr. of Trial 242, 250:9-:15 (Jan. 5, 2015) (explaining methods, which excluded (3)(m) ads);

---

[12] Evidence before this Court shows that advertising content in *Prison Legal News* has been on the rise since 2005.  Paul Wright testified that PLN does not intend to further increase the number and size of offending advertisements.  Tr. of Trial 59:8-:10 (Jan. 5, 2015).  This Court has no reason to disbelieve Mr. Wright.

*see also* Def.'s Trial Ex. 7 (providing number of advertisements forbidden by other rules, including (3)(m), and showing that, by 2009, *Prison Legal News*' advertising content had widened to include more types of prohibited advertisements; but still not revealing the percentage of (3)(m) advertisements).

Another contention made by PLN, which it hopes this Court will adopt as fact, is that FDOC officials amended the Rule in 2009 specifically to exclude *Prison Legal News*.  PLN cites email exchanges among FDOC administrators where they discuss the 2009 amendment and how the new rule might "run afoul" of the promises made in the 2005 litigation.  *See, e.g.*, Tr. of Trial 61-66 (Jan. 6, 2015); Pl.'s Trial Ex. 57a-57i.  To PLN, these emails are a smoking gun of the ulterior motive animating the 2009 revisions.  *See* Tr. of Trial 135-136 (Jan. 5, 2015) (accusing the FDOC of censoring *Prison Legal News* for its editorial content).

At minimum, the emails reveal that FDOC officials were aware that the 2009 changes would lead to rejection of *Prison Legal News*.  This supports the finding that the FDOC intended the 2009 amendments to be substantive.  And perhaps when placed, as PLN does, in the broader context of FDOC prevarication and inconsistent application of the Rule, they hint at chicanery (more on this later).  But it is still a stretch to say that the emails demonstrate that FDOC officials amended the Rule in 2009 specifically to exclude *Prison Legal News*.

These emails are the closest thing PLN presented to direct evidence that the FDOC targets *Prison Legal News*.  Other circumstantial evidence relies heavily on inference to support this theory.  PLN reasons, for example, that security concerns could not possibly underlie the amendment because no major incident or tragedy related to the services advertised occurred between 2005 and 2009.  The Rule must then be a façade, masking institutional bias against a publication that informs prisoners of their rights.

Such a finding would be nothing less than conjecture.  There are many reasons, not the least of which is that there *is* some evidence of stamp-related problems.  Animus is not the only inference that can be drawn from the fact that the FDOC amended subsection (3)(l) before a calamity transpired.  Plus, the FDOC unequivocally denies any malice, its officials going as far as saying that they view *Prison Legal News* favorably.  *See, e.g.*, Tr. of Trial 212:9-:13 (Jan. 7, 2015).  More importantly, PLN failed to offer *any* evidence showing that the FDOC does *not* censor other publications containing similar advertising content, or that the only other publications that the FDOC censors contain editorial content similar to *Prison Legal News*.  To the contrary, the FDOC produced evidence, though limited, that it has repeatedly rejected other publications on (3)(l) grounds, some of which on their face do not resemble *Prison Legal News*.  *See, e.g.*, Def.'s Trial Ex. 12, at 37-39 (censoring *American Arab Message* for advertising services for

stamps), 63-65 (censoring *Cellmates* for pen pal advertisement), 69-71 (censoring *Butterwater* catalog for advertising services for stamps), 72-74 (censoring *Picture Entertainment* for advertising services for stamps); Def.'s Trial Ex. 15.

Here, the more limited conclusion is the soundest.  And that conclusion is that FDOC officials did not amend subsection (3)(l) in 2009 because they disliked *Prison Legal News*' "editorial" content.[13]  And there is no evidence, this Court finds, that the FDOC censors *Prison Legal News* but not other publications with similar advertising content.  Lastly, with respect to subsection (3)(l), this Court finds, consistent with the expert testimony presented at trial, that advertisements for such services implicate legitimate security concerns.  Tr. of Trial 69-147 (Jan. 7, 2015).

Turning to subsection (3)(m), this Court makes the following findings.  Subsection (3)(m) contains a residual clause requiring the FDOC to reject publications that otherwise present a threat to security, order, rehabilitative objectives, and safety.  From 2009 onward, the FDOC became increasingly concerned with services falling outside the ambit of (3)(l) and within the purview of (3)(m).  *See, e.g.*, Tr. of Trial 15:14-:20 (Jan. 7, 2015).  Chiefly troubling among

---

[13] It is not entirely clear how much "motive" matters, if at all, in the First Amendment analysis.  The order later explores the divergent case law on this issue.  Ultimately, this Court does not decide whether motive matters because, even if it does, PLN failed to present sufficient evidence that FDOC officials acted with ill will in 2009 when they amended the Rule and resumed impounding *Prison Legal News*.

these services—at least to the FDOC—are prisoner concierge services, which enable inmates to establish outside bank accounts, run background checks, and locate people, among other things. *See* Tr. of Trial 69:9-70:8 (Jan. 6, 2015); *see also* Tr. of Trial 73:13-:21 (Jan. 7, 2015) (listing services falling under umbrella term "prisoner concierge services"). This Court finds, consistent with the expert testimony produced by the FDOC, that advertisements for these services constitute legitimate security risks. *See* Tr. of Trial 69-147 (Jan. 7, 2015).

*Prison Legal News* contained these sorts of advertisements in 2009. *See* Def.'s Trial Ex. 7. It did not back in 2005. *See id.* Indeed, the largest increase in advertisements in *Prison Legal News* has been for prisoner concierge services. Tr. of Trial 73:13-:21 (Jan. 7, 2015). Unremarkably, then, the FDOC began invoking subsection (3)(m) to censor the publication.

Not all of PLN's evidentiary arguments are duds. The following is largely undisputed. Florida is the *only* state that censors *Prison Legal News* because of its advertising content. Tr. of Trial 71:15-:20, 198-200 (Jan. 5, 2015). The private prison corporations censor *Prison Legal News* only in Florida as well. Tr. of Trial 75:14-:20 (Jan. 5, 2015). Some states that previously censored the publication because of its advertising content have found less restrictive ways of furthering their legitimate penological goals without banning it. *See, e.g.*, Tr. of Trial 81:19-

82:14 (Jan. 5, 2015) (explaining that New York staples a notice to the magazine before delivering it to inmates warning them that certain services are prohibited).

Other prison rules seem in tension with the penological grounds upon which the FDOC censors *Prison Legal News*.  Inmates may call up to 10 numbers preapproved by the FDOC.  Tr. of Trial 13:1-:7 (Jan. 6, 2015).  The FDOC claims that three-way calling and call-forwarding present a security risk because these services mask the identity and location of the true recipient of a call.  Tr. of Trial 197-200 (Jan. 5, 2015).  Yet the FDOC allows inmates to list cell phone numbers, for which it has no way of knowing the location and identity of the person on the other end.  *Id.*; *see also* Tr. of Trial 22:5-:10 (Jan. 6, 2015).  The assignment of a cell phone number likewise does not depend on geography.  Tr. of Trial 49-50 (Jan. 6, 2015) (explaining how someone in Miami can obtain a cell phone number with a Tallahassee area code).  Similarly, even though the FDOC has stamp-related security concerns, it allows inmates to possess up to 40 stamps at any given time.  Tr. of Trial 188:3-:4 (Jan. 5, 2015).  And, as PLN stresses, there are many ways for inmates to obtain the information advertized in *Prison Legal News* despite its censorship.

These inconsistencies aside, this Court determines that the FDOC's stated penological objectives for censoring *Prison Legal New* have been steadfast: security, rehabilitation, and protecting the public, FDOC staff and inmates.

**C**

The FDOC's literature review process can be broken down into two groups. The first group consists of incoming publications that have not previously been rejected by the Literature Review Committee ("LRC"), the body that reviews impoundment decisions made by FDOC institutions. As to that group, the process works as follows.

An issue of *Prison Legal News* enters an FDOC facility or institution. Mailroom personnel initially flag potential advertising violations. If they think the advertising content violates the Rule, the publication is sent to the warden or the warden's designee ("[f]or the purposes of approving the impoundment of publications," the designee is limited to the assistant warden), who makes the impoundment decision for the FDOC institution. Fla. Admin. Code R. 33-501.401(8)(a). If that official believes the publication violates the Rule, he or she completes "Form DC5-101, Notice of Rejection or Impoundment of Publications." *Id.* The form is supposed to indicate the "specific reasons" for impoundment. *Id.*

Several copies of this form are made. Not everyone is entitled to a copy. Under the Rule, the inmate is always entitled to notice whenever a copy of any publication addressed to him or her is impounded. But the Rule only requires that the institution that "originated the impoundment . . . also provide a copy of the completed form to the publisher, mail order distributor, bookstore or sender, and to

21

the literature review committee." Fla. Admin. Code R. 33-501.401(8)(b).  "[A] copy of the publication's front cover or title page and a copy of all pages *cited* on [the form]," are attached to the copy sent to the LRC.[14]  *Id.* (emphasis added).

FDOC personnel do not mark down every offending advertisement.  So the LRC *never* receives a photocopy of the entire impounded publication.[15]  The LRC reviews the institution's decision—in (3)(l) cases, reviewing to see whether offending advertisement is "prominent or prevalent throughout the publication"— without ever knowing the number and size of all offending advertisements in any given issue of *Prison Legal News*, nor the issue's total page count.  It may affirm or overturn the institution's decision on different or additional grounds.  Tr. of Trial 113:20-:25, 120:20-:23 (Jan. 6, 2015).  The LRC does not use Form DC5-101 to make its decision.  Tr. of Trial 120 (Jan. 6, 2015).  Instead, the LRC uses a different form that it keeps internally.  *Id.*  These internal forms have not been provided to this Court by either party.

Once an initial impoundment decision is made, the Rule requires all other institutions to impound the same publication pending review by the LRC.  Fla. Admin. Code R. 33-501.401(8)(c).  The initial impounding institution is supposed

---

[14] Briefly, the parties dispute the burden of making a copy for the publisher every time an FDOC facility impounds a copy of an issue.  The dispute centered on whether doing so would impose a *de minimus* burden on the FDOC.  This Court has considered the evidence and now finds that making a copy for the publisher every time would be minimally burdensome.

[15] The FDOC does not copy the entire publication for fear that doing so infringes copyright protections.

to notify other institutions of the impoundment through a centralized database that explains why a specific publication was impounded.  This reduces duplicative efforts.  Institutions that subsequently receive the same publication should automatically reject it on the same grounds as the initial institution.

Group two concerns publications that have previously been rejected by the LRC.  Once the LRC affirms an initial impoundment, it rejects the specific issue of a publication and informs all institutions of its decision.  Future recipient institutions are then required to reject other copies of that issue.  The LRC does not notify publishers when it upholds an impoundment decision unless the publisher appealed the initial impoundment decision.  Tr. of Trial 86:3-:8 (Jan. 6, 2015).

## D

The FDOC has impounded every issue of *Prison Legal News* since September 2009.  Pursuant to its policy, it admits not providing PLN a notice of impoundment for every *copy* of each issue it has impounded.[16]

The FDOC says that it has provided PLN at least one impoundment notice per *issue* since 2009.  As evidence, the FDOC called two witnesses who worked in the mailroom at Florida State Prison.  Tr. of Trial 154, 180 (Jan. 7, 2015).  One of them, Ms. Patricia Goodman, has been working there since at least 2009.  Tr. of Trial 154:22-155:7 (Jan. 7, 2015).  The two witnesses are responsible for mailing

---

[16] Whether due process requires individualized notice per copy will be discussed later.

out the impoundment notices originating at Florida State Prison. Both testified about the impoundment protocol at their institution and how closely these procedures are followed by mailroom staff. *See, e.g.*, Tr. of Trial 158:5-:7 (Jan. 7, 2015). Neither could independently recall actually sending PLN an impoundment notice every single time. As further support, the FDOC provided documentation of notices of impoundment from 2009 to the present. *See* Def.'s Trial Ex. 5.

None of this, says PLN, demonstrates that the FDOC provided PLN with an impoundment notice for every issue since 2009. PLN is absolutely correct. First, the testimonial evidence submitted by the FDOC is limited to one of its institutions, Florida State Prison. No one argues that Florida State Prison was always the original impounding institution. There is no evidence that the other institutions regularly followed protocol like Ms. Goodman. Second, even for the Florida State Prison, the witnesses admitted that they could not recall whether they notified PLN every time. Third, the notices of impoundment submitted are reproductions of notices received by PLN from *prisoners*, not the FDOC. *See* ECF No. 241, at 9-10 (explaining that the notices reproduced in Defendant's Trial Exhibit 5 contained PLN Bates numbers; PLN originally disclosed these notices to the FDOC during discovery).

This Court finds in favor of PLN on these facts. PLN proved that it did not receive an impoundment notice for every issue impounded since November 2009.

ECF No. 241, at 9.  Two of its witnesses explained PLN's mail protocol, credibly

establishing PLN's meticulous recordkeeping.  Tr. of Trial 252, 268 (Jan. 5, 2015).

From November 2009 to June 2013, Mr. Zachary Phillips was responsible for

filing mail concerning censorship or possible censorship of *Prison Legal News*.

Tr. of Trial 253:8-254:6 (Jan. 5, 2015).  He reviewed notices of rejection or

impoundment from November 2009 to May 2013.  Tr. of Trial 257-263 (Jan. 5,

2015).  PLN did not receive a notice of impoundment from the FDOC for many of

those months.  *See, e.g.*, Tr. of Trial 257:13-:14 (Jan. 5, 2015) (stating that in 2010

PLN did not receive notices in May, June, July, August, September, and October).

In summary, for 26 issues between November 2009 and December 2014,

PLN did not receive any notice from the FDOC that *Prison Legal News* had been

impounded.[17]  That is roughly 42% of all issues during that period where the

FDOC withheld *Prison Legal News* without notifying PLN.  ECF No. 241, at 9.

Of the notices PLN did receive, many did not list the page numbers containing

advertisements allegedly in violation of the Rule.  *Id*.  Some did not even state the

subsection allegedly breached.  *Id.*  And at least three times PLN received a notice

of *rejection* without having first received a notice of impoundment, meaning that

the LRC had made its decision before PLN had an opportunity to appeal.  *Id.*

---

[17] This is the summary provided by PLN in its post-trial brief.  *See* ECF No. 241, at 9.
This Court has independently reviewed the evidence submitted at trial and agrees with the
summary.

Lastly, this Court finds that the FDOC failed to provide notice every time it impounded the *Prisoners' Guerilla Handbook* and the information packets sent to its inmates by PLN. *See* Tr. of Trial 261-262 (Jan. 5, 2015); Tr. of Trial 4-5 (Jan. 8, 2015); Pl.'s Trial Ex. 46; Pl.'s Trial Ex. 86.

## IV

There are three principal issues to be resolved. The first is preliminary and does not address the merits of PLN's lawsuit. That issue is whether the FDOC should be judicially estopped from censoring *Prison Legal News* under Rule 33-501.401(3)(l). Resolving that issue does not completely dispose of the case because PLN also brought an as-applied First Amendment challenge to subsection (3)(m) of the Rule. The two remaining issues are: first, whether the FDOC's censorship of *Prison Legal News* under Rule 33-501.401(3)(l) and (m) unconstitutionally abridges PLN's First Amendment rights;[18] and second, whether the FDOC violated PLN's procedural due process rights.

## A

The preliminary question is whether judicial estoppel bars the FDOC from censoring *Prison Legal News* on the basis that its advertising content violates Rule 33-501.401(3)(l).

---

[18] Applied to the State of Florida by the Fourteenth Amendment.

The doctrine of judicial estoppel generally "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 *Moore's Federal Practice* § 134.30, p. 134-62 (3d ed. 2000)).  It is designed "to protect the integrity of the judicial process." *Id.*  To that end, the doctrine, in its "simplest manifestation[]," estops a party from asserting "a present position because [that] party had earlier persuaded a tribunal to find the opposite." 18B Charles Alan Wright et al., *Federal Practice & Procedure* § 4477 (2d ed. 2015).

The Supreme Court in *New Hampshire* explained that while "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," "several factors typically inform the decision whether to apply the doctrine in a particular case." 532 U.S. at 750 (alteration in original) (quoting *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982)).

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled."  Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an

> inconsistent position would derive an unfair advantage or impose an
> unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (citations omitted).

In this Circuit, courts consider two additional factors. "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1308 (11th Cir. 2001), *cert. granted, judgment vacated on other grounds*, 537 U.S. 1085 (2002)). "[T]hese . . . enumerated factors are not inflexible or exhaustive." *Id.* at 1286. And, courts have discretion in invoking the doctrine. *New Hampshir*e, 532 U.S. at 750. But they "must always give due consideration to *all of the circumstances* of a particular case when considering [its] applicability." *Burnes*, 291 F.3d at 1286 (emphasis added).

The FDOC currently maintains that the advertisements for (3)(l) services in *Prison Legal News* present a security threat, justifying the publication's censorship under that subsection. PLN insists that this position is clearly inconsistent with the 2005 representation that "such 'incidental' ads do not pose a significant security threat to the prisons." Moore Order 15. It would be different if the underlying facts changed, but according to PLN, the only thing that has changed is the FDOC's "interpretation of the evidence or its decisions on how to enforce the rules

at issue." ECF No. 241, at 20. It points out that the percentage of (3)(l) advertising content in *Prison Legal News* did not increase significantly from 2005 to 2009, and that no major incident or tragedy linked to (3)(l) services occurred during that time period. The FDOC's "flip-flopping" "over the same rule and same security concerns," PLN claims, is precisely the sort of inveiglement of the judiciary that judicial estoppel is supposed to ward against.

But because circumstances *have* changed, the two FDOC positions are not clearly inconsistent. First, technology changed. In 2005, the FDOC decided not to censor publications containing advertisements for three-way calling and call-forwarding services because it believed that its telephone vendor could detect and block all such attempts. *See* Moore Order 14. Yet inmates have continued to bypass the FDOC's security measures using technology such as VoIP that previously was not so widely available. The FDOC was clearly mistaken about the efficacy of its security measures. Judicial estoppel simply does not apply "when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

Second, the extent to which *Prison Legal News* advertizes services prohibited by (3)(l) has also changed. PLN stresses that the proportion of the magazine that is (3)(l) advertisement barely increased from 9.21% in 2005 to 9.8%

in 2009.  To PLN, these percentages demonstrate that in 2009 such advertisements were no less "incidental" than they had been in 2005.  PLN thus equates "incidental" to proportional.

A strictly proportion-based metric, however, overlooks significant differences.  For starters, *Prison Legal News* ran larger ads in 2009.  A chart submitted by the FDOC tallies the number of "half page or greater" (3)(l) ads.  Def.'s Trial Ex. 7.  From April 2005, the last issue censored in the previous litigation, to September 2009, the number of such ads increased by 100%, from 2 to 4.  *Id.* at 1.  That number rose even more, now hovering around 6 per issue.  *Id.* at 3.  So while the overall proportion of (3)(l) advertisement had not increased significantly in 2009, the number of larger, more conspicuous ads did.

The magazine also shifted away from advertising three-way calling services to advertisements enabling inmates to purchase products or services with postage stamps.  By PLN's own account, the number of these so-called "stamp" advertisements went from 2 in April 2005 to 7 in September 2009.  *Compare* Pl.'s Trial Ex. 79, at 17-18, *with id.* at 43-44.  That number has steadily ticked upward: 8 by November 2009; 9 in February 2010; 10 in March 2010; a slight decrease before rebounding to 11 in July 2010; 13 by August 2010; peaking at 17 in March 2013; and steadying at the lower end of the teens ever since.  *Id.* at 44-84.  Advertisements for three-way calls have not seen this growth, but they have not

decreased either.  *Id.*  Although PLN argues that the overall percentage of (3)(l)

advertisements has not changed much,[19] the magazine clearly emphasizes a

different *type* of (3)(l) ad today than it did in 2005.

The most obvious shortcoming with equating "incidental" to proportional is

that it misses the absolute increase of advertisements for services prohibited by

(3)(l).  *See id.*; Def.'s Trial Ex. 7.  Perhaps a 10-page publication with one page of

advertisement is functionally equivalent to a 100-page publication with ten pages

of advertisement.  This Court, however, refuses to supplant FDOC officials'

judgment on whether one of these equally proportionate, but qualitatively different

publications presents any more of a security risk than the other.  *See Jones v. N.

Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977) (admonishing

the lower court for "not giving appropriate deference to the decisions of prison

administrators and appropriate recognition to the peculiar and restrictive

circumstances of penal confinement").

All of these changes to the content and format of *Prison Legal News* matter

for judicial estoppel.  PLN paints the FDOC's representations in 2005 as a blanket

promise that *Prison Legal News* would never again be censored for advertising

services prohibited by (3)(l).  But that is not what the Moore Order articulates.  The

---

[19] This is not actually true.  The overall percentage in 2005 was 9.21%.  Pl.'s Trial Ex. 79, at 85.  By 2011 that number had gone up to 10.19%.  *Id.*  It hit 12.66% in 2012, and now hovers above 15%.  *Id.*

FDOC represented that "*such* 'incidental' ads" did not pose a security threat. Moore Order 15 (emphasis added). This is a direct reference to the advertising content at issue in that case. *See* Black's Law Dictionary 1661 (10th ed. 2014) (defining "such" as "That or those; having just been mentioned"). By limiting its representation, the FDOC's promise cannot fairly be read as extending to all future iterations of such advertisements, particularly those different in kind.

Furthermore, the Moore Order itself reflects the limited finding that the FDOC had promised not to impound *Prison Legal News* "in its *current format*." Moore Order 21 (emphasis added). The Eleventh Circuit reiterated this understanding on appeal. *McDonough*, 200 F. App'x at 878 ("The FDOC demonstrated that its current impoundment rule does allow for distribution of PLN in its *current format*.") (emphasis added). The format changed in four years. It has changed even more since then. Consequently, the FDOC's current position is not clearly inconsistent with the position it took before Judge Moore, and this Court's acceptance of that position would not "create the perception that . . . the first . . . court was misled." *New Hampshire*, 532 U.S. at 750-51.

Accordingly, the FDOC is not judicially estopped from adopting the current position that *Prison Legal News* must be censored because its (3)(l) advertising content presents a security risk.[20]

## B

This Court must also decide whether the FDOC's censorship of *Prison Legal News* pursuant to Rule 33-501.401(3)(l) and (m) violates PLN's rights under the First Amendment.

PLN has a legitimate First Amendment interest in accessing prisoners "who, through subscription, willingly seek [the] point of view" expressed in *Prison Legal News*. *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Prison regulations limiting that access must be analyzed under the reasonableness standard developed by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987). *Thornburgh*, 490 U.S. at 413-14 (holding that regulations affecting the sending of a "publication" to a prisoner must be analyzed under *Turner*; refusing to distinguish between incoming correspondence from prisoners and incoming correspondence from nonprisoners); *accord Washington v. Harper*, 494 U.S. 210, 224 (1990) ("[T]he

---

[20] The FDOC additionally contends that judicial estoppel does not apply against states when doing so would "compromise a governmental interest in enforcing the law" and "where broad interests of public policy [are] at issue." ECF No. 242, at 4-5 (quoting *New Hampshire*, 532 U.S. at 755-56). It argues this case implicates both concerns. First, estoppel would compromise the FDOC's interest in enforcing prison safety rules. Second, broad interests of public safety and prison security are at issue. PLN responds that neither interest is at play in this litigation. This Court need not decide this issue because it finds that the totality of the circumstances counsel against judicial estoppel.

standard of review we adopted in *Turner* applies to all circumstances in which the

needs of prison administration implicate constitutional rights."); *Perry v. Sec'y,*

*Florida Dep't of Corr.*, 664 F.3d 1359, 1365 (11th Cir. 2011).  Under *Turner*, such

regulations are "valid if [they are] reasonably related to legitimate penological

interests."  *Thornburgh*, 490 U.S. at 413 (alteration in original) (quoting *Turner*,

482 U.S. at 89).

Several factors are relevant to the reasonableness inquiry.  The first factor is

multifold, requiring courts to "determine whether the governmental objective

underlying the regulations at issue is legitimate and neutral, and that the

regulations are rationally related to that objective."  *Id.* at 414.  This " 'factor' is

more properly labeled an 'element' because it is not simply a consideration to be

weighed but rather an essential requirement."  *Salahuddin v. Goord*, 467 F.3d 263,

274 (2d Cir. 2006); *accord Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) ("[After

stating the first *Turner* factor:] If the connection between the regulation and the

asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of

whether the other factors tilt in its favor.").

A second factor "is whether there are alternative means of exercising the

right that remain open to [the plaintiff]."  *Turner*, 482 U.S. at 90.  "A third

consideration is the impact accommodation of the asserted constitutional right will

have on guards and other inmates, and on the allocation of prison resources

generally." *Id.*  Finally, *Turner* instructs lower courts to inquire whether there are "easy alternatives" indicating that the regulation is not reasonable, but rather an "exaggerated response" to prison concerns. *Id.*

After the impinged constitutional right has been identified, as is the case here, the state must "put forward" the legitimate governmental interests underlying its regulation. *Id.* at 89.  Once this is done, the plaintiff bears the ultimate burden of showing that the regulation in question, as applied, is not reasonably related to legitimate penological objectives. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the [plaintiff] to disprove it.").

The FDOC identified public safety and prison security as the underlying legitimate governmental interests.[21]  No one questions whether those are legitimate governmental interests.  Any suggestion to the contrary would be fruitless. *See Thornburgh*, 490 U.S. at 415 (holding that regulation promulgated with the purpose of "protecting prison security" is legitimate, since that "purpose . . . is central to all other corrections goals"); *Perry*, 664 F.3d at 1366 (acknowledging that "protecting the public and ensuring internal prison security" are legitimate penological interests).

---

[21] It identified other reasons too, but only the security objectives are necessary for this analysis.

PLN instead contends that the FDOC's application of Rule 33-501.401(3)(l) and (m) is not content-neutral, and that censoring *Prison Legal News* for its advertising content is not rationally related to public safety and prison security. And so, with respect to the first factor, the question becomes (1) whether the Rule "operate[s] in a neutral fashion, without regard to the content of the expression" at issue; and (2) whether censoring *Prison Legal News* due to its advertising content rationally relates to public safety and prison security. *Turner*, 482 U.S. at 90.

As to neutrality, the Supreme Court has explained that *Turner* requires nothing more than that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). "Where . . . prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' . . . ." *Id.* at 415-16.

The limited evidence at trial reveals that the FDOC censors an assorted mix of publications under subsections (3)(l) and (m). Nothing in the record implies that such censorship turns on the content of the publication. PLN did not show, for instance, that the FDOC disparately censors publications critical of its institutions.

Lacking this evidence, PLN argues that FDOC administrators did not amend the Rule in 2009 on legitimate penological grounds. PLN alleges, citing a series of

emails, that the true motivation behind the amendment was a dislike of *Prison Legal News*.  *See* Pl.'s Trial Ex. 57a-57i.

"It is unclear what role, if any, motive plays in the *Turner* inquiry."  *Hatim v. Obama*, 760 F.3d 54, 61 (D.C. Cir. 2014).  *Compare Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) ("It is not clear why one bad motive would spoil a rule that is adequately supported by good reasons.  The Supreme Court did not search for 'pretext' in *Turner*; it asked instead whether a rule is rationally related to a legitimate goal.") (citation omitted), *with Salahuddin*, 467 F.3d at 276-77, *and Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993) ("Prison officials are not entitled to the deference described in *Turner* and *Procunier* if their actions are not actually motivated by legitimate penological interests at the time they act.").  In this case, the contours of that role need not be delineated because "[e]ven if some quantum of evidence of an unlawful motive can invalidate a policy that would otherwise survive the *Turner* test," the evidence introduced by PLN is "too insubstantial to do so."  *Hatim*, 760 F.3d at 61; *see also Prison Legal News v. Stolle*, No. 2:13CV424, 2014 WL 6982470, at *6 n.2 (E.D. Va. Dec. 8, 2014) (rejecting applicability of motive and holding, in the alternative, that PLN failed to present sufficient evidence of "unlawful motive" that could "invalidate a policy that would otherwise survive the *Turner* test").  As previously explained, the emails simply do not evidence unlawful animus on the part of FDOC administrators.  Neither does

the other circumstantial evidence.  PLN thus failed to show that the FDOC applies

Rule 33-501.401(3)(l) and (m) in a biased fashion.

Setting neutrality aside, this Court now turns to the gravamen of PLN's First

Amendment challenge.  PLN advances three principal reasons for why there is no

rational connection between the censorship at issue and the stated penological

objectives.

The first argument boils down to a dispute about the evidentiary burden

necessary to establish a "rational" connection.  Everyone, even PLN's expert,

agrees that the underlying services addressed in Rule 33-501.401(3)(l) and (m)

unquestionably compromise public safety and prison security.  *See, e.g.*, Tr. of

Trial 68-69 (Jan. 8, 2015) (summarizing how even PLN's expert agrees that the

underlying services compromise security); Tr. of Trial 203:9-:15 (Jan. 5, 2015)

(admitting that "[those services raise] very legitimate concerns").  This is why the

FDOC forbids prisoners from using them.

But PLN says that evidence that prohibiting the use of these services furthers

security is not enough.  This case, PLN insists, is not about those services.  This

case is about censoring a publication because it *advertizes* those services.  That is

correct.  Even so, the FDOC *also* articulated a logical connection between

censorship and the penological objectives at stake, *and* presented sufficient

evidence in support.

The logic is straightforward.  Without question, the proper, initial response to the dangerous services is forbidding prisoners from using them.  Though not surprisingly, they do so anyway.  Tr. of Trial 241-243 (Jan. 7, 2015).  *See generally Washington*, 494 U.S. at 225 ("[A] prison environment, . . . 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.' "  (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984))).  So the FDOC has adopted prophylactic safeguards in addition to bare proscription.

Rule 33-501.401 is such a safeguard.  Advertisements compromise security because they convert a publication into a "one-stop shop"—to borrow from the FDOC's expert—for dangerous services.  Tr. of Trial 71-72:15 (Jan. 8, 2015).  By limiting inmates' exposure, the Rule seeks to reduce the likelihood that inmates will use those services.

PLN responds that such "general or conclusory" articulation of rationality is insufficient to withstand constitutional muster.  Tr. of Trial 64:17 (Jan. 8, 2015).  This Court agrees, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective." *Beard v. Banks*, 548 U.S. 521, 535 (2006).  The FDOC met that burden by providing the testimony of several administrators who, "relying on their professional judgment, reached an *experience-based* conclusion that [censorship] .

. . further[s] [the] legitimate prison objectives." *Id.* at 533 (emphasis added); *see also Prison Legal News v. Livingston*, 683 F.3d 201, 216 (5th Cir. 2012) ("[P]rison policies may be legitimately based on prison administrators' *reasonable assessment* . . . .") (emphasis added).  And, as additional support, the FDOC provided "expert testimony to establish that [censorship] will help curb" prisoners' use of the services.  *Perry*, 664 F.3d at 1366 (holding that expert testimony is sufficient to establish rational connection; deferring to the opinion of FDOC administrator James Upchurch, who is also a witness in this case).

None of this suffices for PLN.  It wants specific past incidents.  And not merely some past example of an inmate using a prohibited service to do something bad; PLN demands a concrete, unfortunate incident caused by an inmate using a banned service, which the inmate learned about in *Prison Legal News*.  *See, e.g.*, Tr. of Trial 66:2-:8 (Jan. 8, 2015).

No controlling precedent in this Circuit requires the FDOC to provide evidence of an actual, past incident.  *See, e.g.*, *Perry*, 664 F.3d at 1363 (affirming summary judgment in favor of the FDOC on First Amendment challenge to prison regulation despite fact that the FDOC failed to cite specific instances of the alleged problem in Florida).  Several other circuits likewise do not require it.  *See, e.g.*, *Murchison v. Rogers*, 779 F.3d 882, 890 (8th Cir. 2015) ("[P]rison officials need not wait until particular prohibited material causes harm before censoring it . . . .");

*Livingston*, 683 F.3d at 216 ("[P]rison policies may be legitimately based on prison administrators' reasonable assessment of *potential* dangers.").  But even if such evidence were required, FDOC administrators provided examples, both in Florida and throughout the country, of problems associated with specific services that advertize, or have advertized, in *Prison Legal News*.  *See, e.g.*, Tr. of Trial 5-6, 39-41 (Jan. 6, 2015) (explaining that FDOC officials learned of a company that had been sending prisoners money for stamps, and how such companies could distribute money for prisoners to people in the outside world in exchange for stamps; this company had previously advertized on *Prison Legal News*).

PLN's second reason is that the FDOC applies the Rule arbitrarily.  PLN introduced evidence of identical issues of *Prison Legal News* censored at separate FDOC facilities on different grounds, as reflected on the impoundment notice accompanying the censorship.  There is also some testimony about issues that were initially admitted at some facilities while denied at others.  Lastly, PLN stresses that advertisements for other prohibited services and products are not censored by the FDOC.  PLN maintains that these inconsistencies amount to an irrational application of the Rule.

Case law supports the proposition that the consistency with which a regulation is applied matters for determining whether it is rationally connected to a legitimate penological objective.  "The existence of *similar* material within the

prison walls may serve to show inconsistencies in the manner in which material is censored such as to undermine the rationale for censorship or show it was actually censored for its content." *Murchison*, 779 F.3d at 890 (emphasis added). In addition to inconsistent censorship of "similar" material, general "inconsistencies could [also] become so significant that they amount to a practical randomness that destroys the relationship between a regulation and its legitimate penological objectives." *Id.* (quoting *Livingston*, 683 F.3d at 221); *see also Thornburgh*, 490 U.S. at 417 n.15.

Although PLN has presented evidence of inconsistent censorship decisions made by FDOC mailroom staff, this Court does not believe PLN demonstrated inconsistencies that rise to a level of randomness or that undermine the rationale for censoring *Prison Legal News*. The fact that mailroom personnel do not uniformly censor *Prison Legal News* on the same grounds is not dispositive. "With the volume of material that must be screened, we cannot expect prison officials to perfectly screen all material that violates prison regulations." *Murchison*, 779 F.3d at 890. Inconsistent application by mailroom staff goes more to the vagueness of the Rule.

In any event, mailroom staff decisions are not final and do not permanently compel censorship of the magazine throughout Florida. Initial impoundment decisions are subject to review by the LRC. The LRC rejects the publication on

the grounds it thinks adequate.  That decision is then uniformly applied throughout

Florida because once the LRC makes a decision, there is no further individualized

review by mailroom staff.

This pares down the risk of randomness and distinguishes this case from

*Thornburgh*,[22] where each prison warden independently decided censorship, such

that "certain federal prisons had excluded the *very same book* that others had

allowed."  *Livingston*, 683 F.3d at 221.  Here, the very same issue of *Prison Legal

News* is eventually censored throughout the FDOC.  Like in *Livingston*, the LRC's

"system-wide" "exclusion decisions" make the inconsistencies "only arguable,"

because the only apparent inconsistencies left to sort out are the decisions to admit,

for example, an advertisement about guns versus one about three-way calling.  *Id.*

This Court refuses to engage in such "one-to-one comparisons" of specific ads.  *Id.*

Not because these inconsistencies are irrelevant.  But rather, due to the substantial

deference owed prison administrators regarding which type of advertisement is

more problematic.

Absent a showing that the FDOC is admitting other magazines containing

advertisements closely resembling those found in *Prison Legal News*, which there

is none, this Court holds that the "limited amount of inconsistency at the margins

---

[22] Yet, even the inconsistencies in that case did not defeat an otherwise rational connection.  *Thornburgh*, 490 U.S. at 417 n.15 (addressing the "seeming inconsistencies" in that case and holding that the regulation at issue struck "an acceptable balance" between uniformity and individualized review).

of [the FDOC's] exclusion decisions is not enough to defeat the reasonableness of [the FDOC's] practices." *Id.*

The last argument PLN advances is that other FDOC regulations undermine the Rule to such a great extent that they render the Rule's connection to security irrational. To illustrate, among the many such rules explored at trial is a regulation permitting inmates to list cell phone numbers on their preapproved contact list and another allowing inmates up to 40 stamps at any given time. *See* Tr. of Trial 22:5-:10 (Jan. 6, 2015); Tr. of Trial 188:3-:4 (Jan. 5, 2015). PLN asserts that these rules undermine the logic behind censoring some of the services singled out in (3)(l). Cell phones have three-way calling and call-forwarding capabilities identical to, or better than, the services advertized on *Prison Legal News*. The FDOC has no way of knowing a cell phone user's location, just like it does not know the location of the person on the other end of a forwarded call. Tr. of Trial 197 (Jan. 5, 2015); Tr. of Trial 22:5-:10 (Jan. 6, 2015). Also, the FDOC allows inmates to have stamps and allows families to send inmates stamps despite their contention that they are a serious hazard in prisons. *See* Tr. of Trial 188:3-:4 (Jan. 5, 2015).

An FDOC administrator explained each conflicting rule. Cell phones are ubiquitous in modern society. Prohibiting inmates from calling cell phones would effectively preclude them from speaking with many of their loved ones who no longer carry land lines. The FDOC could theoretically impose such a draconian

rule, but it would surely lead to increased tension within prisons.  *See* Tr. of Trial 102-103 (Jan. 7, 2015) (summarizing practical impossibility).

Likewise, the FDOC once proposed a rule that would have embargoed stamps sent by family members to an inmate by mail.  Tr. of Trial 23 (Jan. 6, 2015).  Under the proposed rule, families would have been limited to depositing money into inmates' prison accounts which the inmate could then use to purchase stamps.  Families and friends of prisoners vehemently opposed the proposal, expressing concern that the rule would increase the likelihood that their imprisoned loved ones would either be victimized or simply not purchase any stamps at all. Tr. of Trial 23-24 (Jan. 6, 2015).  Moreover, FDOC officials testified that implementing the accounting measures proposed by PLN to counteract the problems with stamps would be too costly and require amending state statutes.  Tr. of Trial 25 (Jan. 6, 2015).  Nearly every other seemingly paradoxical regulation in place also had some corresponding explanation.

Running a prison system is not easy.  Prison administrators, charged with the unenviable task of "deal[ing] with the difficult and delicate problems of prison management," must make considered decisions that balance order, security and resources. *Thornburgh*, 490 U.S. at 407-08.  The first *Turner* factor requires this Court to determine whether the censorship at issue is rationally related to legitimate penological objectives.  Finding that it is both rational and supported by

evidence, this Court declines PLN's invitation to disrupt the balance struck by the FDOC.

The remaining factors tilt in the FDOC's favor as well.  When considering whether alternative means of exercising the abridged right remain open to the plaintiff, the Supreme Court instructs courts to view " 'the right' in question . . . sensibly and expansively."  *Id.* at 417.  This means that the alternatives need not be perfect substitutes.  *Livingston*, 683 F.3d at 218.

The Rule leaves open sufficient alternatives for PLN to express their point of view to inmates.  First, as in *Perry*, the Rule does not completely prevent PLN from corresponding with inmates.  664 F.3d at 1366.  There are countless other written materials that PLN may send prisoners.  As the Fifth Circuit in *Livingston* explained, if alternative means existed in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), "where prisoners were cut off from [a] unique and irreplaceable [activity]"—"a unique religious ceremony"—surely there are alternatives to a magazine.  683 F.3d at 219.

Second, even *Prison Legal News* is not invariably censored.  The Rule applies only when a particular issue's advertising content crosses a certain threshold.[23]  And while this Court accepts that advertisements are necessary, the unfeasibility of printing *Prison Legal News* without advertising content is not

---

[23] This threshold, however, is almost impossible to identify.  As this Court will explain shortly, vagueness is principally responsible for the Rule's disparate application.

dispositive.  PLN has not proven that it is unable to adopt advertising rubrics that would help bring its magazine in line with prison regulations.

The third factor is the impact the accommodation of the asserted constitutional right will have on guards, inmates and prison resources.  In this case, "the class of publications" excluded by the Rule "is limited to those found potentially detrimental to order and security." *Thornburgh*, 490 U.S. at 418.  The evidence demonstrates that accommodating the specific way in which PLN seeks to exercise its right—through a publication containing dangerous amounts of advertising content—would "significantly less[en] liberty and safety for everyone else, guards and other prisoners alike." *Id.*  The Supreme Court has held that this fact alone pushes the third factor in FDOC's favor.  *Id.* (deferring to the "informed discretion of corrections officials" who had said that accommodating the right would lessen liberty and safety for "everyone else, guards and other prisoners").

The final *Turner* factor is whether there are "easy alternatives" indicating that the regulation is not reasonable, but rather an "exaggerated response" to prison concerns.  482 U.S. at 90.  This is not an inquiry into whether prison officials adopted the "least restrictive alternative." *Id.* at 90-91.  "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

As this Court explained during its discussion of rationality, there are no "easy alternatives" available to the FDOC. The prohibition against using the services themselves is not enough. Similarly, the alternatives suggested by PLN to eliminate the security concerns either have equally unattractive side effects or are costly to implement.

Additionally, with respect to subsection (3)(l), "[a]lthough the FDOC did not need to narrowly tailor its Rule to only prohibit" publications containing "prominent or prevalent" offending advertisements, it adopted a less exaggerated response than censorship for *any* amount of offending advertising content. *Perry*, 664 F.3d at 1367. And as to subsection (3)(m), this Court is "comforted by the individualized nature of the determinations required by the regulation," under which a publication is censored only if the LRC determines that it "presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person." *Thornburgh*, 490 U.S. at 416.

Admittedly, the fact that Florida is the only state that currently censors *Prison Legal News* for its advertising content is troubling—at least for purposes of determining whether the Rule is indeed an exaggerated response. Some states *have* censored the publication for its advertising content. New York once censored it for carrying advertisements about services accepting stamps as payment. Tr. of Trial 81-82 (Jan. 5, 2015). New York eventually settled on a less restrictive way of

furthering its security interest without censoring the entire magazine: attaching a notice warning prisoners that the services advertized are prohibited. *Id.* Even if this is the sounder policy, the FDOC is not required to implement the least restrictive regulation. Moreover, the FDOC may be constrained in ways that New York's department of corrections is not. Significant variances would make comparison futile. Comparing different states' department of corrections is difficult, and in this case the parties did not submit sufficient evidence to do so.

This Court is also not blind to the *many* other worrisome facts uncovered at trial. The most disconcerting is the Rule's vagueness. None of the witnesses at trial were able to articulate any reasonably specific guidelines to determining when advertisements were "prominent or prevalent." Some considered whether font was large and bolded to determine prominence. Others looked to the size of the advertisements. For prevalence, no one could identify a cutoff. With no framework handy, this Court would probably be unable to apply the Rule to those publications at the margins. Yet FDOC officials felt very strongly about their ability to determine prominence and prevalence correctly. It seems that they, unlike this Court, "know it when [they] see it." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

To make matters worse, the LRC, the final decision-maker, *never* reviews an entire publication or book when it makes its decision. As this Court mentioned

earlier, this means that final determinations about *prevalence* are made without knowing whether, for instance, the four or five pages copied and attached to the impoundment notice are four or five out of one hundred, one thousand.

That being said, there is no void-for-vagueness claim pending.  This lawsuit instead focuses on whether the FDOC has applied subsections (3)(l) and (m) to *Prison Legal News* in a manner reasonably related to legitimate penological interests.  Courts have wrestled with the role played by *general* vagueness in the *Turner* analysis.  *See Martinez v. Fischer*, No. CIV S-10-0366 GGH P, 2011 WL 4543191, at *8 n.4 (E.D. Cal. Sept. 28, 2011) ("[T]he undersigned has trouble fitting the *Turner* test, an analysis focused on the legitimacy of prison regulations, with an analysis focused on whether regulations are understandable."); *Miller v. Wilkinson*, No. 2:98-CV-275, 2010 WL 3909119, at *5 (S.D. Ohio Sept. 30, 2010) (noting that "[p]rison regulations are not often challenged on vagueness grounds" and that some courts have held that "the First Amendment overbreadth doctrine, do not 'apply with independent force in the prison-litigation context' " (quoting *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999))); *Bahrampour v. Lampert*, 356 F.3d 969, 975-76 (9th Cir. 2004) (applying *Turner* test despite inmate's assertion that vagueness and overbreadth claims must be considered separate and apart from application of *Turner* test.); *cf. Sweet v. McNeil*, No. 4:08CV17-

50

RH/WCS, 2009 WL 903291, at *7 (N.D. Fla. Mar. 31, 2009) (Hinkle, J.) (importing deferential principles to void-for-vagueness suit, in light of *Turner*).[24]

In this case, all *Turner* factors support the FDOC. This includes the last one, where, instead of banning any amount of offensive advertisement, the FDOC elected the less restrictive option of allowing publications with some advertising content. The difficulty of applying the more reasonable option should not, and does not, overcome the other *Turner* factors. The uniformity with which the publication has been rejected by the LRC, both at the time and after re-reviewing the censored issues in preparation for trial, further alleviates the concern that the Rule cannot be applied intelligibly. Finally, the Rule here seems equally as difficult to apply as the one in *Thornburgh*, but that did not preclude a finding in the government's favor. *See* 490 U.S. at 428 (Stevens, J., concurring in part and dissenting in part) (addressing the regulation's vagueness).

This Court therefore holds that PLN has failed to show that the FDOC's censorship of *Prison Legal News* is not "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

---

[24] PLN does not argue that the *Turner* analysis entirely subsumes the void-for-vagueness inquiry. Moreover, PLN moved to amend their complaint to add a void-for-vagueness claim. This implies that PLN also thinks that the two claims are separate and distinct. In addition, there has not been *any* argument on the issue of whether void-for-vagueness and overbreadth claims apply with independent force in the prison context. This Court accordingly treats them as separate claims.

## C

The final issue is whether the FDOC violated PLN's due process rights in its impoundment of *Prison Legal News*, the *Prisoners' Guerilla Handbook* and the information packets sent to FDOC inmates.

The "decision to censor or withhold delivery of a particular [publication]," such as *Prison Legal News*, "must be accompanied by minimum procedural safeguards."[25]  *Procunier*, 416 U.S. at 417.  Under *Procunier*, those safeguards are: (1) notifying the intended recipient-inmate; (2) giving the author of the publication a reasonable opportunity to protest the decision; and (3) referring complaints about the decision to a prison official other than the person who originally disapproved the correspondence.[26]  *Id.* at 418-19.

---

[25] *Procunier* addressed the due process afforded prisoners and their correspondents when exchanging letters.  Circuit courts have extended the due process safeguards to magazine publishers.  *See Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004); *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).  They have held that a publisher's right to due process does not depend on notifying the inmate.  *Jacklovich*, 392 F.3d at 433-34.

[26] The FDOC seems to have abandoned its argument that *Mathews v. Eldridge* applies. 424 U.S. 319 (1976).  Even if *Eldridge* did apply, *see Perry*, 664 F.3d at 1368, it would similarly require of the FDOC the same procedural safeguards this Court sets forth in this order.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Eldridge*, 424 U.S. at 333.  A "meaningful manner" presupposes that the deprived party be provided with the information necessary to mount a meaningful challenge to the deprivation.  In this case, that means informing PLN of the distinct, independent bases upon which its magazine has been impounded.  Sharing this information is critical to reducing the risk of erroneous deprivation.  Testimony about the ease of making additional copies suggests that the costs of implementation are minimal.  The upshot of doing so benefits the government's interest in due process of law and ensures that PLN has a meaningful opportunity to contest the deprivation.

PLN claims that the current review process violates *Procunier* because only the institution that initially impounds an issue of *Prison Legal News* is required to provide the publisher notice.   Publishers, PLN argues, are entitled to notice every time a *copy* of an issue is impounded.   This is so even if later impoundment decisions duplicate earlier determinations.   The FDOC responds that since all issues of *Prison Legal News* are alike, PLN is only entitled to one notice per issue.

Neither party properly demarks the requirements of due process.   *Procunier* demands that the publisher "be given a *reasonable* opportunity to protest" the censorship.   *Id.* at 18 (emphasis added).   For an opportunity to be reasonable, the publisher must know of the grounds upon which the publication has been censored. *See* Henry J. Friendly, *"Some Kind of Hearing"*, 123 U. Pa. L. Rev. 1267, 1280 (1975) (explaining that it is "fundamental" to due process that "notice be given . . . that . . . clearly inform[s] the individual of the proposed action and the grounds for it").   This knowledge component of due process does not turn on whether the publication is the first copy or a subsequent copy.   What matters is the basis for censorship.   If a subsequent impoundment decision is based on a *different* reason not previously shared with PLN, due process requires that PLN be told of this new reason.

The FDOC's current policy of providing notice once per issue should theoretically satisfy this formulation.   Under the Rule, once one institution

impounds an issue of *Prison Legal News*, a later institution must *automatically* impound that same issue pending a final rejection determination by the LRC.  Fla. Admin. Code R. 33-501.401(8)(c).  The subsequent institution learns of the first institution's reasons for impoundment through a centralized database.  It must then inform its inmate of "the specific reasons why the publication *was* impounded." *Id.* (emphasis added).  That is, the later institution must inform the prisoner of the initial institution's reasons for impoundment.

The succeeding, perfunctory impoundment amounts to "routine enforcement of a rule with general applicability" because it does not raise new grounds for censorship.  *Livingston*, 683 F.3d at 223.  The initial reasons for impoundment having been communicated to PLN, this ordinarily would not require additional notice.

Despite this mechanism, PLN has at times received multiple notices impounding a specific issue of *Prison Legal News* on different grounds.  PLN expresses uncertainty as to how this happens, since the Rule requires future institutions to replicate the first institution's reasoning.  ECF No. 241, at 12 n.10.

One explanation is that sometimes multiple institutions receive the same issue of *Prison Legal News* simultaneously.  When that happens, each institution thinks of itself as an initial impounding institution.  In that scenario PLN should receive a notice *per* initial impounding institution.  But the moment these

simultaneous, initial impoundment decisions are disseminated throughout the

FDOC, later institutions should cease providing independent grounds for

exclusion.

Another explanation is that the Rule is not always followed.  And as a result

a subsequent impoundment is not perfunctory, but rather the product of an

independent determination.  *See, e.g.*, ECF No. 241, at 11-12 (summarizing

evidence).  Worse, FDOC has at times completely failed to inform PLN of an

impoundment decision, only notifying PLN of a *rejection*.  This means that by the

time PLN received notice, the LRC had already reviewed the initial impounding

institution's decision.

The FDOC claims that even if its employees failed to send PLN

impoundment notices, it cannot be held liable because the failure is merely

negligent.  It cites *Daniels v. Williams*, 474 U.S. 327 (1986), and *Davidson v.

Cannon*, 474 U.S. 344 (1986), in support of the argument that "the Due Process

Clause is simply not implicated by a *negligent* act of an official causing unintended

loss of or injury to life, liberty, or property."  *Daniels*, 474 U.S. at 328.  PLN, in

response, contends that *Daniels* only holds that the *substantive* deprivation must be

caused by conduct beyond mere negligence.  According to PLN, the failure to

provide notice—that is, the process itself—gives rise to liability, even if the

employee only negligently failed to do so.

There seems to be a circuit split on the issue of whether *Daniels* is limited to the substantive deprivation or whether it extends to the process itself.  In *Dale E. Frankfurth, D.D.S., v. City of Detroit*, the plaintiff brought an action under § 1983 for damages resulting from the demolition of a building he owned.  Nos. 86-1476, 86-1825, 1987 WL 44769, at *1(6th Cir. Sept. 17, 1987).  The Sixth Circuit, citing *Daniels*, held that the plaintiff's "failure to receive notice was due to the negligent act of a clerk.  Because the act was negligent, no fourteenth amendment deprivation is involved and there is no constitutional need to provide a remedy." *Id.* at *3; *accord Brunken v. Lance*, 807 F.2d 1325, 1331 (7th Cir. 1986) ("[*Daniels*] teaches that an official does not 'deprive' a person of life, liberty, or property, within the meaning of the Fourteenth Amendment, when an official's negligent act causes the unintended loss of or injury to life, liberty, or property. . . . Given this evidence, [the defendant's] failure to notify [the plaintiff] was at most negligent.").

In contrast, the Third Circuit in *Sourbeer v. Robinson* limited *Daniels* to the substantive deprivation.  791 F.2d 1094, 1104-05 (3d Cir. 1986).  In so doing, it summarized the distinction well:

> Cases such as *Davidson*, dealing with a state of mind requirement for § 1983/due process actions, relate only to the highly unusual circumstance where the *deprivation* of life, liberty, or property the case is predicated upon was not intentional, as opposed to where the failure to provide adequate process was not intentional.  For example, in *Davidson* prison guards negligently failed to take action to protect

one prisoner who was threatened by another, allegedly "depriving" him of a liberty interest in being free of assaults. . . . In [*Daniels*] it was alleged that a correctional deputy had negligently left a pillow on a stairway, causing the plaintiff to slip and thereby "depriving" him of a liberty interest. These cases, it is readily apparent, are of a highly unusual nature—the defendants had probably not even been aware until after the fact of the "deprivations" that would trigger due process concerns. "To hold that injury caused by such conduct is a *deprivation* within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law."

Here, in contrast, the keeping of Sourbeer in administrative custody—depriving him of liberty—was itself an intentional act. That being the case, it was not necessary for the district court to make any other state of mind finding. We know of no authority for the proposition that an intentional deprivation of life, liberty or property does not give rise to a due process violation because the failure to provide due process was without fault.

*Id.* (citations omitted). As far as this Court or the parties can tell, the Eleventh Circuit has not spoken on the issue.

This Court believes that the Third Circuit has the better-reasoned opinion. This is particularly true here, where the relief sought is declaratory and injunctive. Even supposing that the "fault" associated with past failures matters for recovering damages against the government, an injunction pivots on the "independent legal right . . . being infringed." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005). The right in this case implicates "the most rudimentary demands of due process of law"—notice. *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965). Just because past failures were the product of negligent

conduct does not absolve the FDOC of its constitutional obligation to provide notice going forward.

In any event, PLN has shown that the FDOC's failure to provide notice exceeded negligence. The systemic failure of FDOC personnel to provide notice 42% of the time reveals that the failures were not coincidental. The high failure rate indicates a substantial risk, one disregarded by FDOC administrators. At the very least this amounts to recklessness or gross negligence, which everyone agrees suffices for a due process violation. *See Fagan v. City of Vineland*, 22 F.3d 1296, 1305 (3d Cir. 1994) (collecting cases); *Burch v. Apalachee Cmty. Mental Health Servs., Inc.*, 840 F.2d 797, 802 (11th Cir. 1988), *affirmed sub. nom. Zinermon v. Burch,* 494 U.S. 113 (1990) (holding allegations of actions taken willfully, wantonly, and with reckless disregard sufficient to state a due process claim). *See generally Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (deliberate indifference is conscious disregard of a substantial risk).

This same reasoning applies to impoundment of the *Prisoners' Guerilla Handbook* and the information packets. The record unquestionably establishes that FDOC personnel failed to notify PLN on a couple of occasions that it had impounded the *Prisoners' Guerilla Handbook* and the information packets. The injunction is appropriate because those failures are part of the greater, widespread practice of not providing notice.

Before concluding, this Court addresses two remaining arguments.  First, the FDOC contends that PLN waived due process.  Mr. Wright admitted that at some point PLN stopped appealing impoundment decisions.  Tr. of Trial 159:20-160:2 (Jan. 5, 2015).   Apparently PLN thought appealing was futile.  From this the FDOC concludes that it no longer had to apprise PLN of impoundment decisions since, in all likelihood, PLN would not have appealed.

The problem with that logic is that the reasons for impounding *Prison Legal News* vary.  Indeed, the Rule proscribes "total[] rejection" of a periodical and mandates that "each issue of the subscription . . . be reviewed separately."  Fla. Admin. Code R. 33-501.401(5).  That PLN did not appeal past impoundments does not necessarily mean that it will not appeal future impoundments based on different reasons.  The old adage that past behavior does not predict future performance rings truer here, where the underlying circumstances change over time.

More importantly, the FDOC failed to notify PLN of many impoundment decisions.  Of course PLN did not appeal.  It did not know that an issue had been censored, by which institution, and on what grounds.  The fact that PLN may have *later* received a copy of an impoundment notice from an *inmate* is of no consequence.  Notice must be timely and must set forth the basis for censorship, which many impoundment notices introduced at trial clearly did not.  *Armstrong*,

380 U.S. at 552 ("[The opportunity to be heard] must be granted at a meaningful time and in a meaningful manner.").  Given these deficiencies, PLN did not waive its right to due process by failing to appeal.

Finally, PLN asserts that the LRC's practice of affirming an impoundment decision on different or additional grounds than that found by the initial impounding institution violates *Procunier*.  Recall that *Procunier* instructs that certain "minimum procedural safeguards" must accompany the decision to censor a periodical.  416 U.S. at 417.  PLN says that the LRC's practice violates the third safeguard requiring that complaints about a censorship decision be referred to someone other than the prison official who "originally disapproved the [publication]."  *Id.* at 418-19.  PLN says that by censoring a publication on a different or additional basis, the LRC effectively becomes the "original" decision-maker.  And because no other prison official reviews the LRC's decisions, PLN is left to ask the LRC to review its own decision, in violation of *Procunier*.

Under PLN's view, the *reason* for censorship determines who "originally disapprove[s]" the publication.  There would be a different "original" decision-maker for each new reason.  But *Procunier* is not so specific.  It only requires that a different prison official review the original censorship.  It says nothing about whether that review must be limited to the reasons originally given.

This is consistent with *Baker on Behalf of Baker v. Sullivan*, 880 F.2d 319, 320 (11th Cir. 1989), which PLN relies on to argue that expanding the scope of review without notice violates due process.   In this case the issue never expands. The initial impounding institution is tasked with determining whether a particular publication violates the Rule.  The same issue that the LRC must decide.

## V

The Supreme Court has made it clear that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84.  Yet these protections mean little if inmates do not understand them.[27]  Cue PLN.  Through its publications PLN teaches inmates their rights and informs them of unconstitutional prison practices.  With this knowledge inmates become another check to government encroachment on constitutional rights.  This in turn helps prison administrators correct insidious practices, ensuring long-term stability.  Everyone ultimately benefits when knowledge grows from more to more.

But the Constitution does not guarantee PLN unfettered communication with inmates.  That right must be balanced against the legitimate penological concerns inherent in running a prison system.  In this case, the FDOC requires PLN to conform its written communications to Rule 33-501.401(3), which censors

---

[27] This is even more pernicious considering how prisoners are not afforded counsel and how prisons limit inmates' access to the prison library, books, and legal materials.

publications containing certain types of advertisements.  After carefully considering the evidence presented at trial and the arguments made by the parties, this Court concludes that the FDOC's censorship of *Prison Legal News* under subsections (3)(l) and (m) of the Rule does not violate PLN's First Amendment rights because the censorship reasonably relates to public safety and prison security.

That the censorship in this case complies with the First Amendment, however, does not give the FDOC license to censor without regard to its due process obligations under the Fourteenth Amendment.  But that is precisely what the FDOC has done, repeatedly.  It has impounded multiple issues of *Prison Legal News* and other PLN mail without notifying PLN.  Adhering to its regulations, it then fails to notify PLN when the mail is finally rejected.  The FDOC will continue to do this going forward absent interjection by this Court.

For these reasons,

**IT IS ORDERED:**

1.     Judicial estoppel does not preclude the Florida Department of Corrections from adopting its current litigation position.

2.     The Florida Department of Corrections' censorship of *Prison Legal News* under Rule 33-501.401(3) of the Florida Administrative Code does not violate Prison Legal News' First Amendment rights.

3.     The Florida Department of Corrections' censorship procedures violate Prison Legal News' right to due process under the Fourteenth Amendment.

4.     The Clerk shall enter judgment stating:

Prison Legal News' First Amendment claim against the Florida Department of Corrections is dismissed with prejudice.

Prison Legal News successfully proved that the Florida Department of Corrections has violated its right to due process under the Fourteenth Amendment. Prison Legal News has also shown that the Florida Department of Corrections' current censorship practices will continue to deprive Prison Legal News of due process of law.

Accordingly, the Florida Department of Corrections is permanently enjoined from censoring Prison Legal News' written communications without due process of law. To comply with due process of law, this permanent injunction modifies the Florida Department of Corrections' current notification procedures as follows: (1) The Florida Department of Corrections must notify Prison Legal News when it first impounds a particular written communication by Prison Legal News. (2) The notification must specify the prison rule, including the subsection, purportedly violated and must indicate the portion of the communication that allegedly violates the cited regulation. (3) The Florida Department of Corrections does not have to notify Prison Legal News when copies of that same written communication are subsequently impounded, unless the subsequent impoundment decision is based on a different or additional reason not already shared with Prison Legal News. (4) The Florida Department of Corrections' Literature Review Committee must notify Prison Legal News of any final determination regarding written

communication by Prison Legal News.    (5) The Literature Review Committee's notification must provide the basis for its decision, including the specific prison rule violated and the portion of the communication that violates the cited regulation.  (6) The Florida Department of Corrections does not have to notify Prison Legal News when copies of that same written communication are subsequently rejected, unless the subsequent rejection decision is based on a different or additional reason not already shared with Prison Legal News.

5.    Although all claims have been adjudicated, the Clerk must **not** close

the file.  This Court retains jurisdiction over the open file to decide

costs and attorney's fees, if any.

**SO ORDERED on August 27, 2015.**

<u>s/Mark E. Walker</u>            
**United States District Judge**